## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| INFOGROUP, INC., infoUSA, INC., and infoUSA MARKETING, INC., Delaware corporations,<br><br>Plaintiffs,<br><br>v.<br><br>DATABASELLC d/b/a Database101.com, d/b/a InfoFree.com, and d/b/a AtoZ Databases, a Nevada limited-liability company, VINOD GUPTA, BLAKE VAN GILDER, JASON DAILEY, MARK PULJAN, JON McCORMICK, and JOHN DOES 1-20,<br><br>Defendants. | Case No. 8:14-cv-49<br><br><br>COMPLAINT<br><br>JURY TRIAL REQUESTED |

COME NOW Plaintiffs Infogroup, Inc., infoUSA, Inc., and infoUSA Marketing, Inc., (collectively, "Infogroup" or "Plaintiffs") and, for their Complaint against DatabaseLLC d/b/a Database101.com, d/b/a InfoFree.com, and d/b/a AtoZ Databases (collectively, "DB101"), Vinod Gupta ("Gupta"), Blake Van Gilder ("Van Gilder"), Jason Dailey ("Dailey"), Mark Puljan ("Puljan"), Jon McCormick ("McCormick"), and John Does 1-20 (collectively, "Defendants"), state the following:

### PARTIES

1.      Plaintiffs are Delaware corporations with their principal places of business in Papillion, Nebraska.

2.      DB101 is a Nevada limited liability company with its principal place of business at 1121 John Galt Blvd., Omaha, Nebraska 68137.

3.      Vinod Gupta is a resident of the State of Nebraska, a former officer and shareholder of Infogroup and current officer of DB101 .

4.      Blake Van Gilder is a resident of the State of Nebraska, a former employee of Infogroup, and, on information and belief, a current employee of DB101.

5.      Jason Dailey is a resident of the State of Nebraska, a former employee of Infogroup, and, on information and belief, a current employee of DB101.

6.      Mark Puljan is a resident of the State of Illinois, a former employee of Infogroup, and, on information and belief, a current employee of DB101.

7.      Jon McCormick is a resident of the State of Nebraska, a former employee of Infogroup, and, on information and belief, a current employee of DB101.

8.      John Does 1-20 are yet to be identified current or former employees of DB101, on information and belief all residents of the State of Nebraska, who were formerly employed by Infogroup.

## JURISDICTION AND VENUE

9.      Jurisdiction in this Court and in the subject matter of this action arises under the Computer Fraud and Abuse Act, 18 U.S.C. §1030; the copyright and trademark laws of the United States, 17 U.S.C. §§ 501 and 15 U.S.C. §§ 1051, et seq.; 28 U.S.C. §§ 1331; and under the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367.

10.     This Court may exercise personal jurisdiction over Defendants based upon their presence within this judicial district and, upon information and belief, their transaction of business and other activities within the District of Nebraska.

11.     Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims set forth in this Complaint occurred within this judicial district and Defendants reside in this judicial district.

## FACTUAL ALLEGATIONS OF THE COMPLAINT

### *Overview*

12.     Database marketing companies are in the business of amassing and maintaining accurate information about businesses and consumers, and selling access to those proprietary lists using convenient websites enabled by powerful, user-friendly computer programs. DB101, a relatively new database marketing company, has, on information and belief, attempted to achieve a competitive business advantage by simply misappropriating Infogroup's database in whole, marketing it to the public as its own, copying Infogroup's industry-leading computer programs for presenting data to users, and even presenting itself to the public as Infogroup and other tortious conduct. Infogroup brings this action to stop DB101's misappropriation and illegal conduct, and to recover for its losses and significant damages caused by DB101's wrongful conduct.

### *Infogroup*

13.     Infogroup collects, combines and analyzes business and consumer information, marketing data, and digital engagement solutions for sales, marketing and business professionals around the world. Infogroup's data and marketing solutions help its customers, which include companies of all sizes, find new prospects, deepen relationships with existing customers and reach businesses and consumers at home, at work and online. Infogroup's business data, over the years, has become a true national resource. It is also used by the top internet search engines, vehicle navigation and on-board assistance systems to power their Point-of-Interest and business search capabilities. Infogroup database customers also include federal, state and local government agencies, emergency services and first responders, libraries, universities, and public

and private institutions of all types.  Infogroup's products and services include data compilation, direct marketing, list management, sales leads, mailing lists, interactive marketing, e-mail marketing, analytics, and data processing.

14.   Infogroup was established in 1972.  Infogroup currently maintains demographic, marketing and other related information on approximately 210 million consumers, 17 million U.S. businesses and 12 million executives.  Infogroup collects data directly from a multitude of original public and proprietary sources, including demographic and marketing information on consumers and businesses.  Infogroup then uses proprietary analytical systems and tools to accurately and comprehensively categorize millions of consumers and businesses into compilations of data sets.

15.   Achieving and maintaining comprehensive databases of such a national scale with high quality and accuracy is a Herculean task – Infogroup maintains a staff of over 400 data professionals just to collect and keep the data collection accurate and up to date.  Infogroup's work includes identifying new sources of data; procuring those data sources; testing and qualifying the sources; converting the sources; identifying and solving overlap between sources; and applying proprietary methods to maximize coverage efficiently.

16.   To maintain the accuracy of the data, all of Infogroup's databases are updated on a continuous basis.  The process includes the application of proprietary modeling and algorithms to data from a multitude of sources to insure that accurate data elements are included in the databases.  Infogroup engages in ongoing and constant efforts to verify and re-verify data through a variety of automated and human methods.

17.   Infogroup's time-tested process for collecting, compiling, and distributing its data has created a reputation within the industry for accuracy and quality.

18.     Infogroup has spent decades and considerable time and money cultivating its reputation, goodwill, and relationships with its customers. To enhance its goodwill with customers, Infogroup maintains highly confidential and detailed records of its customers, including purchasing history and, with respect to businesses, the identity of the person responsible for making purchases. This compilation of customer data has significant value by not being known to Infogroup's competitors.

19.     To deliver Infogroup's valuable data to its customers, and thereby to better serve its customers, Infogroup has developed and maintained the following websites and products, among others: "InfoUSA.com," "Salesgenie.com," "ReferenceUSA.com" and "Credit.net."

20.     "InfoUSA.com" provides businesses and other consumers with mailing lists and sales leads, end-to-end marketing solutions, email marketing and direct-mail marketing services, search-engine marketing, data processing, custom sales-lead generation and business-credit reports, among other services and products.

21.     "ReferenceUSA.com" is one of the premier sources of business and residential information for research and reference needs. The website caters to researchers, students, job-seekers, small-business owners, and entrepreneurs. "ReferenceUSA.com" helps users create marketing plans, analyze market-based and consumer data, search for job opportunities, and research demographic data, among other services.

22.     "Salesgenie.com" provides businesses and professionals a complete solution to acquire and retain customers. It includes access to sales leads and mailing lists, detailed information about their customers, ability to research target markets, prospects and customers, and the ability to reach these customers through email marketing, direct mail and online advertising.

23.     "Credit.net" allows businesses to obtain credit reports and other business information on over 15.5 million U.S. and Canadian businesses, including public and privately-owned businesses.

24.     For each of the above listed websites – "InfoUSA.com," "ReferenceUSA.com," "Salesgenie.com" and "Credit.net" – Infogroup spent considerable time and money developing the visual design and layout, i.e., the graphic interface, of windows, tables, text boxes, buttons, color schemes, typefaces, selection and arrangement of words, and other like elements that exist on each respective website.

25.     For each of the above listed websites – "InfoUSA.com," "ReferenceUSA.com," "Salesgenie.com" and "Credit.net" – Infogroup spent considerable time and money gathering, developing, compiling and arranging the data and other information available on each respective website.

26.     In most cases, Infogroup's customer-related information – including customer lists – and the information found in Infogroup's other data compilations is confidential, proprietary, and password protected.  The information has independent economic value from not being known to others, specifically Infogroup's competitors.  As such, only limited individuals within Infogroup are allowed access to this information.

### *DB101*

27.     In or around October 2009, Vinod Gupta, a former shareholder and officer of Infogroup and its predecessors, left Infogroup and formed DB101.  Gupta did not leave Infogroup voluntarily and, upon information and belief, he is still interested in either owning Infogroup or running it out of business.  As recently as August 2011, Gupta was quoted in the Omaha World Herald as being interested in buying Infogroup, if it were ever for sale.

28.     The nature of DB101's business is "database compilation, sales leads and marketing list sales and data processing." DB101 is a direct competitor to Infogroup.

29.     Upon information and belief, DB101 has intentionally targeted, recruited, and hired more than 30 former Infogroup personnel into key positions at DB101 relating to their work at Infogroup.  In particular, DB101 has hired several key employees of Infogroup whose positions at Infogroup immersed them in some of Infogroup's most valuable trade secrets, including Defendants Van Gilder, Dailey, Puljan, and McCormick, to perform equivalent or similar job functions for DB101.  Upon information and belief, DB101 assigned these former key Infogroup employees tasks at DB101 that duplicated their assigned tasks at Infogroup, and thereby duplicated Infogroup's processes, technical systems, computer programs and business plans and methods, or otherwise used Infogroup proprietary information and trade secrets in an attempt to poach Infogroup customers.

30.     DB101 has represented that it is not an original compiler of data; rather, it purchases data from other sources and re-packages this data for sale.

31.     DB101 owns and operates "Infofree.com," a website that provides "unlimited sales leads" and "mailing lists," the same types of services and products provided by Infogroup's "InfoUSA.com" and "Salesgenie.com."

32.     DB101 owns and operates the website "DatabaseUSA.com," which, like Infogroup's "InfoUSA.com," provides consumers with mailing lists, database marketing, direct mailing and email marketing services.

33.     DB101 owns and operates the website "AtoZDatabases.com," which bills itself as the "premier marketing and reference database," but at prices "30%" less than "the competition." Like Infogroup's "ReferenceUSA.com," DB101's "AtoZDatabases.com" provides consumers

with information on businesses and households throughout the United States.  And, like Infogroup, Defendants market the services provided by "AtoZDatabases.com" through libraries, public institutions and other channels that are substantially the same channels as the ones Infogroup uses for its "ReferenceUSA.com" services.

34.    DB101 also owns and operates "Creditjam.com," which provides "unlimited business credit reports" and other business information on over 14 million businesses, the same types of services provided by Infogroup's "Credit.net."

35.    The visual layout and graphic interfaces associated with DB101's websites, as listed above, are substantially similar – if not exact duplicates – of the visual layout and graphic interfaces found in Infogroup's websites, as listed above.

36.    The organizational schemes and arrangement of data and other information in DB101's websites, as listed above, are substantially similar – if not exact duplicates – of the organizational schemes and data arrangement found in Infogroup's websites, as listed above.

37.    Infogroup maintains its proprietary databases on a protected computer system and uses such computer system to produce and provide mailing lists and other information to customers in interstate commerce across the United States, and to United States Government agencies themselves.

38.    Infogroup takes steps to protect its proprietary databases from unauthorized access both by maintaining electronic security of its computer system and by requiring employees with access to proprietary information and equipment containing proprietary information to sign nondisclosure agreements limiting the scope of their authority to use information housed on Infogroup-protected computers.

39.    In order to protect its proprietary databases and to monitor potential unauthorized access to such databases by competitors, Infogroup occasionally inserts so-called "seed data" files into its databases.  Each such seed data file typically consists of fictitious name, address, and phone-number combinations.  If seed data listings appear in lists sold or offered for sale by a competitor, it is considered proof that the competitor has gained unauthorized access to Infogroup's protected databases.

40.    Infogroup recently has uncovered evidence that DB101 has obtained access to Infogroup's protected computer systems or information stored on such systems.

41.    On or about June 2013, Infogroup undertook a routine data audit to determine whether its seed data was being incorporated into DB101's databases.  This data audit revealed that more than one of DB101's services, including those published to subscribers through "Infofree.com" and "AtoZdatabases.com," had incorporated numerous listings included in the seed data used by Infogroup in November 2011.  In some cases, DB101 even asserted that the seed data listing – which by definition is fictitious -- had been "verified."  An example of DB101's use of Infogroup's seed data appears below:



42.     DB101 was not and is not authorized to access Infogroup's protected computer systems or its proprietary databases in any form.

43.     On information and belief, the only way for DB101 to have accessed Infogroup's seed data is through unauthorized access of Infogroup's protected computer system.

44.     In some instances, DB101 displayed Infogroup's fictitious seed data listings alongside a graphical element of a check-mark in a circle along with the word "verified," suggesting that DB101 had verified the accuracy of the listing.

45.     Upon information and belief, DB101 misappropriated Infogroup's proprietary databases, marketing them as its own, as well as the computer programs DB101 publishes and uses to present its databases.

46.     Upon information and belief, portions of computer programs used in DB101's websites (and made available in JavaScript) within task areas assigned to former key Infogroup employees who now work for DB101, as detailed above in paragraph 29, are substantially similar to the corresponding portions of computer programs for those tasks in Infogroup's own computer program products.

47.     DB101 has attempted to compete with Infogroup in the business of selling sales leads, marketing list sales, data processing and credit reports.  In doing so, DB101 has engaged in a variety of unfair and improper competitive acts, including misappropriating trade secrets, copying Infogroup's technical processes, infringing on Infogroup's intellectual property rights, and attempting to pass itself off as being related to or endorsed by Infogroup.

***State-Court Litigation***

48.     In 2011, frustrated by DB101's ongoing unfair and improper competitive acts, Infogroup filed suit in the District Court for Douglas County, Nebraska, alleging violations of the Nebraska Trade Secrets Act, deceptive trade practices and unjust enrichment, among others.

49.     The state-court litigation ended with a settlement agreement among the parties under which DB101 agreed, among other things, to refrain from referring to any Infogroup product, including but not limited to InfoUSA and ReferenceUSA, in its advertising or marketing communications, to refrain from disparaging Infogroup products, and to refrain from soliciting testimonials purporting to compare Infogroup products with DB101 products, for a period of four years from the date of the March 2012 agreement ("Agreement").  DB101 also agreed to refrain from making any claim that suggests the existence of any present relationship or association between DB101 and Infogroup, its subsidiaries or their products and services.

50.     Infogroup agreed to certain restrictions under the settlement agreement, including, but not limited to, refraining from naming or mentioning Vinod Gupta in its marketing or advertising communications.

***Post-Settlement Agreement Conduct***

51.     Infogroup has abided by its obligations under the Agreement, but even after the execution of the Agreement, DB101 continued to misappropriate Infogroup's business unabated, and engage in other tortious conduct, all to Infogroup's detriment.

52.     For example, DB101 continued – and continues to this day – to make direct references to InfoUSA, Salesgenie, and other Infogroup products in its websites, promotional materials and press releases, in direct violation of the Agreement.  In violation of the Agreement and the law, these references wrongfully suggest a present or ongoing relationship between

DB101, and in particular, improperly suggest a relationship between Gupta and Infogroup's products and services.  One recent example of DB101's flouting of its obligations is a July 11, 2013, press release announcing Defendant McCormick's promotion within the company, which refers to Infogroup as "a similar reference company that shares the same Founder, Vin Gupta."

53.     Additionally, upon information and belief, DB101 continues to solicit and publish – in promotional materials, press releases, on Defendant's various websites and in other advertisements and advertising materials widely circulated to the general purchasing public – customer testimonials that negatively compare Infogroup's products and services with DB101's products and services.

54.     Along with these testimonials, DB101's websites, press releases, advertisements and other promotional materials disparage and malign Infogroup's business, products and services.

55.     Furthermore, on information and belief, DB101 is in wrongful possession of Infogroup's customer data, as is evidenced by, among other things, DB101's direct contact with such customers using information that could be obtained only from Infogroup's confidential, proprietary customer database.

56.     Upon information and belief, DB101 is also in wrongful possession of, and has misappropriated, Infogroup's source code and other trade secrets, brought to DB101 by Van Gilder, Dailey, Puljan, McCormick, and/or other former employees of Infogroup, including John Does 1-20.

57.     Upon information and belief, Defendants targeted key Infogroup computer program developers and other employees for recruitment and placed those former Infogroup employees in equivalent roles at DB101.

58.     Upon information and belief, Defendants were aware of the continuing confidentiality obligations of these former Infogroup employees and, by placing them in equivalent roles at DB101, expected them to misappropriate Infogroup source code and trade secrets to the benefit of DB101, and causing significant damage and harm to Infogroup.

59.     Upon information and belief, DB101 source code in the functional areas of these former Infogroup employees is substantially similar, and in certain instances identical, to confidential Infogroup source code that was known to these former Infogroup employees.

60.     Additionally, upon information and belief, DB101 employees have posed as, and misrepresented themselves as, Infogroup sales representatives when contacting Infogroup customers in an attempt to move those customers to DB101 services.

61.     Since March 2012, DB101 has consistently disregarded its obligations under the Agreement and under the law, engaged in unfair, deceptive trade practices and other tortious conduct, and infringed upon Infogroup's intellectual property rights.

**COUNT I**
**NEBRASKA TRADE SECRETS ACT**
**MISAPPROPRIATION OF TRADE SECRETS**
**(Against All Defendants)**

62.     Infogroup repeats and realleges each of the allegations in the preceding paragraphs previously pled in this Complaint as if each were set forth in full herein.

63.     Infogroup has developed at great expense, and continues to maintain, a comprehensive database that contains a compilation of demographic and product-specific information for millions of consumers and businesses.

64.     Infogroup has spent considerable time, effort and resources collecting and maintaining this database compilation.

14

65.     Infogroup's database of consumers and businesses is economically valuable to Infogroup because it is not known or discoverable by proper means to any third party.

66.     The compilation of information in Infogroup's consumer database is confidential, proprietary and password protected.

67.     Infogroup maintains its proprietary databases on a protected computer system and uses such computer system to produce and provide mailing lists and other information to customers throughout the world.

68.     Infogroup takes steps to protect its proprietary databases from unauthorized access both by maintaining electronic security of its computer system and by requiring employees with access to proprietary information and equipment containing proprietary information to sign nondisclosure agreements limiting the scope of their authority to use information housed on Infogroup protected computers.

69.     Infogroup's consumer and business database compilation is a trade secret under Nebraska's Trade Secrets Act, Neb. Rev. Stat. § 87-501, et seq.

70.     In order to protect its proprietary databases and to monitor potential unauthorized access to such databases by competitors, Infogroup occasionally inserts so-called, "seed data" files into its databases.  Each such seed data file typically consists of fictitious name, address, and phone-number combinations.  If seed data listings appear in lists sold or offered for sale by a competitor, it is considered proof that the competitor has misappropriated Infogroup's trade secret database compilations.

71.     On or about June 2013, Infogroup undertook a routine data audit to determine whether its "seed data" was being incorporated into DB101's databases.  This data audit revealed that most if not all of DB101's services, including those published to subscribers through

"Infofree.com" and "AtoZDatabases.com," had incorporated numerous listings included in the "seed data" used by Infogroup in November 2011.

72.     Defendants were not and are not authorized to access Infogroup's protected computer systems, to make wholesale copies of Infogroup's proprietary databases, or to sell access to Infogroup's proprietary databases, or to benefit from Infogroup's proprietary databases for Defendants' own commercial and competitive gain.

73.     On information and belief, the only way for Defendants to have accessed Infogroup's seed data is through unauthorized access of Infogroup's protected computer system or otherwise misappropriating Infogroup's trade secrets.

74.     Infogroup has developed, and continues to maintain, a detailed, comprehensive and highly confidential record of its customers ("Infogroup's Customer List"), including the purchasing history of such customers and, with respect to businesses, the identity of the person at that business responsible for making purchases.

75.     Infogroup has spent considerable time, effort and resources collecting and maintaining Infogroup's Customer List.

76.     Infogroup's Customer List is economically valuable to Infogroup because it is not known or discoverable by proper means to any third party.

77.     The compilation of information in Infogroup's Customer List is confidential, proprietary and password protected.

78.     Infogroup's Customer List is a trade secret under Nebraska's Trade Secrets Act, Neb. Rev. Stat. § 87-501, et seq.

79.     On information and belief, Defendants have accessed Infogroup's customer database without authorization and have used the information gathered to attempt to poach Infogroup customers.

80.     Infogroup has created proprietary user interfaces for its internet-based services.

81.     Infogroup has spent considerable time, effort and resources designing and programming its proprietary user interfaces.

82.     The proprietary user interfaces are economically valuable to Infogroup because the programming code for said interfaces is not known or discoverable by proper means to any third party.

83.     Infogroup's user interfaces, and the programming code through which they were created, is a trade secret under Nebraska's Trade Secrets Act, Nev. Rev. Stat. § 87-501, et seq.

84.     Upon information and belief, Defendants acquired Infogroup's trade secrets through improper means and are using such trade secrets to derive an unfair and improper commercial advantage over Infogroup.

85.     Defendants' acquisition of Infogroup's trade secrets constitutes misappropriation in violation of Nebraska's Trade Secret Act, Neb. Rev. Stat. § 87-501, et seq.

86.     As a result of Defendants' misappropriation, Infogroup has suffered damages in an amount to be determined at trial.

87.     Unless enjoined, Defendants' misappropriation of trade secrets have caused and will continue to cause Infogroup irreparable harm for which no adequate remedy exists at law.

## COUNT II
## NEBRASKA DECEPTIVE TRADE PRACTICE ACT
### (Against Defendant DB101)

88.     Infogroup repeats and realleges each of the allegations in the preceding paragraphs previously pled in this Complaint as if each were set forth in full herein.

89.     Specifically, with respect to "Infofree.com," DB101 has caused likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods and services because DB101's statements suggest that the information is provided by InfoUSA (a/k/a Infogroup).

90.     Similarly, DB101 has caused likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by another because, from DB101's statements, it appears that DB101 and Infogroup are connected insofar as each has the same "founder."

91.     DB101 has willfully engaged in these deceptive trade practices, knowing them to be deceptive.

92.     When consumers confuse DB101's products and services with Infogroup's, because DB101's products and services are inferior to Infogroup's, Infogroup suffers the negative consumer experience associated with DB101, and loses revenue through lost sales and customers.  Unless enjoined, DB101's acts – which cause customer confusion – have caused and will continue to cause Infogroup to suffer irreparable harm for which no adequate remedy exists at law.

93.     DB101's activities as stated herein constitute unlawful acts and practices in the conduct of its trade and business in violation of Neb. Rev. Stat. §§ 87-301 – 87-306.

### COUNT III
### COMPUTER FRAUD AND ABUSE ACT
### (Against Defendant DB101)

94.    Infogroup repeats and realleges each of the allegations in the preceding paragraphs previously pled in this Complaint as if each were set forth in full herein.

95.    Infogroup maintains its proprietary databases on a protected computer system and uses such computer system to produce and provide mailing lists and other information to customers in interstate commerce across the United States, and to United States Government agencies themselves.

96.    Infogroup takes steps to protect its proprietary databases from unauthorized access both by maintaining electronic security of its computer system and by requiring employees with access to proprietary information and equipment containing proprietary information to sign nondisclosure agreements limiting the scope of their authority to use information housed on Infogroup protected computers.

97.    In order to protect its proprietary databases and to monitor potential unauthorized access to such databases by competitors, Infogroup occasionally inserts so-called, "seed data" files into its databases. Each such seed data file typically consists of fictitious name, address, and phone-number combinations. If ever seed data listings appear in lists sold or offered for sale by a competitor, it is considered proof that the competitor has gained unauthorized access to Infogroup's protected databases.

98.    On or about June 2013, Infogroup undertook a routine data audit to determine whether its "seed data" was being incorporated into DB101's databases. This data audit revealed that more than one of DB101's services, including those published to subscribers through

"Infofree.com" and "AtoZDatabases.com," had incorporated numerous listings included in the "seed data" used by Infogroup in November 2011.

99.    DB101 was not and is not authorized to access Infogroup's protected computer systems or its proprietary databases in any form.

100.    On information and belief, the only way for DB101 to have accessed Infogroup's seed data is through unauthorized access of Infogroup's protected computer system.

101.    DB101's conduct as described above constitutes a violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. §1030.

102.    As a result of DB101's unauthorized access of Infogroup's proprietary databases, Infogroup has suffered economic damages in an amount to be determined at trial but not less than $5,000.

103.    Also as a result of DB101's unauthorized access of Infogroup's proprietary databases, Infogroup has suffered and will continue to suffer irreparable harm for which no adequate remedy exists at law.

## COUNT IV
## FALSE ADVERTISING – LANHAM ACT
### (Against Defendant DB101)

104.    Infogroup repeats and realleges each of the allegations in the preceding paragraphs previously pled in this Complaint as if each were set forth in full herein.

105.    DB101 has distributed and continues to distribute advertisements, marketing materials and communications suggesting, among other things, that DB101's products are the same as Infogroup's, that DB101's data collections are compiled in the same way, that DB101's products and services offer the same or better information than Infogroup's, but at lower cost, that Vinod Gupta is the "founder" or "proprietor" of InfoUSA, Salesgenie.com, and other

Infogroup entities, that DB101's data compilations are "the most accurate" in the industry, and that DB101 was featured on the television newsmagazine "60 Minutes."

106.    DB101 has distributed and continues to distribute advertisements, marketing materials and press releases describing itself as a "leading provider" of sales leads for businesses.

107.    DB101 has distributed and continues to distribute advertisements, marketing materials and communications, including but not limited to materials containing a logo for products and services offered under the name DatabaseUSA, that falsely state that DB101 has been "helping businesses grow since 1972." The false and misleading DatabaseUSA logo used by DB101 appears on the homepage of DB101's "DatabaseUSA.com" website, as well as on various marketing materials distributed by DB101. The 1972 date refers to the year the predecessor company to Infogroup was founded and is used to create the impression that DB101 is related to, affiliated with, sponsored by, or endorsed by Infogroup.

108.    DB101's activities as described in the preceding paragraphs, including, but not limited to, the statement that DatabaseUSA has been "helping businesses grow since 1972," constitute literally false statements about DB101's products and services.

109.    To the extent any of DB101's activities as described in the preceding paragraphs do not constitute literally false statements, they implicitly convey a false impression, are misleading in context, or are likely to deceive consumers.

110.    DB101's false or misleading representations as described in the preceding paragraphs have the tendency to deceive a substantial segment of the audience at which the false or misleading communications are directed.

111.    DB101's false or misleading representations as described in the preceding paragraphs are material, in that they are likely to influence customers' purchasing decisions.

112.    DB101's false or misleading representations as described in the preceding paragraphs were made in or were caused to enter interstate commerce by DB101.

113.    Infogroup has been and will continue to be injured by DB101's false or misleading representations described in the preceding paragraphs, both through diversion of sales from itself to DB101 and through a loss of goodwill developed by Infogroup through decades of efforts causing loss of future sales and customers.

114.    DB101's activities as stated herein constitute false or misleading advertising used in commerce regarding its products and services – and, by extension, Infogroup's products and services – in violation of §43(a) of the Federal Trademark Act, 15 U.S.C. §1125(a), and under the common law of the State of Nebraska.

115.    DB101's wrongful activities have caused, and unless enjoined by this Court will continue to cause, irreparable injury and other damage to Infogroup's business, reputation and goodwill in the industry.  Infogroup has no adequate remedy at law.

### COUNT V
### TRADEMARK INFRINGEMENT – LANHAM ACT
### (Against Defendant DB101)

116.    Infogroup repeats and realleges each of the allegations in the preceding paragraphs previously pled in this Complaint as if each were set forth in full herein.

117.    Infogroup is the owner of the registered service mark INFOUSA (Reg. No. 2147134), covering "business and consumer information services, namely, preparing and compiling informational lists and directories relating to businesses and consumers throughout the United States for others."  Infogroup first used the INFOUSA mark in commerce in 1996, and registration was granted by the U.S. Patent and Trademark Office on March 31, 1998.

118.   Infogroup is the owner of the registered service mark REFERENCEUSA (Reg. No. 2507419), covering services "[p]roviding business and consumer information in the nature of research, business profile, geographic and identification information, via a global computer network."   Infogroup first used the REFERENCEUSA mark in commerce in 1998, and registration was granted by the U.S. Patent and Trademark Office on November 13, 2001.

119.   Infogroup is the owner of the registered service mark SALESGENIE.COM (Reg. No. 3388763), covering services "[p]roviding business information in the field of company profiles, business credit reports, company and contact names, telephone numbers, and addresses via a global computer network.  Infogroup first used the SALESGENIE.COM mark in commerce in 2004, the registration for which was granted by the U.S. Patent and Trademark Office on February 26, 2008.

120.   DB101, in its websites, press releases, and other marketing and advertising communications, regularly describes its chief executive officer, Vinod Gupta, as the "founder" or "proprietor" of InfoUSA, Salesgenie.com, and other Infogroup entities, or otherwise uses Infogroup's marks in such a way as to suggest an ongoing relationship, sponsorship, endorsement, or affiliation between Infogroup and DB101.

121.   DB101's activities alleged herein are systematic and calculated to create the impression that DB101 offers Infogroup's services.

122.   DB101's activities alleged herein are likely to cause confusion, cause mistake, or deceive as to the affiliation, connection or association of DB101 and Infogroup, and to their respective goods and services.

123.   DB101's activities as stated herein constitute false designation of origin and trademark infringement in violation of §43(a) of the Federal Trademark Act, 15 U.S.C. §1125(a), and under the common law of the State of Nebraska.

124.   Upon information and belief, DB101's wrongful activities have caused, and unless enjoined by this Court will continue to cause, irreparable injury and other damage to Infogroup's business, revenue, sales, reputation and goodwill in the industry. Infogroup has no adequate remedy at law.

## COUNT VI
## NEBRASKA COMMON LAW UNFAIR COMPETITION
### (Against All Defendants)

125.   Infogroup repeats and realleges each of the allegations in the preceding paragraphs previously pled in this Complaint as if each were set forth in full herein.

126.   Defendants improperly used Infogroup's trade secrets – including Infogroup's Customer List, source code, and its consumer and business database compilations – to unfairly compete with Infogroup and to solicit business from Infogroup's customers.

127.   Defendants' wrongful conduct has substantially interfered with the ability of Infogroup to compete on the merits of its products and services.

128.   Defendants' activities as stated herein constitute unfair competition in violation of the common law of the State of Nebraska.

129.   Defendants' acts and conduct as alleged herein have damaged Infogroup, in an amount to be determined at trial, and will continue to cause irreparable harm to Infogroup's business, reputation and goodwill in the industry, and other damages.  Infogroup has no adequate remedy at law.

**COUNT VII**
**COPYRIGHT INFRINGEMENT**
**(Against Defendant DB101)**

130.    Infogroup repeats and realleges each of the allegations in the preceding paragraphs previously pled in this Complaint as if each were set forth in full herein.

131.    Infogroup owns a valid copyright in the creative works embodied in the website "ReferenceUSA.com" and covered by its copyright registration No. TXu 1-859-267, a copy of which is attached hereto as Exhibit 1.

132.    Infogroup owns a valid copyright in the creative works embodied in the website "Salesgenie.com" and covered by its copyright registration No. TXu 1-859-264, a copy of which is attached hereto as Exhibit 2.

133.    Infogroup owns a valid copyright in the creative works embodied in the website "Credit.net" and covered by its copyright registration No. TXu 1-860-626, a copy of which is attached hereto as Exhibit 3.

134.    Infogroup owns a valid copyright in the literal computer program source code fixed in the computer program products enabling "ReferenceUSA.com," "Salesgenie.com" and "Credit.net," which are covered by its copyright registration Nos. TXu 1-860-582 and TXu 1-860-589, copies of which are attached hereto as Exhibits 4 and 5.

135.    Infogroup owns a valid copyright in the creative works embodied in its listing of industries and economic categories and covered by its copyright registration No. TXu 1-860-574, a copy of which is attached hereto as Exhibit 6.

136.    Infogroup owns valid copyrights in the creative works embodied in the user interface of its online map-search functionality used in the websites "Salesgenie.com" and

"ReferenceUSA.com" and covered by its copyright registration Nos. TXu 1-878-377 and TXu 1-878-378, copies of which are attached hereto as Exhibits 7 and 8.

137.    DB101 had access to the graphic interfaces found on Infogroup's websites, including, but not limited to, "ReferenceUSA.com," "Salesgenie.com" and "Credit.net."

138.    DB101 had access to the organizational schemes found on Infogroup's websites, including, but not limited to, "ReferenceUSA.com," "Salesgenie.com" and "Credit.net."

139.    DB101 had access – albeit illicit access through computer fraud and misappropriation of trade secrets – to the literal computer program source code fixed in the computer program products enabling key Infogroup services, including, but not limited to, "ReferenceUSA.com," "Salesgenie.com" and "Credit.net."

140.    DB101 had access to Infogroup's unique listing of industries and economic categories.

141.    DB101 had access to the online map-search functionality used in the websites "Salesgenie.com" and "ReferenceUSA.com."

142.    Substantial nonfunctional similarities exist between the graphic interface presented on DB101's website, "AtoZDatabases.com" and the graphic interface presented on Infogroup's website, "ReferenceUSA.com."  Such similarities include, but are not limited to, the look, feel, and layout of search pages as illustrated below:

26





143.    Substantial nonfunctional similarities exist between the graphic interface presented on DB101's website, "Infofree.com" and the graphic interface presented on Infogroup's website, "Salesgenie.com."

144.    Substantial nonfunctional similarities exist between the graphic interface presented on DB101's website, "Creditjam.com" and the graphic interface presented on Infogroup's website, "Credit.net."

145.    Substantial nonfunctional similarities exist between the map-based search graphic interface presented on DB101's websites and the map-based search graphic interfaces presented on Infogroup's websites.

146.    Substantial nonfunctional, atypical similarities exist between the organizational scheme presented on DB101's website, "AtoZDatabases.com" and the organizational scheme presented on Infogroup's website, "ReferenceUSA.com."

147.    Substantial nonfunctional, atypical similarities exist between the organizational scheme presented on DB101's website, "AtoZDatabases.com" and the organizational scheme presented on Infogroup's website, "Salesgenie.com."   Such similarities include, but are not limited to, the look, feel, and layout of the sites' overview pages as illustrated below:



148.    Substantial nonfunctional, atypical similarities exist between the organizational scheme presented on DB101's website, "Infofree.com" and the organizational scheme presented on Infogroup's website, "Salesgenie.com."

149.   Substantial nonfunctional, atypical similarities exist between the organizational scheme presented on DB101's website, "Creditjam.com" and the organizational scheme presented on Infogroup's website, "Credit.net."

150.   Substantial nonfunctional, atypical similarities exist between the literal computer program code reproduced, distributed and publicly displayed by   DB101's websites – including, but not limited to, "Infofree.com," "DatabaseUSA.com," "AtoZDatabases.com" and "Creditjam.com" – and the computer program code fixed in Infogroup's computer program products – including, but not limited to, "ReferenceUSA.com," "Salesgenie.com" and "Credit.net."

151.   Substantial nonfunctional, atypical similarities exist between the listing of industries and economic categories on DB101's websites – including, but not limited to, "Infofree.com," "DatabaseUSA.com," "AtoZDatabases.com" and "Creditjam.com" – and the listing of industries and economic categories on Infogroup's websites – including, but not limited to, "ReferenceUSA.com," "Salesgenie.com" and "Credit.net."

152.   Substantial nonfunctional, atypical similarities exist between the online map-search function of Infogroup's websites "Salesgenie.com" and "ReferenceUSA.com" and the map-search function of DB101's websites.

153.   A number of DB101's websites and computer program products are composed of derivative works based upon the copyrighted works of Infogroup.

154.   DB101's activities as stated herein constitute copyright infringement in violation of the Federal Copyright Act, 17 U.S.C. § 501.

155.    DB101's activities alleged herein have caused, and unless enjoined by the Court, will continue to cause irreparable injury and other damages, for which no adequate remedy exists at law.

156.    DB101's infringement of Infogroup's copyrights was willful and intentional.

## COUNT VIII
## TRADE DRESS INFRINGEMENT – LANHAM ACT
### (Against Defendant DB101)

157.    Infogroup repeats and realleges each of the allegations in the preceding paragraphs as though if each were set forth in full herein.

158.    Infogroup has developed user interfaces for its web-based services that have distinctive looks and feels that, on information and belief, users have come to identify with Infogroup products and services.

159.    The elements, arrangement, and look and feel of the user interfaces are separate and distinct from the functional aspects of those interfaces.

160.    The elements, arrangement, and look and feel of the user interfaces, in totality, constitute protectable trade dress in the user interfaces of Infogroup's web-based services. Examples of these combinations of elements, and the look and feel they create, appear in the screen shots included in Paragraphs 141 and 146, above.

161.    Defendant DB101 has substantially copied Infogroup's trade dress in its user interfaces, as illustrated by the screen shots included in Paragraphs 141 and 146, above.  By doing so, Defendant DB101 has created a likelihood of confusion as to the source, or as to sponsorship, affiliation, or connection between DB101's services and Infogroup's services covered by that trade dress.

31

162.   DB101's activities as stated herein constitute trade-dress infringement in violation of §43(a) of the Federal Trademark Act, and under the common law of the State of Nebraska.

## COUNT IX
## NEBRASKA CONSUMER PROTECTION ACT
### (Against All Defendants)

163.   Infogroup repeats and realleges each of the allegations in the preceding paragraphs previously pled in this Complaint as if each were set forth in full herein.

164.   In reviewing the Infogroup "seed data" listings (as described in paragraph 39, above) present in DB101's "Infofree.com" and "AtoZDatabases.com" services, Infogroup discovered that these fictitious Infogroup "seed data" listings, when displayed to customers on DB101's websites, included DB101's "VERIFIED" logo, with a checkmark design.  DB101, in its "DatabaseUSA.com" website and other marketing materials, advertises that this "VERIFIED" logo means that the listing has been triple verified – by actual DB101 personnel contacting the listed business and verifying that the information is correct.  DB101's marketing claim that such a listing has been triple-verified is patently false.

165.   This deceptive behavior of falsely labeling these "seed data" listings as "VERIFIED" injures and places Infogroup – which goes to great expense and effort to actually verify listings before it marks any listing as "verified" in its products – at a competitive disadvantage to DB101, who patently misrepresents listings as being "VERIFIED."

166.   In addition to the "seed data" listing conduct described above, all of the Defendants' conduct alleged throughout this Complaint (and in particular, Count I-III, V & VI) – including, but not limited to, the improper use of Infogroup's trade secrets, the infringement upon Infogroup's intellectual property rights, and false advertising – constitutes unfair and

deceptive acts or practices in the conduct of trade or commerce in violation of Nebraska's Consumer Protection Act, Neb. Rev. Stat. § 59-1601, et seq.

167.    Defendants' unfair and deceptive conduct impacts the public interest and adversely affects the people of the State of Nebraska, in that the wrongful conduct creates a likelihood of confusion and misunderstanding in the marketplace between the services and products offered by Infogroup and DB101.

168.    As a result of Defendants' conduct, Infogroup has been damaged in an amount to be determined at trial.  Defendants' conduct, in violation of Nebraska's Consumer Protection Act,  also entitles Infogroup to the costs of this lawsuit, including a reasonable attorneys' fee, pursuant to Neb. Rev. Stat. § 59-1609.

## COUNT X
## BREACH OF CONTRACT
### (Against Defendant DB101)

169.    Infogroup repeats and realleges each of the allegations in the preceding paragraphs previously pled in this Complaint as if each were set forth in full herein.

170.    In March 2012, Infogroup and DB101 executed a valid, enforceable settlement agreement, to resolve the claims raised in prior litigation between the parties, Case No. CI-11-5969 in the District Court of Douglas County, Nebraska.

171.    The Agreement continues to bind Infogroup and DB101.

172.    In the Agreement, DB101 agreed to discontinue the use of any advertisements, marketing materials, including, but not limited to, press releases and promotional materials, containing references to Infogroup (e.g., Infogroup, InfoUSA, Salesgenie, Reference USA or any

of the other trade names currently or formerly used by Infogroup) or Infogroup's goods and services.

173.   DB101 also agreed not to make any claims that would suggest the existence of any present relationship or association between DB101 (including its subsidiaries, affiliates, employees, owners, founders, or agents) and Infogroup, including Infogroup's subsidiaries, products and services.

174.   Additionally, DB101 agreed not to malign or otherwise disparage Infogroup, either publicly or privately, in any way related to the companies' respective businesses.

175.   DB101 has breached its obligations under the Agreement by, among other things, failing to remove or discontinue the use of advertisements, marketing material that improperly references Infogroup and Infogroup's goods, products and services.

176.   DB101 has breached its obligations under the Agreement by, among other things, improperly referencing trade names currently or formerly in use by Infogroup and by suggesting a present relationship or association between Infogroup and DB101.

177.   Upon information and belief, DB101 has breached its obligations under the Agreement by, among other things, improperly soliciting and publishing testimonials from consumers who negatively compare Infogroup's products and services with DB101's products and services.

178.   DB101 has breached its obligations under the Agreement by, among other things, publicly disparaging Infogroup and Infogroup's business.

179.   Infogroup has performed, and continues to perform, its obligations under the Agreement.

180.    As a result of DB101's breach of the Agreement, Infogroup has been damaged in an amount to be determined at trial.

## COUNT XI
### EQUITABLE RESCISSION (IN THE ALTERNATIVE)
### (Against Defendant DB101)

181.    Infogroup repeats and realleges each of the allegations in the preceding paragraphs previously pled in this Complaint as if each were set forth in full herein.

182.    Infogroup and DB101 executed the Agreement, a valid and enforceable settlement agreement, in March 2012.

183.    As alleged in Count X, above, DB101 breached key provisions in the Agreement, including, but not limited to, the cease and desist and non-disparagement provisions of the Agreement.

184.    DB101's breach of the Agreement is so substantial and fundamental as to defeat the purpose of the Agreement and the parties' objectives in making the Agreement.

185.    As a result of DB101's breach of the Agreement, Infogroup was deprived of the benefit it reasonably expected to receive in making the Agreement.

186.    Infogroup is entitled to rescission of the Agreement as a result of DB101's material and substantial breach of the Agreement.

## COUNT XII
### CIVIL CONSPIRACY
### (Against All Defendants)

187.    Infogroup repeats and realleges each of the allegations in the preceding paragraphs previously pled in this Complaint as if each were set forth in full herein.

35

188.    Upon information and belief, Defendants Van Gilder, Dailey, Puljan, McCormick, and John Does 1-20 were, at one time, all employees of Infogroup, with access to Infogroup's trade secrets and copyrighted works, including, but not limited to, Infogroup's Customer List, source code, and its consumer and business database compilations.

189.    Upon information and belief, Defendants DB101 and Gupta recruited Van Gilder, Dailey, Puljan, McCormick, and John Does 1-20 to work for DB101, and John Does 1-20 are current employees of DB101.

190.    Upon information and belief, Defendants acted in concert to misappropriate Infogroup's trade secrets after Van Gilder, Dailey, Puljan, McCormick, and John Does 1-20 ceased working for Infogroup and began working for DB101.

191.    Upon information and belief, Defendants acted in concert to infringe upon Infogroup's copyrights after Van Gilder, Dailey, Puljan, McCormick, and John Does 1-20 ceased working for Infogroup and began working for DB101.

192.    Upon information and belief, after Van Gilder, Dailey, Puljan, McCormick, and John Does 1-20 ceased working for Infogroup and began working for DB101, Defendants agreed to engage together in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of Nebraska's Consumer Protection Act, Neb. Rev. Stat. § 59-1601, et seq.

193.    By misappropriating Infogroup's trade secrets, infringing upon Infogroup's copyrights and engaging in deceptive acts or practices, all to gain an unfair business advantage over Infogroup, Defendants Van Gilder, Dailey, Puljan, McCormick, and John Does 1-20 acted outside the scope of their respective authority and employment with DB101.

194.    As a result of Defendants' conduct, Infogroup has been damaged in an amount to be determined at trial.

**COUNT XIII**
**TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP**
**(Against Defendant DB101)**

195.    Infogroup repeats and realleges each of the allegations in the preceding paragraphs previously pled in this Complaint as if each were set forth in full herein.

196.    Defendant McCormick worked for Infogroup from 2002 to April 2004 and again from May 2004 to January 2010.

197.    In May 2004, Infogroup and Defendant McCormick executed a valid, enforceable Standards of Business Conduct Agreement, the terms of which expressly survive termination of employment.   In January 2010, Infogroup and Defendant McCormick executed a valid, enforceable Separation Agreement and General Release (collectively, the "Agreements").

198.    The Agreements continue to bind Infogroup and McCormick.

199.    In the Agreements, McCormick agreed to maintain and protect the confidential information disclosed by Infogroup to McCormick in the course of his employment, including "highly sensitive and proprietary information regarding [Infogroup's] products, services, intellectual property (including, but not limited to, patents, trademarks, copyrights, mask works, trade secrets, business processes, software and source code thereof), customers, prospective customers, vendors, suppliers, pricing and costing information, marketing strategies, business plans, methods, financial information and other related information" designated as confidential by Infogroup.

200.    In the Agreements, McCormick agreed that he would "forever treat all matters relating to [Infogroup's] business as Confidential Information" and that he would not "use, give or divulge such Confidential Information to any third party."

37

201.   Upon information and belief, DB101 was aware of the McCormick's confidentiality obligations under the Agreements.

202.   Upon information and belief, DB101 recruited McCormick to work for DB101, where he was served as Vice President of Product and Technology for AtoZDatabases before being promoted to General Manager of AtoZDatabases on or about July 11, 2013.

203.   Defendant Van Gilder worked for Infogroup until approximately September 2010, at which time, on information and belief, Infogroup and Van Gilder executed a valid, enforceable Separation Agreement.

204.   In the Separation Agreement, Van Gilder agreed to maintain and protect the confidential information disclosed by Infogroup to him in the course of his employment, including "highly sensitive and proprietary information regarding [Infogroup's] products, services, intellectual property (including, but not limited to, patents, trademarks, copyrights, mask works, trade secrets, business processes, software and source code thereof), customers, prospective customers, vendors, suppliers, pricing and costing information, marketing strategies, business plans, methods, financial information and other related information" designated as confidential by Infogroup.

205.   In his Separation Agreement, Van Gilder agreed that he would "forever treat all matters relating to [Infogroup's] business as Confidential Information" and that he would not "use, give or divulge such Confidential Information to any third party."

206.   On information and belief, Van Gilder was recruited and hired by DB101 in August 2012 and currently serves as vice president of sales for infofree.com.

207.   Defendant Dailey worked for Infogroup from December 2010 until June 2013.

208.    In November 2010, Infogroup and Defendant Dailey executed a valid, enforceable Standards of Business Conduct Agreement, the terms of which expressly survive termination of employment.

209.    In the Business Conduct Agreement, Defendant Dailey agreed to protect and not disclose at any time, during or following his employment, "Confidential Information," which the Business Conduct Agreement defined as, among other things, "information . . . not generally known in the relevant trade or industry and not freely available to persons not employed by Infogroup, about Infogroup products, processes, business operating procedures, trade secrets and information relating to, but not limited to, services, marketing, distribution, customer lists, financial data, pricing, and other management and marketing plans."

210.    In June 2013, Defendant Dailey resigned from Infogroup, stating that he was "not going to a competitor in the industry and will keep all of Infogroup's information confidential."

211.    On information and belief, Defendant Dailey was recruited and hired by DB101 on or about September 2013.

212.    Defendant Puljan worked for Infogroup from June 1996 until February 2001 and from October 2004 until October 2012.

213.    In 1996 and again in 2004, Infogroup and Defendant Puljan executed valid, enforceable agreements that included Puljan's agreement to maintain and protect the confidential information disclosed by Infogroup to Puljan in the course of his employment.  In October 2012, Infogroup and Puljan executed a valid, enforceable Separation Agreement and General Release.

214.    In his Separation Agreement, Puljan agreed to maintain and protect the confidential information disclosed by Infogroup to Puljan in the course of his employment, including "highly sensitive and proprietary information regarding [Infogroup's] products,

services, intellectual property (including, but not limited to, patents, trademarks, copyrights, mask works, trade secrets, business processes, software and source code thereof), customers, prospective customers, vendors, suppliers, pricing and costing information, marketing strategies, business plans, methods, financial information and other related information" designated as confidential by Infogroup.

215.   In the Separation Agreement, Puljan agreed that he would "forever treat all matters relating to [Infogroup's] business as Confidential Information" and that he would not "use, give or divulge such Confidential Information to any third party."

216.   In June 2013, DB101 issued a press release announcing Puljan's hiring as DatabaseUSA's regional sales manager.

217.   Upon information and belief, DB101 induced Defendants McCormick, Dailey, Puljan and Van Gilder to breach their confidentiality obligations and/or non-compete obligations under their employment and/or separation agreements with Infogroup by, among other things, misappropriating Infogroup's confidential information, source code, computer programs, customer information, and other trade secrets.

218.   As a result of DB101's intentional interference with the agreements, Infogroup has been damaged in an amount to be determined at trial.


**COUNT XIV**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

219.   Infogroup repeats and realleges each of the allegations in the preceding paragraphs previously pled in this Complaint as if each were set forth in full herein.

220.    Defendants have received substantial financial benefits as a result of Defendants' tortious and improper conduct, including, but not limited to, unfair competition and the theft of trade secrets.

221.    Defendants have received and retained these financial benefits, primarily in the form of improperly earned revenue, under circumstances where it would be inequitable and unjust for Defendants to retain that revenue.

222.    The retention by Defendants of the substantial financial benefits they have and continue to receive and hold would be unjust under the circumstances.

WHEREFORE, Plaintiffs pray for relief as follows:

1.    Judgment in favor of Infogroup on Counts I through XIV above.

2.    An injunction prohibiting Defendants from:

- Using Infogroup's copyrighted materials, trademarks, and trade names;

- Using Infogroup's misappropriated trade secret information;

- Accessing Infogroup's protected computer systems or using information gathered through such unauthorized access;

- Continuing its practice of making false and misleading statements regarding DB101's services.

3.    An award of actual damages, in an amount to be proven at trial.

4.    An Order requiring Defendants to disgorge all financial benefits, including profits, realized by Defendants as a result of their wrongful conduct as alleged herein.

5.    An award of costs and reasonable attorneys' fees incurred in this action.

6.    Such other and further relief as the Court deems just and proper.

41

**JURY DEMAND AND REQUEST FOR PLACE OF TRIAL**

Pursuant to Fed. R. Civ. P. 38 and NECivR 40.1(b), Plaintiffs hereby demand a trial by jury and requests that trial of this case take place in Omaha, Nebraska.

Dated this 12th day of February, 2014.

**INFOGROUP, INC., infoUSA, Inc., and infoUSA Marketing, Inc., PLAINTIFFS**

By:  s/ John P. Passarelli
    John P. Passarelli #16018
    Douglas W. Peters #23782
    Brooke H. McCarthy #25077
    Kutak Rock LLP
    1650 Farnam Street
    Omaha, NE  68102-2186
    Telephone  (402) 346-6000
    Facsimile  (402) 346-1148
    john.passarelli@kutakrock.com
    douglas.peters@kutakrock.com
    brooke.mccarthy@kutakrock.com