8:14-cv-00049-JMG-SMB  Doc # 32-2  Filed: 05/07/14  Page 1 of 155 - Page ID # 471
DEPOSITION OF Amit Khanna                    April 16, 2014
INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.

**Page 1**

```
                    IN THE UNITED STATES DISTRICT COURT

                      FOR THE DISTRICT OF NEBRASKA

INFOGROUP, INC., infoUSA, Inc.,      )Case No. 8:14CV49
and infoUSA Marketing, Inc.,         )
Delaware corporations,               )
                                     )
            Plaintiffs,              )
                                     )
    vs.                              ) D E P O S I T I O N
                                     )
DATABASEUSA.COM LLC d/b/a           )
Database101.com, d/b/a InfoFree.com,)
and d/b/a Ato2 Databases, a Nevada  )
limited liability company, VINOD    )
GUPTA, BLAKE VAN GILDER, JASON      )
DAILEY, MARK FULMAN, JON McCORMICK, )
and JOHN DOES 1-20,                 )
                                     )
            Defendants.             )

                         VOLUME I

                  DEPOSITION OF AMIT KHANNA

        DEPOSITION OF AMIT KHANNA, taken before Tammy J.
Hetherington, a General Notary Public within and for the
State of Nebraska, beginning at 9:55 a.m., on Wednesday,
April 16, 2014, at 1650 Farnam Street, Omaha, Nebraska, to be
read in evidence on behalf of the defendant, pursuant to the
Nebraska Rules of Discovery and the within stipulations.




                  TAMMY J. HETHERINGTON, RPR
                 Registered Professional Reporter
                 Matheson-Taulborg Court Reporters
                 7602 Pacific Street, Suite Ll101
                       Omaha, Nebraska  68114
                         402-397-9669
```

**Page 2**

## APPEARANCES

For the Plaintiffs:    Mr. Douglas W. Peters
                       Attorney at Law
                       1650 Farnam Street
                       Omaha, Nebraska  68102

For the Defendants:    Mr. Mark C. Laughlin
                       Mr. Patrick S. Cooper
                       Attorneys at Law
                       500 Energy Plaza
                       409 South 17th Street
                       Omaha, Nebraska  68102-2663

Also Present:          Mr. Vinod Gupta
                       Mr. Fred Vakili

COPY

**Page 3**

                         I N D E X
                                            Page

Direct Examination by Mr. Laughlin            4
Cross-Examination by Mr. Peters             138

                       EXHIBITS
                                          Identified

1.  Declaration of Amit Khanna in Support     4
    of Plaintiffs' Motion for Preliminary
    Injunction

2.  Internet printout regarding Infogroup    117

3.  Document labeled "Infogroup Verified &   130
    Non-Verified Businesses"

4.  Document labeled "ReferenceUSA's Database 131
    Now Updated Daily"

5.  Document labeled "infoUSA Find New Customers 132
    & Grow Your Sales Mailing Lists, Sales
    Leads, Email & Direct Mail Services"

6.  Document labeled "ReferenceUSA – Data     133
    Quality"

7.  Document labeled "ReferenceUSA – FAQ"     134

8.  Document labeled "ReferenceUSA, The       136
    premier source of business and residential
    information for reference and research"

9.  Document labeled "ReferenceUSA – Custom   137
    Search"

**Page 4**

```
 1            (Exhibit No. 1 marked for identification.)

 2                      AMIT KHANNA,

 3              having been first duly sworn,

 4                  testified as follows:

 5                  DIRECT EXAMINATION

 6   BY MR. LAUGHLIN:

 7   Q.   Can you state your name.

 8   A.   Amit Khanna.

 9   Q.   Spell your last name, please.

10   A.   K-H-A-N-N-A.

11   Q.   Mr. Khanna, as you know, my name is Mark Laughlin, and

12        I represent the defendants in litigation filed by

13        Infogroup, Inc., and others.  You have filed a

14        Declaration in this case, correct?

15   A.   That's correct.

16   Q.   Handing you what the court reporter has marked as

17        Exhibit 1, is that a true and accurate copy of the

18        Declaration that you filed in this case?

19   A.   (Witness reviewing Exhibit 1.)

20                  MR. PETERS:  Mark, while he's reviewing,

21        maybe it's an appropriate time for us to put our

22        comments on the record.  For the record, I want to note

23        that a Protective Order has been entered, or agreed to,

24        between the parties, and executed by the parties, and

25        the Protective Order culls out various levels of
```

EXHIBIT 5

8:14-cv-00049-JMG-SMB   Doc # 92-2   Filed: 05/07/14   Page 2 of 155 - Page ID # 472

INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.

**5**

1  protection for documents and deposition testimony,
2  including confidential, highly confidential, and highly
3  confidential, attorneys' eyes only.
4      Counsel have discussed subject areas that may be
5  considered by the plaintiff to be highly confidential,
6  attorneys' eyes only, and that may come up during the
7  course of this deposition, and in the course of
8  discussion of certain documents that have been produced
9  by the plaintiffs.
10     There are two representatives of defendants in the
11 room today, Mr. Gupta and Mr. Vakili.  Counsel have
12 discussed the need for these individuals to exit the
13 deposition room when lines of questioning that are
14 likely to implicate attorneys'–eyes–only information
15 are begun.
16     For the convenience of Mr. Gupta and Mr. Vakili,
17 the attorneys have discussed and will take best efforts
18 to group and organize the deposition in such a way as
19 to minimize the inconvenience to them.
20 A. Mr. Laughlin, yes, it looks, pretty much, like the
21    Declaration that I signed.
22 Q. Thank you.
23         MR. LAUGHLIN:  And I also would like to
24    put on the record, and then pursuant to a discussion of
25    counsel, we were provided certain documents this

**6**

1  morning, all of which were marked for attorneys' eyes
2  only, not all.  There's some spreadsheets and otherwise
3  that have yet to be provided, and so I think we
4  discussed holding open this deposition, as needed, for
5  any potential follow-up and, also, issues as to what is
6  highly confidential and things of that nature; is that
7  fair?
8         MR. PETERS:  That's accurate.  Yeah,
9    that's fair.
10        MR. LAUGHLIN:  Okay.
11 Q. (BY MR. LAUGHLIN)  Mr. Khanna, I'm here today to ask
12    you a series of questions concerning your Declaration.
13    If at any time you don't understand my questions, if
14    you'll ask me to rephrase, I will do so, okay?
15 A. Yeah, absolutely.
16 Q. And if you don't ask me to rephrase, I'm going to
17    assume that you understood my question and answered to
18    the best of your ability; fair?
19 A. Fair enough.
20 Q. If you need a break at any time, let me know.
21 A. Will do.  Thank you.
22 Q. You are president of the Small and Medium Business at
23    Infogroup, Inc. currently; is that true?
24 A. That's correct.
25 Q. And, generally, describe your job duties as such.

**7**

1  A. So my role at Infogroup is to, really, oversee all our
2     sales and product services that we sell to small– and
3     medium–size businesses.  A lot of our products are
4     marketing, sales and credit relation, information–based
5     products.
6  Q. Tell me what documents you reviewed in preparation for
7     your deposition here today.
8  A. Can you specify a time frame?
9  Q. At any time.
10 A. My deposition?  Primarily, this document itself
11    (indicating).
12 Q. Exhibit 1?
13 A. Yeah, Exhibit 1, thank you, and one — a few of the
14    pages on the documents marked attorneys' eyes only.
15 Q. And without disclosing any sensitive information
16    contained therein, are you able to tell me, generally,
17    what of the attorneys'–eyes–only documents you reviewed
18    by type?
19 A. Specifically, the seed information that's provided to
20    you, because I had prior review of that; I knew of
21    that.
22 Q. So other than the information that was provided to us
23    this morning related to seed information, and your
24    Declaration, were there any other documents that you
25    reviewed, at any time, in preparation for your

**8**

1  deposition here today?
2  A. Not specifically in relation to the Declaration.
3  Q. Generally?
4  A. Generally?  No, it's really these documents.
5  Q. And, then, in your Declaration, when you made it, you
6     said that — and I'll direct you to paragraph one, you
7     say that you have confirmed, through your review of
8     business records kept in the ordinary course of
9     business, and through discussions with appropriate
10    personnel, the facts of this Declaration; do you see
11    that?
12 A. So the last sentence in that first paragraph?
13 Q. Correct.
14 A. Yes.
15 Q. Tell me all of the business records that you reviewed
16    that you reference in paragraph 1.
17 A. Most of the exhibits.
18 Q. Are you telling me that portions of the exhibits,
19    that's all the documents that you reviewed and that
20    you're referencing in paragraph one of your
21    Declaration?  I just want to make sure I understand
22    your answer.
23 A. Sure.  And, obviously, the business records kept in
24    ordinary course of business, you know, things that
25    cross my desk every day.

8:14-cv-00049-JMG-SMB   Doc # 250-1 Filed: 06/08/20 Page 3 of 155 - Page ID # 472    April 16, 2014
DEPOSITION OF Ashok Khanna
INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.

**9**

1    Q.   Well, and that's exactly what I'm asking. I mean,
2       basically, what you're saying here is, hey, in order to
3       be able to make all these statements in my Declaration,
4       I've reviewed some documents, and I talked to some
5       people. And what I'm trying to get at is I want a
6       complete list of all the business records that you
7       reviewed that you're referencing in paragraph one.
8    A.   So that — I mean, specifically, it's the exhibits that
9       are part of this document, but it's, generally, my
10      knowledge of the business, but, specifically, in coming
11      up with the Declaration, it was the exhibits.
12   Q.   Okay. And then you also had discussions with
13      appropriate personnel to verify some of the facts in
14      this Declaration, correct?
15   A.   That is correct.
16   Q.   Tell me all of the personnel that you had discussions
17      with that you reference in paragraph one.
18   A.   It would have been — if I can go through the exhibits,
19      I can probably do it. So, obviously, the trademarks
20      was with our counsel; Exhibit K was something I
21      reviewed myself; same thing with Exhibit L; goes for
22      Exhibit N as well; same thing for press release on
23      Exhibit O; same thing for Exhibit P; same thing for
24      Exhibit Q; for Exhibit R was my VP of sales that had
25      forwarded me this E-mail; and Exhibit S is from

**10**

1      counsel.
2    Q.   Did I understand your answer that the appropriate
3      personnel that you reference in paragraph one is your
4      counsel and your VP of sales?
5    A.   That's correct.
6    Q.   And is your VP of sales Pam Quick?
7    A.   No.
8    Q.   Okay. Who is that?
9    A.   It's John Copenhaver.
10   Q.   Last name?
11   A.   Copenhaver.
12   Q.   Copenhaver?
13   A.   Yes.
14   Q.   And describe for me the conversations you had with John
15      Copenhaver as it relates to Exhibit R or your
16      Declaration.
17   A.   And my conversation with John Copenhaver was when I
18      received the E-mail, the said E-mail. My conversation
19      wasn't related to coming up with the Declaration, it
20      was just becoming apprised of the fact of what had
21      transpired.
22   Q.   Okay. When did you receive — when you say "the
23      E-mail", you're talking about Exhibit R?
24   A.   That's correct.
25   Q.   When was that sent to you?

**11**

1    A.   I don't remember the date off the top of my head.
2    Q.   Within the last couple of months?
3    A.   Probably longer than that.
4    Q.   Within the last year?
5    A.   Yes.
6    Q.   I mean, obviously, the E-mail — let me ask you this:
7      Are we talking one month after these E-mails,
8      six months after these E-mails, in March of 2013?
9    A.   I don't recall. Yeah, I don't really recall. It would
10      have happened fairly close to the date of the E-mail.
11   Q.   In other words, you would have gotten it separate and
12      apart from the litigation; you would have gotten it as
13      part of your job?
14   A.   That's correct.
15   Q.   And I want to go back, I just want to make sure I
16      understand. You talk about discussions with
17      appropriate personnel in number one. How many
18      discussions did you have with Mr. Copenhaver that
19      you're referring to in Exhibit 1?
20   A.   And the Exhibit 1, I think, really, talks about coming
21      up with this Declaration. I really didn't have that
22      many discussions with Copenhaver regarding the
23      Declaration.
24   Q.   Fair enough. So would it be accurate, then, to say
25      that when you talk about discussions with appropriate

**12**

1      personnel in Exhibit 1, you're referring only to your
2      counsel?
3    A.   Yeah, for the Declaration, that's correct.
4    Q.   Okay, fair enough. And in terms of you say you had
5      conversations with your counsel regarding the
6      trademarks, how long did those conversations take?
7    A.   Not very long.
8    Q.   Five minutes?
9    A.   Probably, there was some confusion in terms of the
10      different trademarks that were filed at different
11      times, so there was probably — you know, some of it
12      might have been via E-mail, so five minutes would be
13      fairly close, I mean, depending upon how you look at
14      typing an E-mail.
15   Q.   Are you, yourself, contending that Database
16      misappropriated or stole Infogroup's — some of
17      Infogroup's trade secrets?
18           MR. PETERS: Objection, asks for a legal
19      conclusion.
20   Q.   (BY MR. LAUGHLIN) Go ahead.
21   A.   Can you rephrase the question? I'm not sure I
22      understand it.
23   Q.   Yeah. Are you, personally, yourself, alleging that
24      Database took, illegally, or stole Infogroup's
25      databases?

8:14-cv-00049-JMG-SMB   Doc # 251-1   Filed: 06/01/14   Page 4 of 155 - Page ID # 474

DEPOSITION OF Amit Khanna                                      April 16, 2014
INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.

---

**13**

1           MR. PETERS:  Same objection.
2  A.    So let me paraphrase the question so I understand it
3        correctly.  Is your question saying that do I,
4        personally, think DatabaseUSA took Infogroup's data?
5  Q.    (BY MR. LAUGHLIN)  Yes.
6  A.    Is that the question?
7  Q.    Yes.
8  A.    I guess that's what we're here to find out.
9  Q.    But can you answer my question?
10 A.    I don't know.
11 Q.    Okay.  Does anyone at Infogroup, to your knowledge,
12       contend that Database took, illegally, or stole
13       Infogroup's database, or part thereof?
14 A.    I cannot speculate what other people, what they think.
15 Q.    Are we talking about the consumer and business database
16       in your Declaration, in terms of what may or may not
17       have been taken, or are we just talking about the
18       business database?
19 A.    I think the specific exhibit is related to the business
20       database.
21 Q.    In other words, did you just say that the — there's a
22       question in your mind as to whether Database took
23       Infogroup's data, and did you just say that we're not
24       talking about the consumer database in this litigation,
25       we're only talking about the business database?

---

**14**

1           MR. PETERS:  Objection, it's compound,
2        and it misstates former testimony.
3  Q.    (BY MR. LAUGHLIN)  Is that accurate?
4  A.    I guess I don't know what DatabaseUSA has or has not.
5        What we do know is our seed showed up in the business
6        database for DatabaseUSA, and those are the facts we
7        know.
8  Q.    Let me ask it this way:  Do you, or anyone at
9        Infogroup, to your knowledge, have any information that
10       would suggest that there were seed names in the
11       consumer database that showed up in one of Database,
12       LLC's databases?
13 A.    I can't, obviously, speculate to others.  I,
14       personally, don't know.
15 Q.    In other words, the only seed names that you know of
16       that showed — that Infogroup alleges Database has are
17       from the business database, and there are none from the
18       consumer base — consumer database; is that accurate?
19 A.    So in my Declaration, the seed is from the business
20       database, that is correct.
21 Q.    All seeds that you reference?
22 A.    There is only one seed referenced in the Declaration,
23       which is from the business database.
24 Q.    As you — and that's KN, Inc.?
25 A.    That's correct.

---

**15**

1  Q.    As you sit here today, are you aware of any other seed
2        name other than KN, Inc. — let me start over.  As you
3        sit here today, are you aware of any Infogroup seed
4        name, other than KN, Inc., that is in one of the
5        databases of Database, LLC?
6           MR. PETERS:  I'm going to step in.
7           MR. LAUGHLIN:  I'm not asking him to —
8           MR. PETERS:  I know, I'm making clear
9        this is a yes-or-no question.
10 A.    Yes.
11 Q.    (BY MR. LAUGHLIN)  In order to quicken this up, just so
12       we've got a record, Infogroup has its consumer
13       database, which you say, in paragraph two, has 210
14       million consumers, correct?
15 A.    That's correct.
16 Q.    Then it has a business database which has 17 million
17       businesses?
18 A.    That's correct.
19 Q.    And is that true as of today, approximately, 17 million
20       businesses that Infogroup has in its database?
21 A.    That's correct.
22 Q.    Are there any businesses that Infogroup — and when I
23       say "Infogroup", "infoUSA", I'm going to use those —
24       "infoUSA Marketing" — I'm going to use those names
25       interchangeably; is that okay with you?

---

**16**

1  A.    That's fine.
2  Q.    Do you understand what I mean?
3  A.    Yeah.
4  Q.    Does Infogroup have any business information other than
5        the 17 million business names in its business database
6        that you reference in paragraph two?
7  A.    Can you clarify the question?
8  Q.    Yeah.  You've got 17 million businesses in the business
9        database.
10 A.    That's correct.
11 Q.    Do you have any businesses — does Infogroup have any
12       businesses that aren't in the business database?
13 A.    We will have records outside of the 17 million
14       businesses, that is correct.
15 Q.    Tell me, briefly, about those.
16 A.    There could be a number of records.  There could be
17       businesses that have gone out of business that we,
18       through our compilation process over time, have known
19       that they are out of business records.
20 Q.    Right.
21 A.    There could be records that we know are businesses, but
22       we haven't been able to verify them, so there will be
23       categories of business records that are kind of work in
24       progress.
25 Q.    How many business records, total, are there that

---

8:14-cv-00049-JMG-SMB   Doc # 32-2   Filed: 05/07/14   Page 5 of 155 - Page ID # 476

INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.

17

| 1 | | Infogroup has, when you put all of those together? |
| 2 | A. | I'm not sure of that number. |
| | Q. | Tell me all of the sources that Infogroup uses to |
| 4 | | compile its business database. |
| 5 | | MR. PETERS: This is going to be an area |
| 6 | | that we'd like to table for an attorneys'-eyes-only |
| 7 | | discussion. |
| 8 | Q. | (BY MR. LAUGHLIN) Mr. Khanna, is database compilation |
| 9 | | part of your job duties? |
| 10 | A. | No, it isn't. |
| 11 | Q. | Who is in charge of that? |
| 12 | A. | Matt Graves. |
| 13 | Q. | Is it true that all of the information contained in |
| 14 | | Infogroup's business database is publicly-available |
| 15 | | information? |
| 16 | A. | Can you repeat the question? |
| 17 | | MR. LAUGHLIN: Can you read it back, |
| 18 | | Tammy? |
| 19 | | (The requested portion of the testimony |
| 20 | | was read back by the court reporter.) |
| 21 | A. | That's false. And, maybe, define "publicly available". |
| 22 | Q. | (BY MR. LAUGHLIN) Well, how would you define it? |
| 23 | A. | I wouldn't, it's your question. |
| 24 | Q. | Information that I can find out on the Internet, |
| | | information that I can go to government sources and |

18

| 1 | | get, information that anyone could go and find. |
| 2 | A. | That's false. |
| 3 | Q. | What information contained in the Infogroup database is |
| 4 | | not publicly available, as I've just defined it? |
| 5 | A. | That's a pretty broad question. I mean, there are |
| 6 | | sales models that we have, credit scores that we have, |
| 7 | | that's not necessarily publicly-available information. |
| 8 | Q. | Number of employees, revenue, are these what you're |
| 9 | | referring to? |
| 10 | A. | Yes. |
| 11 | Q. | There are certain numbers that you take in information, |
| 12 | | and then Infogroup itself models out or things like |
| 13 | | that, right? |
| 14 | A. | Uh-huh. |
| 15 | Q. | Yes? |
| 16 | A. | That's correct. |
| 17 | Q. | And I want to put those numbers aside that you're |
| 18 | | modeling. |
| 19 | A. | Okay. |
| 20 | Q. | Other than data or numbers that Infogroup itself |
| 21 | | models, such as number of employees or revenue, or |
| | | things of that nature, is the remainder -- is all the |
| 23 | | rest of the information contained in the Infogroup |
| 24 | | business database publicly available, as I defined it |
| 25 | | earlier? |

19

| 1 | A. | I don't know. The question is too broad. |
| 2 | Q. | How so? |
| 3 | A. | You have a lot of fields. You got to go, really, field |
| 4 | | by field and then think about, would that information |
| 5 | | be available publicly. |
| 6 | Q. | How about if I said business name, business address, |
| 7 | | business phone number, executives; is all of the |
| 8 | | information in those fields in the Infogroup business |
| 9 | | database publicly available, as I've defined it? |
| 10 | A. | And the definition is very broad and vague. Would you |
| 11 | | consider knowing who the owner of a business is public |
| 12 | | information? I don't know. It depends on your broad |
| 13 | | definition of public information, so that's why the |
| 14 | | question back to you. |
| 15 | Q. | And I've defined it as information you can find on the |
| 16 | | Internet, in part. |
| 17 | A. | And the answer is, probably, no. |
| 18 | Q. | Why? |
| 19 | A. | I don't know where to find a business owner for every |
| 20 | | business on the Internet. |
| 21 | Q. | In paragraph three, you say: Infogroup collects data |
| 22 | | directly from a multitude of original public and |
| 23 | | propriety sources; do you see that? |
| 24 | A. | That's correct. |
| 25 | Q. | What proprietary sources are you referring to? |

20

| 1 | | MR. PETERS: This is going to be an |
| 2 | | attorneys'-eyes-only discussion. |
| 3 | Q. | (BY MR. LAUGHLIN) What public sources are you |
| 4 | | referencing in paragraph three of your Declaration? |
| 5 | A. | So sources such as the phone books, the Secretary of |
| 6 | | State filings; those are the two I can recall off the |
| 7 | | top of my head. |
| 8 | Q. | I'm on Page 2 of your Declaration. Then, do you see |
| 9 | | where you say: When information has been verified by |
| 10 | | an Infogroup employee as being accurate and current, |
| 11 | | that information will be designated as verified in |
| 12 | | Infogroup's data listings provided to customers? |
| 13 | A. | That's correct. |
| 14 | Q. | Tell me the process that Infogroup goes through to |
| 15 | | verify the information as you reference in paragraph |
| 16 | | three of your Declaration. |
| 17 | A. | So we have different ways of verification: One is when |
| 18 | | somebody enters that information into our system, we |
| 19 | | verify to the source it came from to make sure it's |
| 20 | | transcribed accurately. Once it's in the system, we'll |
| 21 | | go through a multitude of other verification processes, |
| 22 | | including calling that business, to make sure that we |
| 23 | | can verify that information is accurate. |
| 24 | Q. | When you say you go through a multitude of other |
| 25 | | processes as part of Infogroup's verification, tell me |

8:14-cv-00049-JMG-SMB Doc # 32-2 Filed: 05/07/14 Page 6 of 155 - Page ID # 476

INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.

**21**

1  all of those.

2  A.  I wouldn't be the best person to answer the details of

3  that.

4  Q.  When you say that Infogroup goes through a multitude of

5  processes to verify its data, you mentioned one,

6  calling the businesses.  I'd like you to list --

7  A.  That's correct.

8  Q.  -- all, as you sit here today, that you are aware of,

9  that Infogroup does to verify its data, as you

10  reference in paragraph three of your Declaration.

11  A.  So the phone books would be one; calling those

12  businesses would be two; verifying, through the source,

13  where the information came from would be three.  I

14  think those are the three I can think of.

15  Q.  When you say number two is phone books, tell me what

16  you mean.

17  A.  So taking the printed phone books that you get, the

18  Yellow Pages, key information off of that.

19  Q.  When you do your calling, where does Infogroup -- does

20  Infogroup use publicly-available phone connect data?

21  A.  Can you repeat the question?

22  Q.  Sure.  Tell me how -- let's start with the -- I'm going

23  back to your first one, calling businesses.

24  A.  That's correct.

Q.  Where does it get the phone numbers to call?  Where

**22**

1  does Infogroup get the phone numbers to call as part of

2  its verification process?

3  MR. PETERS:  If you know the answer.

4  A.  I don't know all the places we get the information

5  from.  A few of them are, like I had mentioned, the

6  Yellow Pages, Secretary of State filings.

7  Q.  (BY MR. LAUGHLIN)  As you sit here today, are you aware

8  of any nonpublic sources that Infogroup uses to get

9  phone numbers to call as part of its verification

10  process?

11  A.  Yes.

12  Q.  Tell me about those.

13  MR. PETERS:  To the extent that's

14  proprietary information, that's going to be something

15  we want to table.

16  Q.  (BY MR. LAUGHLIN)  Let's go to the third point, you

17  said, was you verify sources of where the information

18  came from.  Tell me what you mean by that.

19  A.  So if we get the phone books, somebody transcribes them

20  and keys them into the system; we will validate that

21  what is in our system matched the original source,

22  which was the phone book.

23  Q.  So when you talked about -- and I wrote down there's

24  three ways that you are aware of that Infogroup

25  verifies its information:  One was it calls the

**23**

1  businesses, two was the phone books, and I wrote down

2  three, verify sources of where the information came

3  from.

4  A.  The information that's keyed into our system, that you

5  validate it to the source it came from, in the sense

6  that whatever source provided that's in the example,

7  the phone book would be a source, so you validate

8  what's keyed into the system is what the source has, to

9  avoid any kind of typos or mis-keying of information.

10  Q.  So do I understand, generally, what you're telling me

11  is Infogroup gets information from the Secretary of

12  State and from phone books, correct?

13  A.  That's correct.

14  Q.  And in terms of what it verifies, the way it verifies

15  is it does, what I have two things, in my head, to

16  kind of summarize:  One is it goes back to the phone

17  books or the Secretary of State and verifies that, hey,

18  we entered the information accurately; and then number

19  two, Infogroup makes telephone calls to verify that the

20  business is open, phone number is accurate, et cetera?

21  A.  That's correct.

22  Q.  Is there anything else, that you're aware of, that

23  Infogroup does to verify the accuracy of the data, as

24  you reference in paragraph three, other than that?

25  A.  There are, you know, proprietary internal processes

**24**

1  that we have that will work on that data to validate,

2  you know, to identify erroneous information.

3  Q.  How accurate is Infogroup's databases?

4  A.  That's a pretty open-ended question.  Pretty.

5  Q.  Well, for example, if you took the example, 17 million

6  names that are currently in Infogroup's business

7  database, can you give me an estimate as to how many of

8  those entries you, personally, believe are accurate and

9  current, as you use those terms in paragraph three of

10  your Declaration?

11  A.  I think the question depends on what do you mean by

12  "accurate and current"?

13  Q.  Okay.  Well, let's go back to your -- you are on

14  paragraph three of your Declaration that you have in

15  front of you, correct?

16  A.  Uh-huh, yes.

17  Q.  Tell me what you mean when you use those terms in your

18  Declaration, "accurate and current".  What definition

19  were you using?

20  A.  So at the time of compilation, we validate that the

21  information is current, accurate.

22  Q.  So you're qualifying these terms in terms of the timing

23  of when it's done?

24  A.  And if you're referring, specifically, to Infogroup

25  then uses proprietary analytical systems and tools to

**25**

1   accurately and comprehensively categorize millions of
2   consumers and businesses into compilations of data,
3   namely, its consumer and business databases; is that
4   the sentence you're referring to, or is it the next
5   one?
6   Q.   When information has been verified by an Infogroup
7        employee as being accurate and current, that's what I'm
8        referring to.
9   A.   Okay.
10  Q.   And my question is:  Give me a definition of the words
11       "accurate" and "current", as you're using them there.
12  A.   So my definition of that would be that we have
13       validated parts of that information to be true.
14  Q.   Which parts?
15  A.   At one -- I'm not the best person to speak to the
16       details of when a record is deemed -- or the nuances of
17       when its verified versus not verified.
18           Now, there will be process and weightage given to
19       different inputs received in verifying the information,
20       and at a particular grade, it will be considered
21       verified.
22  Q.   Well, tell me what you're -- I understand you may not
23       be the best person --
24  A.   Yeah.
25  Q.   -- but you're the only person I have here to ask.

**26**

1   A.   Okay.
2   Q.   So, Mr. Khanna, I would ask you, based on your
3        understanding, what does it take for a record -- for
4        Infogroup to consider a record verified versus
5        nonverified?
6   A.   So according to me, a record will be verified when
7        we've substantiated it from the source that it came
8        from; that is, we validated that what we got is what is
9        in our system, and when we call that particular
10       business, we did manage to validate, through a phone
11       call, that that is truly a business.
12  Q.   And when you say "validate through a phone call", let's
13       talk about -- and, again, I want your understanding as
14       to what Infogroup needs to do in order to consider the
15       business verified.  Do they need to just -- is it
16       enough to be verified if someone picks up at the other
17       end?  Do they need to verify the name of the business,
18       the address of the business?  Tell me what your
19       understanding is as to what, specifically, needs to be
20       done in the call in order for Infogroup to consider a
21       business verified as compared to nonverified.
22  A.   So --
23           MR. PETERS:  If you have an
24       understanding of what the practices are.
25  A.   Yeah, again, I don't know the details of it.  My broad

**27**

1        understanding is we validate each field on the phone
2        call.  So on the phone call, we will try and validate,
3        were we able to verify the name of the business and
4        some of the other key fields?
5   Q.   (BY MR. LAUGHLIN) Which would be what?
6   A.   Name, address, phone number, obviously, type of
7        business, and based on the input received, we will deem
8        it to be verified.
9   Q.   What percent of the phone calls that are made by
10       Infogroup as part of this verification process are not
11       answered?
12  A.   I don't know that number off the top of my head.
13  Q.   Can you give me an estimate?
14  A.   No.
15  Q.   In other words, you can't tell me whether that's
16       5 percent, 25 percent, 70 percent?
17  A.   And your specific question is, how many of those are
18       not answered?
19  Q.   Correct.
20  A.   I don't know that number off the top of my head.
21  Q.   Who would?
22  A.   Matt Graves should.
23  Q.   If the phone calls that Infogroup makes as part of its
24       verification process are not answered, is the record
25       kept in the database, or is it removed?

**28**

1   A.   I think the question goes back to, what do you mean by
2        "not answered"?  Just because we called a business
3        once, is that considered, in your definition, not
4        answered?  We could try multiple times, multiple times
5        of the day, multiple times of the week.  In a lot of
6        those cases, we might not be able to get ahold of the
7        business in the first attempt, so there could be
8        multiple attempts.
9   Q.   Fair enough.  Let's say, after how many attempts
10       Infogroup makes, there's no answer.
11  A.   Uh-huh.
12  Q.   What happens to that entry in the Infogroup database?
13  A.   To the best of my knowledge, there might be other
14       corroborating evidence to suggest that it is a real
15       business, and we might treat it as verified or
16       unverified depending on all the information available
17       related to that particular record.
18  Q.   Describe for me all the other corroborating evidence
19       that you just referred to.
20  A.   Like I said, I'm not the person that knows the details.
21  Q.   Are you able to give me any examples of corroborating
22       evidence that you just referred to in your prior
23       answer?
24  A.   So we could have tried to call the business and might
25       not have succeeded.  We might have been able to call

8:14-cv-00049-JMG-SMB Doc # 52-2 Filed: 05/07/14 Page 8 of 155 - Page ID # 478

INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.

**29**

1 the business the previous year, and we might have call
2 records associated with that, so there might be
3 evidence associated with us having reached that
4 business at a prior time, a prior year. That would go
5 into determining whether it's deemed verified or not.
6 Q. Could it be possible that there are businesses that are
7 in the Infogroup business database that are listed as
8 verified even though Infogroup was not able to get
9 ahold of anybody during its telephone calls?
10 A. I'm not — I don't know that information.
11 Q. Who would?
12 A. Matt Graves would.
13 Q. When you call — if I understand it, Infogroup makes
14 quite a few of these calls that we're talking about?
15 A. That's correct.
16 Q. What's your understanding as to how many they make?
17 A. I'll be speculating an actual number.
18 MR. PETERS: I don't want you to
19 speculate. If you know the answer, you can provide the
20 answer.
21 A. No, I don't.
22 Q. (BY MR. LAUGHLIN) And when they call, when Info — are
23 the Infogroup employees who call?
24 A. We've got a dialing system that calls.
25 Q. Sure, but is the Infogroup employees that are speaking?

**30**

1 A. That's correct.
2 Q. And if they're asked who is calling, why are you
3 calling, what do they say to these businesses?
4 A. You know what, I don't know what the rebut is, or what
5 the answer to that rebut is.
6 Q. And, again, would it be fair that your job has nothing
7 to do with this verification process; would that be
8 accurate?
9 A. Define "nothing to do". We sell that information.
10 Q. Your job has nothing — you are not involved in any way
11 in the actual verification process that Infogroup uses
12 that you've referenced in your Declaration, true?
13 A. Yes, the process reports into, like I said, Matt
14 Graves, so I'm not responsible for manning the
15 operations of the verification process.
16 Q. Okay. And at the end of paragraph three, you mention
17 web sites and products, infoUSA.com, Salesgenie.com,
18 ReferenceUSA.com and Credit.net; do you see that?
19 A. Yes.
20 Q. And are those all web sites from which a person can
21 access parts of the Infogroup databases, the consumer
22 database and the business database?
23 A. That's correct.
24 Q. Is Infogroup's database used in relationship to any web
25 sites, publicly-available web sites, such as Yahoo or

**31**

1 others?
2 A. Sorry, could you repeat the question, please?
3 Q. Sure. Is the Infogroup — so you've got the Infogroup
4 databases that are there and that people can access
5 through the four web sites that we just talked about —
6 A. That's correct.
7 Q. — that are unique to Infogroup, right?
8 A. That's correct.
9 Q. Is it true that there are other web sites from which,
10 also, members of the public can access the data that's
11 contained in the Infogroup consumer and business
12 databases?
13 A. That is correct.
14 Q. Tell me about all of those web sites that you are aware
15 of, as you sit here today.
16 A. I'm sure I'm going to forget a few.
17 MR. PETERS: I'll step in and just note
18 that this is going a little bit beyond the bounds of
19 what the Declaration covered, but understanding the
20 circumstances, I just want to make sure that we're
21 trying — Mr. Khanna is here to answer questions
22 related to his Declaration, and he's not being
23 presented as a company witness, a person most
24 knowledgeable on this issue, or any of these other
25 issues that we've talked about, solely on his personal

**32**

1 knowledge of the Declaration and exhibits that were
2 provided. I just want to make sure that we don't get
3 too far beyond the four walls of that.
4 A. So where our data is available at sites that I know of,
5 you mentioned Yahoo, absolutely; Google, Bing, Ask, I
6 think those are the ones that I'm pretty sure still
7 serve up our data.
8 Q. (BY MR. LAUGHLIN) With respect to all of those web
9 sites, the entire Infogroup consumer and business
10 database are accessible by the public from all those
11 web sites, correct?
12 A. False.
13 Q. Why?
14 A. All of the data is not presented on the web sites.
15 Q. What data is presented — what part of the Infogroup
16 database's consumer business is accessible by the
17 public through those web sites and what is not?
18 A. I can't speak to the specificity of each field that
19 each of those sites presents, but broadly speaking,
20 business name, address and phone number.
21 Q. Did you just say that it's your understanding that of
22 the Infogroup business database, that all business
23 names, addresses, and phone numbers for the 17 million,
24 or however many million entries are in the Infogroup
25 business database, 100 percent of those are available

**33**

1      on Yahoo, Google, Bing, and Ask?
2   A.   No, I didn't say that.
3   Q.   Okay. Then, I misunderstood you, so give it to me
4      again, please.
5   A.   So broadly speaking, those three fields are available.
6      Which businesses are presented and which businesses are
7      not presented is up to the Infogroup licensees, the
8      ones that I named. They determine which ones to
9      present, which ones not to present, and it, obviously,
10      also, depends on what is being searched.
11   Q.   What's your understanding as to the search
12      mechanisms -- let's just take Yahoo, Google, Bing, and
13      Ask, generally. What's your understanding as to the
14      search mechanisms and capabilities of those web sites
15      to search and get results from the Infogroup business
16      database?
17   A.   I won't even begin to speculate on that. There are
18      hundreds of people that work on that. I have no idea
19      what and how their search works.
20   Q.   When you say they have "hundreds of people", are you
21      talking about Infogroup, or these sites?
22   A.   No, these sites, Google, that are presenting our data.
23   Q.   But it is your understanding that if I went to Yahoo or
24      Google or Bing or Ask and I said, okay, Fraser Stryker,
25      that's my law firm, and I said, hey, I want to — give

**34**

1      me something on Fraser Stryker. I enter that into
2      Yahoo or Google or such, and that the way it would work
3      is that web site would go in to the Infogroup business
4      database and pull up the information that it has, and
5      it would display, at a minimum, Fraser Stryker's name,
6      business address, and phone number; is that your
7      understanding?
8   A.   No, that's not my understanding. They could be any
9      number of databases; ours happens to be one of them. I
10      don't know if they're presenting Fraser Stryker as it
11      is in our database or anybody else's, or any of the
12      other, additional sources that they would use.
13   Q.   What other sources -- let's take Yahoo. You say that
14      you're aware that Info -- and I'm not trying to beat a
15      dead horse here, Mr. Khanna, but I do want to
16      understand your knowledge.
17   A.   Yeah.
18   Q.   Okay. So let's just take Yahoo.
19   A.   Yeah.
20   Q.   You've already testified that Yahoo has licensed
21      Infogroup's business database for its Yahoo.com site,
22      correct?
23   A.   That's correct.
24   Q.   Are you aware of any other business databases that
25      Yahoo has licensed or has access to?

**35**

1   A.   In general, yes; specifically, no. I don't know which
2      other databases they've licensed, but I know that they
3      have licensed other data sites.
4   Q.   Is it also your understanding that when Infogroup
5      licenses its business database to Yahoo, Google, Bing,
6      and Ask, and others, that that license gives access to
7      the entire database?
8   A.   That is correct. It gives license to the licensor,
9      access to the complete database. Obviously, the
10      license comes with a lot of restrictions on how they
11      can use that information and what they can display.
12   Q.   And tell me your understanding for Yahoo, Google, Bing,
13      and Ask. What is your understanding as to what
14      restrictions, if any, these web sites have in terms of
15      what information they can display with respect to the
16      Infogroup database?
17   A.   So the one restriction I do know of, off the top of my
18      head, is displaying the zip code in their results page.
19      So they are not allowed to display the zip code on the
20      results page, which lists multiple results. They
21      aren't allowed to show that zip code on the detail
22      page, when you're looking at a particular business.
23   Q.   And what's your understanding as to why that
24      restriction is in place?
25   A.   That restriction is in place so that, you know, people

**36**

1      can't create mailing lists out of these free public
2      sites.
3   Q.   Any other restrictions you're aware of other than the
4      zip code restriction you just discussed?
5   A.   It's been a few years since I looked at those
6      contracts. I'm trying to recall. Off the top of my
7      head, number of results would be another restriction,
8      how many of our records that they can show on a
9      specific page.
10   Q.   In total, or just on a --
11   A.   On one page.
12   Q.   On one page? In other words, you don't understand
13      there's any limit to the number of results, just on one
14      page, and then you go to the next page, that kind of
15      thing?
16   A.   That's correct.
17   Q.   Anything else that you're aware of?
18      MR. PETERS: And I want to stop you
19      before we go too much farther in this. We're talking
20      about details of contracts between Infogroup and its
21      customers, and I mean, I'm not sure that, to the
22      extent that it's relevant to our deposition here today,
23      if we go any further with this, I think this is --
24      we're going to get close to some proprietary business
25      information.

8:14-cv-00049-JMG-SMB   Doc # 321 Filed: 06/06/14   Page 10 of 155 - Page ID # 4801
INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.
Deposition of Om Khanna                                        April 16, 2014

**37**

1    MR. LAUGHLIN: Well, again, I'm not
2  asking what the restrictions are in the contract, I'm
3  asking for what people can access on the web sites, his
4  understanding of that. That's what I'm trying to get
5  at.
6    MR. PETERS: And if he has personal
7  knowledge of what those are, outside of the contracts,
8  then he can answer.
9  A.  That's, pretty much, it.
10 Q.  (BY MR. LAUGHLIN) Well, and I don't want to limit it
11 to inside or outside of the contracts. We've talked --
12 I think my original question, Mr. Khanna, to try to
13 summarize this, so we can move on, my original question
14 was, with Yahoo, Google, Bing, and Ask, what
15 restrictions are you aware of, that when a public
16 person comes to these sites and wants to access the
17 Infogroup database, are there any restrictions of any
18 kind? And you mentioned, first of all, that they might
19 not display a zip code on a list due to the mailing?
20 A.  That's correct.
21 Q.  And please tell me any other restrictions that you're
22 aware of other than that one, then we can move on.
23 A.  So number of listings they can show on a single page.
24 Q.  Does that complete your answer?
   A.  Yes.

**38**

1  Q.  Let's go to Infogroup's ReferenceUSA product.
2  A.  Okay.
3  Q.  And that's a product that Infogroup offers through
4  libraries and other institutions, correct?
5  A.  That's correct.
6  Q.  Can you give me -- I'm sorry.
7  A.  That is correct.
8  Q.  Can you give me a number -- an estimate of a number of
9  libraries and other institutions that the ReferenceUSA
10 product is available through?
11 A.  I don't know the specific number of libraries that it's
12 available through.
13 Q.  Can you give me an estimate?
14 A.  I can't even give you an estimate, actually.
15 Q.  And isn't it true, for example, if I go down to the
16 Omaha Public Library in downtown Omaha, I can get on
17 their computer, and I can access all of Infogroup's
18 business database, correct?
19 A.  That is correct.
20 Q.  And I can get lists filtered by zip code and other
21 filters, correct, other lists?
22 A.  That's correct.
23 Q.  That's a free service to the public?
24 A.  That's correct.
25 Q.  And any member of the public can come in to -- any

**39**

1  member of the public can access, correct?
2  A.  I don't think it's any member of the public, I think
3  it's a library patron.
4  Q.  Okay. Any person who has got a library card at the
5  Omaha Public Library can go on in and get into and
6  access Infogroup's business database; is that correct?
7  A.  That is correct.
8  Q.  And are there any fields you're aware of that are not
9  accessible through ReferenceUSA?
10 A.  We do not provide all information through ReferenceUSA.
11 We have a number of fields that we don't provide.
12 Q.  What are those?
13 A.  Broadly speaking, in terms of, like, E-mail addresses,
14 we don't provide. We won't provide lifestyle
15 information. Broadly speaking, those are the two
16 categories that come to mind.
17 Q.  How many -- let's talk about resellers. Infogroup uses
18 resellers to sell data and services; is that true?
19 A.  That's correct.
20 Q.  And for the record, tell me what you mean when you
21 say -- what is a reseller, to you?
22 A.  A reseller, to me, is somebody that is providing our
23 mailing lists to an end customer to help them with
24 their marketing efforts.
25 Q.  And when Infogroup works with resellers, the resellers

**40**

1  have access to Infogroup's entire database, including
2  all seed names, correct?
3  A.  When you say "access", can you define "access"?
4  Q.  Well, why don't you tell me how it works, for the
5  record, in terms of resellers and how they fulfill
6  orders to end users?
7  A.  Sure. So a reseller would, typically, call us and
8  define what their client is looking for in terms of
9  their marketing efforts, and we will run those searches
10 in our system and, typically, provide them with a count
11 of how many matching records there are, and once that
12 customer commits to buying it, we will fulfill that
13 transaction and send them the data.
14 Q.  And all of Infogroup's seed names would be included in
15 those counts and would, if it met the criteria, would
16 be provided to end users, true?
17 A.  If it met the criteria, the related seed names will be
18 included, that's correct.
19 Q.  Like, for example, on KN, Inc., there's a zip code
20 affiliated with that, correct?
21 A.  Yes.
22 Q.  And if an end user went to a reseller and said, hey, I
23 want all the businesses in the zip code -- the zip code
24 for KN, Inc. in Exhibit K is 33326, and there's a
25 four-digit after that, but let's say an end user goes

**41**

1  to a reseller and says, I want to market and send a
2  marketing letter to every business in zip code 33326.
3  When you gave them a count, that would include KN,
4  Inc., correct?
5  A.  That's correct.
6  Q.  And that list that would be provided to -- the list
7  that would be provided to the end user would include
8  KN, Inc., correct?
9  A.  You know, let me -- "it depends" is the right answer,
10  because depending on what the criteria for the search
11  is, it might or might not be included.
12      At times -- when a reseller, particularly, wanting
13  to do a mailing, would want all records in a particular
14  zip code, there's something called a location dupe-out,
15  where you would only, typically, provide a single
16  business and a single address.  So we might have
17  multiple businesses at a single location, and in which
18  case, we will give one record out of those several
19  businesses; it might not be all records.
20  Q.  I understand.  I guess, just very basically, though,
21  your seed names are part of the database, and they're
22  treated like any other entry in there with respect to
23  people who ask for lists, true?
24  A.  Broadly speaking, that's correct, yes.
25  Q.  And so, for example, if I went in to the Omaha Public

**42**

1  Library, and I went to ReferenceUSA, and I said, give
2  me all the businesses in zip code 33326, KN, Inc. would
3  be one of the businesses that would come up, correct?
4  A.  Barring any other filters, I'm not sure what the
5  default setting is.  So if you just typed in that zip
6  code, I'm not sure, off the top of my head, whether we
7  would give one business per location as our default, or
8  all businesses for that location, so "it depends" is
9  the answer.
10  Q.  Sure, and, again, though, you don't treat -- Infogroup,
11  when it makes its database available to Yahoo, or to
12  the library patrons, or to end users of resellers, seed
13  names are treated in exactly the same manner as
14  non-seed names and are equally accessible; you'd agree
15  with that, true?
16  A.  Yes.
17  Q.  And so, again, if I went to Yahoo or Google or Bing or
18  Ask, and I did a filter saying, give me all zip codes
19  of 33326, then I'm probably going to get KN, Inc.?
20  A.  You can't do that search on Yahoo.
21  Q.  I cannot?
22  A.  No, you can't go to Yahoo and say, give me all
23  businesses at this zip code.
24  Q.  Okay.  What searches can I do?
25  A.  You can say, I want a Spanish restaurant in a zip code,

**43**

1  and it will give you that.
2  Q.  So if I had the right -- if I ask the right question,
3  give me -- well, what kind of business was KN, Inc.
4  listed in Infogroup's database?
5  A.  You know what, I'm not sure.  Let's look at the
6  exhibit.  So according to the exhibit, in the
7  AtoZ Database, it's sanitary services.  My guess would
8  be it's very similar in the Infogroup database.
9  Q.  And assuming that's correct, if I went to Yahoo and
10  said, give me all the sanitary service companies in
11  Florida, KN, Inc. would come up on Yahoo?
12  A.  "Florida" is a broad search.  You'll get thousands of
13  records.  Whether you get to see that record depends on
14  what Yahoo's algorithm for prioritizing, sorting, and
15  displaying that information is.
16  Q.  Maybe I'm making this too complicated.
17  A.  Making it too broad.
18  Q.  If I went to Yahoo or Google or Bing or Ask and said,
19  give me all the sanitation service companies in Westin,
20  Florida, those databases would access the Infogroup
21  database, and they'd come back with everything that
22  matched that, which would include KN, Inc.; would you
23  at least agree with that?
24  A.  I can't speak to Yahoo search algorithms and what they
25  show based on what search.

**44**

1  Q.  Well, if their algorithms were accurate, in other
2  words, if they pulled everything that matched in the
3  Infogroup database, this would come up?
4  A.  I'm not an expert on Yahoo's search algorithms, what
5  they deem to be records that they incorporate in the
6  database and what they don't.
7  Q.  How many end users have been provided KN, Inc.?
8  A.  I have no idea.
9  Q.  Who would?
10  A.  I don't know; probably, Matt Graves.
11  Q.  Is it -- I just want to ask about your understanding.
12  Is it your understanding that Infogroup has that
13  information?  In other words, if I went to -- you know,
14  let's say we go to Infogroup's database, and I said,
15  hey, how often was Microsoft company accessed?  Well,
16  that might be a lot, but how many times KN, Inc. was
17  accessed might be a lot less than that.
18      My question is, based on your understanding, is
19  Infogroup able to tell how many times a record was
20  accessed or sold or viewed?
21  A.  No.
22      MR. PETERS:  We've been going a little
23  over an hour.  Do you need a break, anybody need a
24  break?
25      MR. LAUGHLIN:  Sure, we can take a

**45**

1  break.

2  (A break was taken.)

3  Q. (BY MR. LAUGHLIN) We're back on the record.

4  Mr. Khanna, a couple of follow-up questions. I

5  want to get back to accuracy of the data. I assume, in

6  your capacity as the president of the Small and Medium

7  Business group, you get questions from clients or

8  resellers, or somebody that says, hey, you know, how

9  accurate is this data, I mean, right?

10 A. (Nonverbal response.)

11 Q. And when you're asked that -- is that a yes? You're

12 shaking your head.

13 A. Yes.

14 Q. And when you get asked that question, what

15 representations do you, yourself, make as to how

16 accurate Infogroup's data is?

17 A. You know, typically, we'll represent what we've done to

18 collect the information, specifically, and depending on

19 the question of, you know, what do they mean by

20 accuracy, we might answer that differently, but in

21 general, it will be talking about our compilation

22 process.

23 Q. Well, let's say I call you up and I say, hey, you know,

24 I want to get a list of all the doctors in Omaha

25 because I want to market to them, and I'm just curious,

**46**

1  you know, how accurate is this? How many of these are

2  going to be the real names, at the real addresses, with

3  the real phone numbers, and the real specialties, and

4  everything else? Are we talking 100 percent? Are we

5  talking 90 percent? Are we talking 40 percent? I

6  mean, I assume you get questions of that nature, and if

7  true, my question is, what's your response to those?

8  A. Obviously, I don't get the specific questions, but my

9  sales team does, and the typical response to a question

10 like that is, what are you trying to do?

11 Q. Mail letters to them, all the doctors in Omaha, to

12 solicit their business.

13 A. Okay. So in a case like that, we will typically say,

14 if you're going to do mailings, depending on when you

15 buy the data from us and do the mailings, you can

16 expect probably something to the tune of 93 percent

17 deliverable, deliverability, because you don't know

18 what the mailman is going to do.

19 Q. How about phone calls? I want all the phone numbers of

20 all the doctors in Omaha because I want to call them

21 and market my medical product. Hey, how accurate is

22 Infogroup's data? What's your response to, now I'm

23 switching to phone numbers, if it makes a difference to

24 you?

25 A. Every question is different when you're calling

**47**

1  professionals. We will not answer that question with

2  specificity because it's no different, if you're trying

3  to reach different parts of the database, you will get

4  different connect rates.

5  Q. What's the range of connect rates that you would get?

6  A. I think you'll have to be more specific to a particular

7  instance, and at that point, I can speculate what

8  somebody in my team would say.

9  Q. Well, and I'm not trying to be obtuse here, but I

10 thought you said, okay, how accurate -- I mean, you

11 make some representations in your Declaration --

12 A. Uh-huh.

13 Q. -- about the accuracy of the Infogroup data.

14 A. Yes.

15 Q. And at just a very basic, plain English level, I'm

16 trying to find out how accurate you think it is.

17 A. Yes, but your question is not specifically how accurate

18 the data is, your question is specific to how accurate

19 is it for the person using it, for the purpose that

20 they are using it?

21 Q. Okay.

22 A. I can't speculate to that.

23 Q. Well, let's just go back to the data itself, then.

24 Forget about the uses.

25 A. Uh-huh.

**48**

1  Q. How accurate is Infogroup's data in its business

2  database?

3  A. Like I previously mentioned, it's pretty accurate at

4  the time we compile it and validate it.

5  Q. Well, but what do you mean by "pretty accurate"?

6  A. That's, I'm guessing -- do you want a specific number

7  as a percentage?

8  Q. That would be helpful.

9  MR. PETERS: If you know.

10 A. I don't know.

11 Q. (BY MR. LAUGHLIN) And a while back, you said

12 93 percent delivery. That's a very specific figure.

13 Is there a -- where does that come from?

14 A. That is something that we tell our customers,

15 specifically, for mailing.

16 Q. And my question is, why 93 as opposed to 89 or

17 95 percent? It sounds like that came from somewhere.

18 Where did that come from?

19 A. It came from just, over the years, that's what we've

20 used in expectation setting.

21 Q. Well, I understand that, but my whole point is where

22 did it come from? Why is it that you use that?

23 A. I don't know where it came from.

24 Q. Would you agree with me that with respect to records in

25 the Infogroup business database that Infogroup labels

8:14-cv-00049-JMG-SMB Document 105-07/14 Page 13 of 155 - Page ID # 463

DEPOSITION OF Amit Khanna                                        April 16, 2014
INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.

**49**

1   as verified, that less than 100 percent of the
2   information contained in those records is accurate?
3   A.  I can't speak to that.
4   Q.  Well, Mr. Khanna, with –– 17 million business records
5       in the database, right?
6   A.  Uh-huh.
7   Q.  That's a yes?
8   A.  Yes, I would testify to that.
9   Q.  And how many of those –– do you have an understanding
10      as to how many of those Infogroup claims are verified,
11      as Infogroup uses that term, approximately?
12  A.  I don't know that number.
13  Q.  Are you able to give me an approximation?
14  A.  No, because the question is vague. When you say it's
15      accurate ––
16  Q.  No, no, I'm sorry. Let me restate. I'm not talking
17      about –– I'm now focusing on –– you understand
18      Infogroup says, this record is verified, this record is
19      not verified, right?
20  A.  That's correct.
21  Q.  And my question is, of the, approximately, 17 million
22      businesses in the Infogroup database, can you give me
23      an estimate as to how many of those are verified, as
24      Infogroup defines that term and advertises that term?
    A.  I can't speculate to that.

**50**

1   Q.  Okay. And however many there are, you and I can ––
2       you're not going to sit here, under oath, sir, and
3       claim that 100 percent of the verified information in
4       Infogroup's database is completely accurate, are you?
5   A.  Absolutely not. That's why I said I don't know.
6   Q.  I mean, we all know businesses come and they go, and
7       information is received that isn't 100 percent accurate
8       to begin with, and you expect that at least some of
9       Infogroup's verified business records in its business
10      database will not be accurate at any given time, fair?
11  A.  I think you're confusing "verified" with "accurate".
12      You're using both interchangeably, and I'm not sure
13      why.
14          MR. PETERS: Just answer the question
15      that's put to you.
16  A.  Can you repeat the question?
17  Q.  (BY MR. LAUGHLIN) Let me ask it this way: You would
18      agree with me that even –– for all the records that
19      Infogroup verifies, however many that might be, it is
20      certain that there's going to be some inaccuracies even
        in records that Infogroup verifies; would you agree at
        least with that statement?
23  A.  Fair enough.
24  Q.  Is that a yes?
25  A.  Yes.

**51**

1   Q.  Thank you.
2       Is there a public database of new phone numbers
3       that's available?
4   A.  Can you define "public"?
5   Q.  Amit Khanna can call and pay for it and get it, Mark
6       Laughlin can call and pay for it and get it, and
7       John Q. Public can call and pay for it and get it.
8   A.  Yes, you can buy such data. For what purposes, I'm not
9       sure, so not everyone can buy information. So it could
10      be available, but I don't know if it's available for
11      public, open-ended use, or specific restrictions around
12      that.
13  Q.  Let me switch. Is there –– and I don't want you to
14      divulge any confidential information, but do you, as
15      part of –– as part of Infogroup's marketing, do they
16      say, hey, you know, we service X many millions of
17      customers, or hundreds of thousands of customers. Can
18      you give me –– are you able to give me an estimate as
19      to how many customers Infogroup has?
20  A.  Tens of thousands.
21  Q.  And would it be an accurate statement that all of the
22      seed names that Infogroup has in its business databases
23      could be provided to all of Infogroup's customers if
24      they asked for the right selects and the right list,
25      true?

**52**

1   A.  I can't speculate to that. I mean, we have so many
2       products, I don't know what specific records go in
3       which product.
4   Q.  Is there a single customer of Infogroup –– as you sit
5       here today, are you able to identify a single Infogroup
6       customer who would not be able to access the seed names
7       in the Infogroup business database?
8   A.  I think the trouble I have with that question is what
9       do you mean by "access"?
10  Q.  Can you answer the question as phrased?
11  A.  No.
12  Q.  If any of the tens of thousands of customers of
13      Infogroup called up and said, I want all the sanitation
14      businesses in Westin, Florida, 100 percent of those
15      customers would have access –– would receive KN, Inc.,
16      true?
17  A.  It would depend on what product they are buying.
18  Q.  Well, what do you mean by that? I'm just saying, give
19      me a list of all the sanitation services in Westin,
20      Florida.
21  A.  Yeah, do you want that as a directory? Do you want it
22      in a CD-ROM? There are different products, and
23      different products get different parts of the data.
24  Q.  Which products would exclude KN, Inc.?
25  A.  I don't have –– I can't speak to that.

8:14-cv-00049-JMG-SMB Doc # 32-2 Filed: 06/07/17 Page 14 of 155 - Page ID # 494

UNITED STATES DEPOSITION OF RAKESH KHANNA April 16, 2014

INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.

---

**Page 53**

1  Q.  Are there any, that you're aware of, that would exclude
2      KN, Inc., as you sit here today?
3  A.  Like I said, I'm not aware of what record,
4      specifically, would go in which product, so I'm not
5      aware of which ones won't get it.
6  Q.  I guess, Mr. Khanna, I'm not trying to play hide the
7      ball here, but just as a very big picture matter, you
8      know, I want to -- when I walk out of here, I want to
9      know who has got access to KN, Inc. --
10 A.  Okay.
11 Q.  -- and seed names like that, and I guess I just want to
12     make sure that I understand correctly.  And so
13     Infogroup has tens of thousands of customers --
14 A.  Uh-huh.
15 Q.  -- and if they called up and asked for the right
16     selects, just as a very basic matter --
17 A.  Okay.
18 Q.  -- you could send any of those customers a list that
19     would have KN, Inc. on it?
20 A.  Yes, in that example, that is true.
21 Q.  And then same for the resellers, for all -- can you
22     give me an approximate number of resellers that
23     Infogroup has?
24 A.  I don't know that.
25 Q.  Can you give me -- when you said tens of thousands of

**Page 54**

1      customers before, were you including end users that
2      order through resellers?
3  A.  I was just talking about customers as a company, as a
4      whole.
5  Q.  Directly to you?
6  A.  What do you mean?
7  Q.  Forget it.  Let me ask it this way:  To the extent that
8      there's any end user customer who orders from Infogroup
9      through a reseller, and if any of them ask, give me all
10     the sanitation services in Westin, Florida, all of
11     those end users would receive KN, Inc.; they would have
12     access to KN, Inc. as well, correct?
13 A.  That's true.
14 Q.  And, again, anybody who is a member of the Omaha Public
15     Library, who goes in to the library, or sits at their
16     desk with their library card and connects to the Omaha
17     Public Library web site, if they said, you know, pull
18     up all the sanitation services in Westin, Florida,
19     they, too, would see a list with KN, Inc. on it,
20     correct?
21 A.  Probably, yes.
22 Q.  Are you familiar with Manta?
23 A.  Yes.
24 Q.  Does Infogroup provide any data to Manta?
25 A.  I don't know.

**Page 55**

1  Q.  Do you know whether -- strike that.  Let's go to
2      paragraph four of your Declaration and just -- how
3      long, by the way, have you been president of the Small
4      and Medium Business at Infogroup?
5  A.  Slightly over a year.
6  Q.  And how long have you worked at Infogroup?
7  A.  As a whole, approximately, 15 years.
8  Q.  And before you were president of the Small and Medium
9      Business group, what position did you hold?
10 A.  I held a number of positions over the years.
11 Q.  What was the one right before Small and Medium
12     Business?
13 A.  I think it was president, strategy and planning.
14 Q.  And you were responsible for what in that regard?
15 A.  In that regard, I was responsible for determining --
16     helping define the strategy for the small business
17     group of where we wanted to go with that business.
18 Q.  And how long did you do that?
19 A.  Approximately, nine months.
20 Q.  Before that, what did you do?
21 A.  Before that, I was responsible for, I think, database
22     compilation.
23 Q.  How long did you do that?
24 A.  I was responsible for that, I think, about six to
25     nine months.

**Page 56**

1  Q.  And what did you do, specifically, there in database
2      compilation?
3  A.  I was responsible for the operation.
4  Q.  Of compiling the database?
5  A.  That's correct.
6  Q.  What did you do before that?  I'm hopeful you're going
7      to tell me you were at something for a number of years
8      as opposed to months.
9  A.  I wish.  Before that, I was responsible for our
10     database licensing group.
11 Q.  How long did you do that?
12 A.  I think, two years.
13 Q.  And was that with respect to the resellers?
14 A.  No.
15 Q.  What did you do there for the licensing group?
16 A.  My team was responsible for licensing our data to
17     strategic partners.
18 Q.  Such as?
19 A.  Such as Yahoo and Google and Bing.
20 Q.  Let's go back to paragraph four.  You say:  In fact,
21     Infogroup employs more than 400 individuals just to
22     collect, archive, update, and verify the data; do you
23     see that?
24 A.  Yes.
25 Q.  How many individuals, currently, does it employ?

8:14-cv-00049-JMG-SMB   Doc # 222-3   Filed 05/07/14   Page 15 of 155 - Page ID # 485

DEPOSITION OF Amit Khanna                                                          April 16, 2014

INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.

**57**

1   A.   I don't know the exact number.

2   Q.   Where did you -- what's the source of that information?

3        How do you know that?

4   A.   Overall head count by group, I'm privy to that

5        information.

6   Q.   Did you, yourself, go and look that up and calculate

7        that, or was it done for you?

8   A.   It was done for me.

9   Q.   Who did it?

10  A.   The organizational chart shows how many people each

11       group has.

12  Q.   I asked a bad question.  Did you, yourself, type this

13       Declaration?

14  A.   No, I didn't.

15  Q.   Who did?

16  A.   My counsel did.

17  Q.   Were there different versions that you reviewed?

18  A.   Define "versions".  We went back and forth on drafts.

19  Q.   Approximately, how many back-and-forths were there?

20  A.   I can't recall.

21  Q.   The first draft came from your lawyer?

22  A.   That's correct.

23            MR. PETERS:  Is that a question?

24            MR. LAUGHLIN:  Yes.

25  Q.   (BY MR. LAUGHLIN)  Did you -- let's get back to this

**58**

1        400 number, as an example.  Is that a number that you

2        would have -- did you go out and try to figure out what

3        that number was, and you provided that to your

4        attorney, or did the number come from someone other

5        than you?

6   A.   To the best of my recollection, I would have provided

7        that number.

8   Q.   Before receiving the first draft of your Declaration?

9   A.   Yeah.

10  Q.   What other information did you gather and provide to

11       your attorney prior to receiving the first draft of

12       your Declaration?

13  A.   So all the exhibits -- not all, some of the exhibits in

14       the Declaration.

15  Q.   You had already?

16  A.   I provided, yes.

17  Q.   Tell me which ones.

18            MR. PETERS:  I think he may have gone

19       through that list at the outset of the deposition.

20  Q.   (BY MR. LAUGHLIN)  Okay.  And the ones I wrote down

21       were K, L, N, O, P, R, S.  And my question, Mr. Khanna,

22       in order to speed this up, is, are those the exhibits

23       that you would have provided to your attorney?

24  A.   That's correct.

25  Q.   The remainder were provided to you?

**59**

1   A.   The trademark stuff was provided to me.

2   Q.   Were all the other exhibits, other than the ones I just

3        read off, provided to you as well?

4   A.   Can you repeat the exhibits?

5   Q.   Yes.  K?

6   A.   Okay, yes.

7   Q.   L?

8   A.   Yes.

9   Q.   N?

10  A.   Yes.

11  Q.   O?

12  A.   Yes.

13  Q.   P?

14  A.   Yes.

15  Q.   R?

16  A.   That's correct.

17  Q.   The remainder of the exhibits would have been provided

18       to you, correct?

19  A.   Sorry, I've got to go through.  A, B, C, D, E, F, G, H,

20       I, J were provided to me.

21  Q.   Okay.  Let's move on to paragraph five, and I'm going

22       to mostly skip this to a later part of the

23       deposition --

24  A.   Uh-huh.

25  Q.   -- but I do want to ask, with respect to computer

**60**

1        access, I'd like to just ask you specific questions as

2        to the access of the defendants.  Tell me everything

3        you know about the computer access that Blake

4        Van Gilder had at any time while he was at Infogroup.

5   A.   I can't speak to that.  We, obviously, have a team

6        that's responsible for security and access.  They would

7        know specifics.

8   Q.   Same question for Jason Dailey.

9   A.   I can't speak to the access that any individual had,

10       specifically, at any given points in time.

11  Q.   Your answer would be the same, then, for Mark Puljan?

12  A.   That's correct.

13  Q.   How about Mr. Gupta?

14  A.   Uh-huh.

15  Q.   You're not able to speak to what access he may or may

16       not have had while he was at Infogroup?

17  A.   That's right.

18  Q.   Tell me about -- you say, in your Declaration, that you

19       consider Database to be a competitor -- Database, LLC,

20       to be a competitor of Infogroup's.  Is that your

21       belief, or do you have that belief?

22  A.   That's correct.

23  Q.   Who else do you consider to be a competitor of

24       Infogroup's?

25  A.   Dun & Bradstreet.  Do you want more?

8:14-cv-00049-JMG-SMB    Doc # 232    Filed 05/07/14    Page 16 of 155 - Page ID # 4861

DEPOSITION OF Amit Khanna                              April 16, 2014

INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.

### Page 61

1  Q.  Yes.

2  A.  We would consider Experian, Axium; probably, Fair
      Isaac. Those would be the main competitors.

4  Q.  Do all of those competitors that you just listed have a

5      business and consumer database similar to Infogroup's?

6  A.  Probably not all of them.

7  Q.  Which ones do?

8  A.  Dun & Bradstreet only has a business database; Experian

9      has both; Axium has both; Fair Isaac has neither --

10     frankly, I don't know which ones they have.

11  Q.  And would you expect, for the databases that

12     Dun & Bradstreet and Experian and Axium have, start

13     with consumers, would you expect that their consumer

14     count would be similar in number to Infogroup's?

15  A.  I would expect, yes.

16  Q.  And same question for business database, you would

17     expect, in terms of number of businesses that they

18     have, you would expect that the number would be

19     similar, correct?

20  A.  You know what, I don't know.

21  Q.  Why not?

22  A.  Just because some of the other players are not that

23     strong in a business database, so I don't know what

24     they have.

25  Q.  Who would you say, of the groups Dun & Bradstreet,

### Page 62

1     Experian and Axium, is the closest competitor that

2     would have the database that would most closely

3     resemble Infogroup's?

4  A.  Which database?

5  Q.  Business.

6  A.  Dun & Bradstreet.

7  Q.  And do you have any idea -- as you sit here, do you

8     have an estimate as to how many businesses

9     Dun & Bradstreet has in their business database?

10  A.  No, I don't.

11  Q.  But wouldn't you expect -- I mean, Dun & Bradstreet,

12     just from publicly-available sources, you know that

13     they go out and they get their data -- they get their

14     list of businesses from, basically, the same places

15     that Infogroup does, these publicly-available sources,

16     the Secretary of States, new business filings, the same

17     publicly-available sources that you get, right?

18  A.  I don't know that. Nobody tells you what their secret

19     source is. So they compile their data the way they do;

20     that's a question for them.

21  Q.  I understand that, but are you telling me, under oath,

22     Mr. Khanna, that you don't have any idea how

23     Dun & Bradstreet, whether they use public --

24  A.  I didn't say I don't have any idea. I say I don't have

25     an understanding of how they compile their data --

### Page 63

1  Q.  Fair enough.

2  A.  -- under oath.

3  Q.  I understand that. Don't you think that there would be

4     millions and millions of entries that would be in both

5     the Dun & Bradstreet database and the Infogroup

6     business database and the Database, LLC, database?

7  A.  I can't speculate to that.

8  Q.  Is it your general understanding that you and the

9     competitors that have a business database -- D&B,

10     Experian, Axium, Database, LLC, and Infogroup -- that

11     all of your competitors get the vast majority, if not

12     all, of their data from the same publicly-available

13     sources?

14  A.  Again, I can't speculate to how other people compile

15     their data.

16  Q.  Would you dispute that?

17  A.  I would -- I would not know enough to think about it,

18     one way or the other.

19  Q.  If I asked you, Mr. Khanna, I want to start from

20     scratch, and I want to compile my own business

21     database, and we're going to hire people and verify it,

22     but I got nothing now, and I want to get up to the 15

23     or 17 million that Infogroup and others have, and I

24     want to hire you to do it; how would you do it?

25     MR. PETERS: I'm going to object to the

### Page 64

1     question to the extent that it calls for detail on how

2     it's currently done, as some of those issues are going

3     to be attorneys' eyes only, discussions left for later.

4  A.  I think the answer would be, it depends. What are you

5     trying to do with the data?

6  Q.  (BY MR. LAUGHLIN) Compete with Infogroup.

7     MR. PETERS: Same objection.

8  A.  A specific part of Infogroup? Infogroup is pretty

9     broad, when we have customers in different segments, so

10     depending on what part of the business you're trying to

11     compete with, I might collect data differently.

12  Q.  (BY MR. LAUGHLIN) How about if I wanted to compete

13     with infoUSA.com?

14     MR. PETERS: Counsel, can we table this

15     discussion for the attorneys' eyes only? I mean, I

16     understand the way you're asking the question, but the

17     information you're seeking is, essentially, asking him

18     to reconstruct all the data sources that they use.

19     We've already addressed that some of those are

20     proprietary and are off-limits for the open portion of

21     this deposition.

22     MR. LAUGHLIN: Well, and I'm not asking

23     him to disclose the sources.

24  Q.  (BY MR. LAUGHLIN) Let me ask it this way: If I told

25     you I want to start a new business, and I want to

**65**

1  get -- and I want to compete with infoUSA.com, and I
2  want to get a business database of 17 million
3  businesses, just like Infogroup, isn't it true that you
4  would start with publicly-available sources to start
5  building that database, and that would get us a
6  long way there, without naming them?
7  A.  I don't know.  That might not be the most effective way
8  of doing it.
9  Q.  Does Experian license the Infogroup database?
10  A.  I think that's confidential information.
11          MR. PETERS:  The identities of
12  particular licensees?
13  Q.  (BY MR. LAUGHLIN)  Do you know who designed -- who
14  initially designed the Infogroup business compilation
15  process?
16  A.  The company was founded by Mr. Gupta.
17  Q.  I want to go into some competitors.  In addition to,
18  you know, the big companies that you mentioned, the
19  Dun & Bradstreets, the Experians, isn't it true that
20  there are hundreds of other people who will offer for
21  sale, here's a number of businesses, business names and
22  addresses; it's a pretty fragmented industry, would you
23  agree with that?
24  A.  I can't speculate to your definition of
         "fragmentation".

**66**

1  Q.  Let me ask you this:  Would you agree that there are
2  hundreds of people who, if I went out and said, hey,
3  give me the name of a thousand businesses or a million
4  businesses, would you agree with me that there's
5  hundreds of people who would offer to sell me such a
6  list?
7  A.  I don't know the count.
8  Q.  Would you dispute that there are hundreds of people or
9  companies who would offer to sell you a thousand names
10  or a million business names, addresses, and phone
11  numbers, currently?
12  A.  Hundreds of people or companies, that's the question?
13  Q.  Yes.
14  A.  So companies or people?
15  Q.  Yes.
16  A.  Both?
17  Q.  Yes.
18  A.  I would not dispute it.
19  Q.  And as president of the Small and Medium Business at
20  Infogroup, isn't part of your challenge that there are
21  people that are selling data that's a lot different than
22  what you offer, and the way that you compete against
23  those offers with your clients, or potential clients,
24  is by telling them, our data is better?
25          MR. PETERS:  Can you read the question

**67**

1  back?
2          (The requested portion of the testimony
3          was read back by the court reporter.)
4  A.  In a broad sense, yes, it's different as well.
5  Q.  (BY MR. LAUGHLIN)  How so?
6  A.  It depends on who is selling what.  So, yes, our job is
7  to educate the customer on our products and our data
8  and highlight, you know, the nuances of our data.
9  Q.  Are you aware, for example, that there are companies or
10  people out in the marketplace that are saying, hey,
11  I'll give you 5 million or 10 million business names,
12  addresses, and phone numbers, and I'll do it for $5,000
13  or $10,000?  Are you aware of that?
14  A.  I'm aware of it.
15  Q.  What's your understanding as to the source of the data
16  of those people?
17  A.  I can't speculate.
18  Q.  And I don't want you to speculate.
19  A.  I don't know.
20  Q.  Have you ever, or anyone at Infogroup, to your
21  knowledge, ever made an investigation as to try to
22  figure out, geez, you know, they're undercutting our
23  price by a wide degree, I wonder what the source of
24  their data is, and done an investigation?
25  A.  I don't know who would have done that investigation, in

**68**

1  what context.
2  Q.  Do you know -- Infogroup makes a claim in this lawsuit
3  that KN, Inc. has come into the possession of Database,
4  LLC, correct?
5  A.  That's correct.
6  Q.  Are you aware of any other individual or company, other
7  than Infogroup and Database, LLC, that has possession
8  of KN, Inc., or any of the fields related thereto?
9  A.  To the best of my knowledge, no.
10  Q.  Are you aware of any person or company, other than
11  Infogroup and Database, LLC, that has, in their
12  possession, any seed name that Infogroup has ever used
13  at any time?
14  A.  And I think the questions you're asking is also a
15  company that we wouldn't have given the seed name to
16  ourselves; is that correct?  I mean, obviously, I
17  already stated, in my earlier testimony, that our
18  partners would, potentially, get those seeds that have
19  rightfully licensed -- paid us millions of dollars for
20  licensing information.
21  Q.  Correct.
22  A.  So can you repeat the question, please?
23  Q.  Sure.  Are you aware of any person or company who is in
24  possession of any seed name of Infogroup, at any time,
25  other than those who have licensed it?

69

1  A.  Yes.
2  Q.  Tell me about those.
3          MR. PETERS:  I'll object as to
4  relevance.  It's outside the scope of the Declaration.
5  Q.  (BY MR. LAUGHLIN)  Again, we can agree, but go ahead.
6  A.  What exactly do you want me to go ahead and tell you?
7  Q.  Give me a list.
8  A.  Of?
9  Q.  You just told me you're aware of, basically, people who
10     have seed names of Infogroup, and they didn't license
11     it.  Give me a list of all those that you're aware of.
12  A.  I think that would be confidential and probably
13     attorneys' eyes only.
14  Q.  Why?
15  A.  Because they are potential places or potential sources
16     that somebody could go, and we suspect, have our data,
17     and somebody could go and get it from.
18          MR. LAUGHLIN:  Off the record.
19          (An off-the-record discussion was held.)
20  Q.  (BY MR. LAUGHLIN)  Paragraph nine, the second sentence
21     of what you write is:  This data audit revealed that
22     more than one of DB101's services, including those
23     published to subscribers through InfoFree.com and
24     AtoZdatabases.com, had incorporated numerous listings
25     of those seed files used by Infogroup in November of

70

1     2011, correct?
2  A.  Correct.
3  Q.  Tell me how it was you determined that November of 2011
4     date.
5          MR. PETERS:  This is, again, going to go
6     into seeding protocols and conventions that is going to
7     be attorneys' eyes only.
8          MR. LAUGHLIN:  Well, I'm not asking him
9     what he did, I'm just saying how he determined the date
10     was November, as opposed to another date.
11          MR. PETERS:  It's part of the seeding
12     protocol.
13          MR. LAUGHLIN:  I guess that's something
14     we will then put in another part of the deposition, and
15     we can discuss later.
16  Q.  (BY MR. LAUGHLIN)  Let's go to Exhibit K.  Can you
17     please give me the background on who pulled this record
18     up, when it was pulled up, when the screen shot was
19     made?
20  A.  I pulled this record up, and I made the screen shot.
21  Q.  When?
22  A.  After I learned about the audit results and the seeds
23     that were found.
24  Q.  And can you give me a time frame?
25  A.  It was the day that -- day or, maybe, within plus/minus

71

1     a day of the audit results that the seeds were found in
2     the DatabaseUSA database.
3  Q.  And I get that.  I'm trying to -- was that three months
4     ago, nine months ago?
5  A.  The date is on the exhibit --
6  Q.  Okay.
7  A.  -- off the printout.
8  Q.  Tell me -- up top?
9  A.  Yes, it's June 28, 2013.
10  Q.  What did you do with this record after you printed it
11     off?
12  A.  I sent it to our counsel.
13  Q.  Are you aware of anyplace on the Internet where the
14     information contained in Exhibit K, where you could
15     find that same information?
16  A.  Not to my recollection.
17  Q.  Do you know what scraping is?
18  A.  I'm familiar with the term.
19  Q.  And what is its meaning to you?
20  A.  I guess, in the context of data --
21  Q.  Yes.
22  A.  -- is copying information off of a web site.
23  Q.  Is it possible for someone to scrape most or all of the
24     information contained in the Infogroup business
25     database?

72

1  A.  I'm no scraping expert.
2  Q.  So you don't know, either way, whether it is or not?
3  A.  That's correct.
4  Q.  Are you aware of anyone who has claimed to have scraped
5     all or part of Infogroup's business database and is,
6     subsequently, offering it for sale?
7  A.  No, I'm not.
8  Q.  Based on what you know of scraping, would it be
9     possible to get on Yahoo, Google, Bing, or Ask and
10     scrape millions of business names or other fields of
11     information from the Infogroup database?
12  A.  Like I said, I'm not a scraping expert.  I mean, the
13     sites that you mentioned are pretty savvy, you know,
14     companies, and they deal with information, so I'm sure
15     they've got protective measures against somebody
16     scraping their sites, but I'm no expert on it.
17  Q.  Let me ask it this way:  If someone were to make the
18     statement that it is possible to get on Yahoo, Google,
19     Bing, or Ask and scrape millions of business names or
20     millions of other bits of information from the
21     Infogroup business database, would you dispute that
22     testimony?
23          MR. PETERS:  Calls for speculation.
24  A.  Like I said, I'm not an expert on it.  I don't know,
25     one way or the other.  If somebody is claiming that,

73

1    they are the ones you should ask why they're claiming
2    it.
3    Q.   (BY MR. LAUGHLIN) And how about, going over to
4         ReferenceUSA, based on what you know about how the
5         ReferenceUSA product is offered and how it can be
6         accessed, would it be possible, based on what you know,
7         for someone to go in and, with a computer, scrape, you
8         know, again, millions of business names or millions of
9         other bits of information from the Infogroup business
10        database?
11   A.   Can you repeat the question?
12   Q.   Sure.  You have at least a basic familiarity of the
13        ReferenceUSA product and what is offered and, more
14        importantly, how it's accessed by members of the Omaha
15        Public Library and every other library that it's
16        offered, correct?
17   A.   Uh-huh, that's correct.
18   Q.   Based on that information that you have, do you believe
19        it would be possible for someone to come in and, with a
20        computer, scrape millions of business names, or
21        millions of other bits of information, through the
22        ReferenceUSA product of names or information that's in
23        the Infogroup business database?
24   A.   Again, I'm not an expert on what people can do to
         scrape, how much information.

74

1    Q.   Okay.  And I bet I'm going to get the same answer, but
2         same question:  If someone were to testify that it is,
3         in fact, possible for someone to come in, through
4         ReferenceUSA, at one of a various number of libraries
5         throughout the country, and scrape millions of business
6         names and other information from the Infogroup business
7         database, would you dispute that testimony?
8    A.   I wouldn't be able to speak to it, one way or the
9         other.
10             MR. LAUGHLIN:  And, Counsel, am I right
11        that if I'm going to ask questions about — any more
12        questions on the genesis of this, and why he was doing
13        it, and the search and everything, that's the
14        attorneys'–eyes–only issues?
15             MR. PETERS:  That's right.
16             MR. LAUGHLIN:  Then, I'm going to move
17        on then.
18   Q.   (BY MR. LAUGHLIN) How many companies have access to
19        the Infogroup database and then offer online telephone
20        directories?
21   A.   I don't know that exact number off the top of my head.
22   Q.   Can you give me an estimate?
23   A.   Years ago, when I was running that division, it would
24        have been, probably, a dozen.
25   Q.   And just so I understand how this works, so I go

75

1         online, and I want to get a telephone number of a
2         business, and let's say a site is using the Infogroup.
3         If I entered in KN, Inc., is it your understanding, as
4         things sit today, that there would be more than 10
5         places where, if I went to this business database that
6         licensed Infogroup data, or had it available, and I put
7         in KN, Inc., that it would come up, the information,
8         the phone number contained in Exhibit K?
9    A.   Like I said, I don't know how many there are today.
10   Q.   But however many there are, I would go on — so there's
11        some number of people who license this, and I can get
12        on the Internet and go to one of however many there
13        are, and if I put in KN, Inc., the phone number that
14        you put in, the seed name is going to pop up, true?
15   A.   I think I kind of talked to this, what Google and Yahoo
16        and some of those companies do in terms of their search
17        algorithms.  I can't speak to what will come up.
18   Q.   Sure.  Infogroup makes its database available and, at
19        least, makes it available to some number of people who
20        are offering, I'll give you a telephone number, and
21        it's at least — all of the seed names and the phone
22        numbers and the information are at least accessible;
23        would you agree with me on that?
24   A.   Again, it goes back to how that search is performed on
25        those sites.  I can't speak to how they perform the

76

1         search.
2    Q.   Is KN, Inc. still in the Infogroup business database?
3    A.   To the best of my knowledge, it is not.
4    Q.   When was it taken out?
5    A.   To the best of my knowledge, it was for a specific
6         month only.
7    Q.   Did you just say that KN, Inc. was only in the business
8         database for one month?
9    A.   To the best of my knowledge, that's correct.
10   Q.   What month was that?
11   A.   November.
12   Q.   Of 2011?
13   A.   That's correct.
14   Q.   I just want to make sure I understand it —
15   A.   Uh-huh.
16   Q.   — so forgive me for being a lawyer.
17   A.   Okay.
18   Q.   Did you just say that before November 1st of 2011, it's
19        your understanding that KN, Inc., as it's set forth in
20        Exhibit K, was not in any Infogroup database?
21   A.   I don't know that.
22   Q.   Is that your belief?
23   A.   It is my belief that that seed was in there for that
24        month, and only there for that month, yes.
25   Q.   Okay.  And, again, in other words, KN, Inc. wasn't in

INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.

---

**77**

1 any Infogroup database before November 1, 2011, and
2 KN, Inc. wasn't in the Infogroup database at any time
3 after November 2011; is that accurate?
4 A. That's correct.
5 Q. So is it your belief, as you sit here today, that — is
6 it your belief that someone, in the month of
7 November 2011, stole or took KN, Inc.?
8 MR. PETERS: Objection, calls for
9 speculation, legal conclusion.
10 A. Yeah, I mean, I'd be speculating.
11 Q. (BY MR. LAUGHLIN) You don't have — do you have any
12 information of any kind, as you sit here today, as to
13 how — when you make the claim that KN, Inc. is in the
14 Database, LLC, database, do you have any knowledge of
15 any kind as to how KN, Inc. got from the Infogroup
16 business database, as you allege, into the Database,
17 LLC, database?
18 A. No.
19 Q. Does anyone at Infogroup, to your knowledge?
20 A. To my knowledge, I don't know.
21 Q. Is it your belief that somebody took — somebody
22 accessed KN, Inc. and used it for an unlicensed
23 purpose, or you don't know, either way?
24 A. I don't know.
25 Q. Okay. Do you, as you sit here today, do you or

**78**

1 anyone — strike that. As you sit here today, do you,
2 or anyone at Infogroup, to your knowledge, have any
3 information of any kind regarding when the KN, Inc.
4 seed name got into the Database, LLC, database, as you
5 allege?
6 A. I don't know that.
7 Q. Same question for the other seed names that you allege
8 ultimately made it into the Database, LLC, database.
9 A. I don't know — I don't know who knows that, who knows
10 as to when it got into that database.
11 Q. Do you, or anyone at Infogroup, to your knowledge, have
12 any information to suggest that Mr. Gupta specifically
13 had anything to do with the transfer of the KN, Inc.
14 name from the Infogroup business database to the
15 Database, LLC, database, as you allege?
16 A. I don't know if anyone would have that information.
17 Q. Same question for Mr. Blake Van Gilder.
18 A. No, I don't think we know either. We don't know
19 whether Blake or Mr. Gupta would have taken that
20 record. Is that your question?
21 Q. Well, let me ask it a different way: Do you have any
22 information — do you, or anyone at Infogroup, have any
23 information that it was Mr. — that Blake Van Gilder
24 had any part in the fact that KN, Inc. was in the
25 Infogroup business database and somehow got

**79**

1 transferred, as you allege, to the Database, LLC,
2 database?
3 MR. PETERS: I'm just going to object to
4 the extent that Mr. Khanna isn't speaking for the
5 company. He's testifying as to his personal knowledge,
6 and your question is framed as "anyone at Infogroup".
7 He's not a 30(b)(6) witness.
8 A. I don't know.
9 Q. (BY MR. LAUGHLIN) Same question: Do you, or anyone at
10 Infogroup, to your knowledge, have any information of
11 any kind to suggest that Mr. Jason Dailey had anything
12 to do with the fact that KN, Inc. was a seed name in
13 Infogroup's business database and somehow, as you
14 allege, got transferred to Database, LLC's, business
15 database?
16 A. I don't know.
17 Q. Same question with respect to Mr. Puljan.
18 A. Same answer.
19 Q. And to the extent it was different, same question for
20 Mr. Gupta.
21 A. I don't know.
22 Q. And, finally, same question for any database employee.
23 A. I don't know.
24 Q. Let's turn to —
25 MR. PETERS: Counsel, about how much

**80**

1 more of the open portion do you have? We've been going
2 about an hour and 15 minutes since we came back on, I
3 think.
4 MR. LAUGHLIN: I think now probably
5 would be a good time to take a break. I mean, I'm
6 certainly a lot closer to the end than I am to the
7 beginning, but I do have — I've got at least one other
8 topic, and, I mean, I'm going through this
9 (indicating).
10 MR. PETERS: Sure, I understand. Let's
11 go off the record.
12 (A break was taken.)
13 Q. (BY MR. LAUGHLIN) We are back on the record.
14 Mr. Khanna, I asked you some questions about the
15 individuals who had been named defendants, and I forgot
16 Mr. McCormick, and just for the record, I want to ask
17 one question about Mr. McCormick, and that is: Do you,
18 or anyone at Infogroup, to your knowledge, have any
19 information of any kind that Mr. McCormick had any
20 participation in the transfer of the KN, Inc. seed name
21 from Infogroup's business database to, as you allege,
22 it going into the Database, LLC, database?
23 A. I don't know.
24 Q. Do you have paragraph 10 of your Declaration in front
25 of you?

---

**81**

1  A.  Yes.

2  Q.  The first sentence, you say: Defendant Database 101

3  claims that it uses a verification process similar to

4  Infogroup's on its data compilations, and designates

5  individual records as verified; do you see that?

6  A.  Yes, I do.

7  Q.  Where did DB101 make that claim that you reference?

8  A.  That is a page on the DB -- I think it's on the

9  DatabaseUSA site which talks about compilation process.

10  Q.  And let me make sure. Are you saying Database actually

11  claims, hey, our verification process is similar to

12  Infogroup's, or is it that you read Database's

13  verification, and you believe that that is similar to

14  Infogroup's?

15  A.  You know what, I don't recall whether it specifically

16  said it's similar, or it seems similar.

17  Q.  And is that the same -- I'm trying to figure out what

18  you -- you could read the sentence to say Database

19  claims that it's similar to Infogroup, or you could

20  read it to say Database claims that its verification

21  process is X, which is similar to Infogroup; do you

22  understand the distinction I'm making?

23  A.  Yes. Let me reread this.

24  Q.  And my question is: Which of those two do you mean?

   A.  Can you talk to the difference again, just so we're on

**82**

1  the same page?

2  Q.  Yeah. So I read this sentence as one of two ways: One

3  is you could be saying, Defendant Database is claiming

4  that its verification process is similar to

5  Infogroup's --

6  A.  Yeah.

7  Q.  -- or another thing you could be saying is Defendant

8  Database says its verification process is X, which is

9  similar to Infogroup's, even though Database is not

10  making that claim. Do you understand, first of all,

11  the difference that I'm --

12  A.  Yes.

13  Q.  So my question, then, is, which of those two senses or

14  ideas are you trying to communicate in your first

15  sentence of paragraph 10?

16  A.  It's, I think, my understanding that it seems similar

17  to Infogroup's; it's the latter.

18  Q.  Let's go on to the second paragraph: Defendants',

19  meaning Database's, marketing materials state that the

20  "verified" designation means that a human operator has

21  personally checked the data to verify that it is

22  current and accurate; do you see that?

23  A.  That's correct.

24  Q.  Tell me all information that you possess that forms the

25  basis for that statement.

**83**

1  A.  I would say, really, three things: One is, obviously,

2  the "verified" symbol on the exhibit; the second that

3  I've looked at is the compilation process on the

4  DatabaseUSA's web site which talks about compilation

5  process; and the third is a compilation video that

6  shows a group of people compiling information and

7  making phone calls.

8  Q.  What compilation video are you referring to?

9  A.  That is a video, I think, put out by one of Database,

10  LLC's companies, showing people compiling information.

11  Q.  is this something that you found on the web?

12  A.  Yes.

13  Q.  Do you have a copy of it?

14  A.  Not at the time.

15  Q.  What web site did you find it on?

16  A.  I'm not sure. I've seen the video, I think it was

17  maybe loaded up on YouTube, or on AtoZ's web site, or

18  DatabaseLLC's web site.

19  Q.  And to the extent -- have you made a copy?

20  A.  No.

21  Q.  Which of those three sources -- I want to focus on the

22  fact that "verified" means that a human operator has

23  personally checked the data. Where did the fact that a

24  human operator has personally checked the data --

25  what's your source for that contention?

**84**

1  A.  I think it's based on the wordings on DB101's web site

2  itself which talks about compilation process, and/or on

3  the exhibit.

4  Q.  Which exhibit are you referencing?

5  A.  I'm looking at K. K, obviously, doesn't say human

6  operator. I think it was the web site. It was -- I

7  remember seeing it somewhere, specifically.

8  Q.  You end paragraph 10, you say: Notably, as further

9  demonstrated by the screen capture, the seed files

10  placed in Infogroup's databases are labeled as

11  verified; do you see that?

12  A.  Yes.

13  Q.  Does Infogroup label any of its own seed names as

14  verified?

15  A.  That's correct.

16  Q.  I said, did Infogroup?

17  A.  Yeah, we do label our records as verified.

18  Q.  So Infogroup, for all of the seed names -- and we'll

19  get into that after Mr. Gupta and Mr. Vakili leave --

20  A.  Uh-huh.

21  Q.  -- but I just want to make sure I'm tracking with you.

22  A.  Yeah.

23  Q.  It is your testimony that Infogroup's seed names,

24  themselves, are listed as verified?

25  A.  You know what, I don't know that.

85

1    Q.    That's what you believe?
2    A.    I don't believe that either. I just don't know it.
3         But we do label records as verified; I don't know if
4         the seeds, specifically, are labeled as such.
5    Q.    Well, let me ask you this: The whole — under what
6         circumstances would Infogroup label a seed name, in
7         other words, a business that it knows was manufactured
8         and fake — would there be any circumstances under
9         which Infogroup would label a fake — a business that
10        it, itself, knows is fake as being verified?
11            MR. PETERS: Calls for speculation.
12   Q.    (BY MR. LAUGHLIN) To your knowledge?
13   A.    You know, we have a very competent compilation team.
14        People know the specifics of what records are deemed
15        verified. They do their job; I trust they do their
16        job. So to your question, I don't know.
17   Q.    Well, let me ask it this way: I mean, if one of your
18        customers called you and said, hey, I want to make sure
19        that, at least as far as you know, all the businesses
20        I'm getting on my list are real and accurate, at least
21        as far as you know —
22   A.    Uh-huh.
23   Q.    — which would exclude seed names that you know are
24        fake, okay?
     A.    Uh-huh.

86

1    Q.    Would your response be, well, there may be some fake
2         seed names in there, or would your response be,
3         absolutely, Infogroup, all of the businesses that we're
4         going to give you, at least to our own knowledge, are
5         real and existing?
6    A.    So what's the question? I'm sorry.
7    Q.    The question is: Is it your — would you represent to
8         a customer that part of the data they're going to
9         receive are names, businesses that you know —
10        Infogroup, knows to be fake?
11   A.    You know, it's speculation. I don't know when or why I
12        would disclose that. It would depend on the context.
13   Q.    Under what circumstances would you, personally, sell to
14        one of your customers in the Small and Medium Business
15        group a list that would include a business that
16        Infogroup itself knows is fake?
17   A.    I, personally, would sell the list as the list based on
18        the criteria the customer requested, and if it has
19        a seed, it has a seed.
20   Q.    So you don't think there's anything wrong — strike
21        that. So even if you knew — let me give you a
22        hypothetical. I call and I say, give me all the
23        sanitation businesses in Westin, Florida. And you run
24        the search, and there's 20 of them, and one of them is
25        KN, Inc., that you know is fake.

87

1    A.    Uh-huh.
2    Q.    Would you give me the list with KN, Inc. in it, or
3         would you exclude KN, Inc. because it was fake?
4    A.    I would give you the list, as-is. I would not have
5         control over picking individual records that go in the
6         list or don't go in the list. You ask for a criteria,
7         you get that criteria.
8    Q.    I got it. I'm sorry, can you go back one page?
9    A.    Sure.
10   Q.    You say: However, as demonstrated by the screen
11        capture, Defendant DB101 has often attached the
12        "verified" designation; do you see that?
13   A.    Uh-huh.
14   Q.    That's a yes?
15   A.    That's correct.
16   Q.    When you say "often", tell me how many times you're
17        aware of that D&B has done that, to your knowledge.
18   A.    You mean, DB101?
19   Q.    Yes.
20   A.    Has done what?
21   Q.    Attached the "verified" designation to records that
22        could not have been verified?
23            MR. PETERS: Can you repeat the
24        question?
25            MR. LAUGHLIN: Do you want to read it

88

1    back, Tammy?
2            (The requested portion of the testimony
3            was read back by the court reporter.)
4    Q.    (BY MR. LAUGHLIN) Let me just re-ask it, because we
5         got a whole bunch of questions. When you use the word
6         "often" in paragraph 10 of your Declaration, list for
7         me every instance in which you're aware that Defendant
8         Database101 has attached the "verified" designation to
9         its records that could not have been verified.
10           MR. PETERS: Counsel, to the extent that
11       this question, essentially, is asking, tell me every
12       instance you know of where a seed of Infogroup has
13       appeared in DB101 data compilation, that goes to the
14       attorney's-eyes-only issues that we'll be discussing
15       later.
16           MR. LAUGHLIN: I'm just asking for a
17       number.
18           MR. PETERS: Well, you're asking — if
19       you would read the paragraph in full, you'll see the
20       clarification and limitation on the word "often".
21           MR. LAUGHLIN: I don't follow you.
22           MR. PETERS: That could not have been
23       verified, dash, the fictitious seed data listings that
24       Infogroup had inserted in its databases to detect
25       unauthorized access and use. That's expressly defining

**89**

1  what "often" means.

2        So your question is asking him, how many times

3  have you found Info seeds in Database -- in DB101

4  compilations? As we discussed earlier, those would be

5  topics reserved for the attorneys'-eyes-only portion of

6  the deposition.

7        MR. LAUGHLIN: Without agreeing, one way

8  or the other, whether that's right, I will just move on

9  then, and we can do that in the second part of the

10  depo.

11        MR. PETERS: I appreciate it. Thank

12  you.

13  Q.  (BY MR. LAUGHLIN) If you could go to paragraph 11, you

14      start: Defendants have frequently -- excuse me. You

15      write, in paragraph 11 of your Declaration: Defendants

16      have frequently has (sic) made references to Infogroup,

17      and used Infogroup service marks in its marketing and

18      promotional materials to suggest a present or ongoing

19      relationship between DB101 and Infogroup's products and

20      services; do you see that?

21  A.  Yes.

22  Q.  List -- when you say "frequently", list every example

23      of that, that you're aware of, as you sit here today.

24  A.  They are in the attachments.

     Q.  In other words, the entire list of the times where you

**90**

1  claim that the defendants have made references to

2  Infogroup to suggest a present or ongoing relationship,

3  those are all attached to your Declaration, and there's

4  nothing else; is that accurate?

5        MR. PETERS: Objection, that misstates

6  his testimony.

7  Q.  (BY MR. LAUGHLIN) Okay. Do you mean that in the --

8      I'm going to re-ask the question: Is it an accurate

9      statement, then, that all of the examples where

10      defendants have used Infogroup services marks to

11      suggest a present or ongoing relationship between

12      Database and Infogroup, all of those that you're aware

13      of are attached to your Declaration; is that an

14      accurate statement?

15  A.  I believe my statement is, specifically, that they have

16      used Infogroup in a number of ways, and the exhibits

17      attest to that.

18  Q.  Right, but that's not my question. Before we get to

19      the exhibits, okay --

20  A.  Yeah.

21  Q.  -- I want to know the full universe of every time that

22      you claim that anybody at Database has suggested a

23      present or ongoing relationship between Database and

24      Infogroup, and I first want to start off, to figure out

25      if there's anything other than what you've attached.

**91**

1  is there?

2  A.  And I can't attest to that because I haven't seen all

3      the marketing material for DB101. So if you want to

4      get an answer to that, I would request you ask your

5      client to present to you all the marketing material

6      they've used.

7  Q.  Let me ask it this way: As you sit here today, are you

8      or anyone at Infogroup, to your knowledge, aware of any

9      statements or references made by anyone at Database to

10      suggest a present or ongoing relationship between

11      Database and Infogroup, other than what you've attached

12      to your Declaration?

13  A.  I'm sure I've seen other material which references

14      Infogroup, infoUSA, in some way, shape or form.

15  Q.  So the answer to the question is yes?

16  A.  That's correct.

17  Q.  Then tell me -- give me a list and, specifically,

18      identify which other references or statements you're

19      referring to, other than what's attached to your

20      Declaration that we're going to discuss.

21  A.  And to my knowledge, it wasn't the intent of this

22      deposition for me to provide any other material outside

23      of what I've mentioned in my Declaration here.

24  Q.  I don't know why you did it, but my question is, I want

25      you to specify every example of statements of anyone at

**92**

1  Database or References which suggest to you a present

2  or ongoing relationship between Database and Infogroup,

3  other than what you've attached.

4  A.  And I can't provide that. I'm not privy to all that

5      marketing material, and your client is.

6  Q.  Let's go to Exhibit L. Are there any statements made

7      or anything about Exhibit L that, in your view, is

8      false?

9  A.  Define "false" for me.

10  Q.  What's your definition of "false"? Not true? I'll

11      give you one, not true.

12  A.  Could it be misleading, I mean, shades of gray?

13  Q.  We'll get to "misleading" in a minute, but right now,

14      can you answer my question with a definition of "false"

15      meaning not true?

16  A.  Not to my knowledge.

17  Q.  Please turn to Exhibit M. Are there any statements

18      made in Exhibit M that you consider to be false?

19  A.  To my knowledge, no.

20  Q.  Please turn to Exhibit N. Are there any statements in

21      Exhibit N that you consider to be false?

22  A.  In this particular instance, I don't know enough to

23      know whether they are true or false.

24  Q.  Can you please turn to Exhibit O? Are there any

25      statements in Exhibit O that, in your view, are false?

93

1  A.  To the best of my knowledge, no.
2  Q.  Please turn to Exhibit P.  Is there anything in
3      Exhibit P that you consider to be false?
4  A.  To the best of my knowledge, no.
5  Q.  Please turn to Exhibit Q.  Is there anything in
6      Exhibit Q that you consider to be false?
7  A.  To the best of my knowledge, no.
8  Q.  Sticking with Exhibit Q, is there anything in Exhibit Q
9      that you consider to be misleading in any way?
10 A.  No, I don't.
11 Q.  In fact, if I am reading Exhibit Q correctly, there
12     appears to be someone from InfoFree who is saying that,
13     in fact, Infogroup and InfoFree are two different
14     companies; is that the way you read it?
15 A.  Yes.
16 Q.  In that vein, Mr. Khanna, are you aware of anyone at
17     Database who has ever actually claimed that Database is
18     somehow affiliated with, or a part of, Infogroup?
19 A.  I wouldn't know what people at Database101 are saying.
20 Q.  Let me turn back, if I could, to Exhibit P.
21 A.  P, you said?
22 Q.  Yes -- actually, let me have you turn to Exhibit O.
23 A.  Okay.
24 Q.  And on the second line, do you see where it says,
       InfoFree.com started by the founder and former head of

94

1      Infogroup, Vin Gupta?  Do you see that?
2  A.  Yes.
3  Q.  Is there anything misleading, in your view, about that
4      statement?
5  A.  That individual statement, no.
6  Q.  Is there anything in any way misleading, in your view,
7      with anything in Exhibit O?
8  A.  Not that I can attest to.
9  Q.  Let me turn to Exhibit N, and let me turn to the third
10     paragraph, and there's a quote, and then it begins,
11     says founder Vin Gupta; do you see that?
12 A.  Yes.
13 Q.  Where it says, says founder Vin Gupta, who also founded
14     infoUSA, Infogroup, and SalesGenie; do you see that?
15 A.  Yes.  You said Exhibit N, right?
16 Q.  Exhibit N, as in Nancy?
17 A.  Yes.  In the third paragraph, it says, InfoFree is
18     quickly becoming --
19 Q.  Correct.
20 A.  Okay.
21 Q.  And if you could go down a line from there, there's a
22     quote, and then it says -- after the quote, it says,
23     says founder, Vin Gupta, who also founded infoUSA,
24     Infogroup, and SalesGenie; do you see that?
25 A.  Uh-huh.

95

1  Q.  That's a yes?
2  A.  That's, yes, I see it.
3  Q.  And when it says, says founder, Vin Gupta, who also
4      founded infoUSA, Infogroup, and SalesGenie, do you find
5      that in any way misleading?
6            MR. PETERS:  I'm going to object to this
7      line of questioning to the extent it calls for a legal
8      conclusion.
9  A.  In my mind, it is misleading.
10 Q.  (BY MR. LAUGHLIN)  How so?
11 A.  It -- people could read that as that Vin is still
12     affiliated with the two companies he founded.
13 Q.  If this language in this had said, says founder, Vin
14     Gupta, who, in the past, had founded infoUSA,
15     Infogroup, and SalesGenie, would your testimony be that
16     that would -- you'd be okay with that; that you would
17     not consider that misleading?
18           MR. PETERS:  Same objection.
19 A.  I can't speak to what people would find misleading.
20 Q.  (BY MR. LAUGHLIN)  But let me ask it this way:  In your
21     view, according to you, if this article was changed to
22     say, says founder, Vin Gupta, who formerly had founded
23     infoUSA, Infogroup, and SalesGenie, if it said that,
24     would you consider that statement to be misleading?
25 A.  Again, it doesn't connote that there is no relationship

96

1      any longer between the companies.
2  Q.  So the answer to my question is, yes, you would
3      still --
4  A.  Potentially, yes.
5  Q.  How about if it said, says founder Vin Gupta, who
6      formerly founded infoUSA, Infogroup, and SalesGenie,
7      but has subsequently left those companies; in your
8      view, if it said that, would that be misleading?
9  A.  No, I think that would be fair.
10 Q.  Let's go to Exhibit P.  Is there any part of Exhibit P
11     that you consider to be misleading?
12 A.  You know, without any other facts about the person
13     receiving the letter, I can't say whether it's
14     misleading or not.
15 Q.  Let's go to Exhibit --
16           MR. PETERS:  I'd ask you to look at the
17     whole exhibit.
18 A.  And, yeah, obviously, at the bottom, where it says,
19     also founder of infoUSA, is, again, similarly
20     misleading.
21 Q.  (BY MR. LAUGHLIN)  Your testimony is that -- which one?
22     I'm sorry, I had moved on.
23 A.  Exhibit P.
24 Q.  P, thanks.  You're saying, when it says, Vin Gupta,
25     founder and chairman, and it says, also founder of

**97**

1    infoUSA?
2  A.  Uh-huh.
3  Q.  And you consider that to be misleading?
4  A.  Potentially, yes.
5  Q.  Why?
6  A.  Because somebody could read that as connoting an
7      existing relationship.
8  Q.  Are you aware of anyone -- are you aware of anyone in
9      the world who has ever made the statement that
10     Exhibits L through P -- that anything in Exhibits L
11     through P was misleading?
12 A.  Are you saying, am I aware of anyone that got confused
13     by those statements?
14 Q.  No, but I'm glad you said that because that will be --
15     I want to know that, too, but let's go back to my
16     original question. Are you aware of any human being on
17     this planet who has stated words to the effect that
18     anything in Exhibits L through Exhibit P, that they
19     found it any way misleading?
20         MR. PETERS:  If you know.
21 A.  Yeah, I don't know that, specifically, but that is an
22     exhibit where somebody did get confused, so I don't
23     know what they saw, but people are getting confused.
24 Q.  (BY MR. LAUGHLIN) And I'm going to get there, but let
25     me ask, and I know, you're referencing -- why don't you

**98**

1      tell me what you're referencing, so I can ask a good
2      question?
3  A.  That's in reference to Exhibit R, as somebody,
4      potentially, did get confused.
5  Q.  Okay. So let me ask it this way: Other than the
6      person in Exhibit R, are you aware of anyone on the
7      planet, at any time, who was in any way confused as to
8      the relationship between Infogroup and Database, LLC,
9      due to anything contained in Exhibits L through Q?
10 A.  And that's a very specific question. I don't know who
11     has looked at those particular exhibits to be able to
12     attest to whether they looked at it and got confused by
13     them.
14 Q.  Can you turn to Exhibit L?
15 A.  Yes.
16 Q.  And the second paragraph starts off: McCormick's
17     promotion came after spending the last three years with
18     AtoZ Databases; do you see that?
19 A.  Yes.
20 Q.  Then let me drop down to the last sentence of that
21     paragraph. It says: McCormick spent eight years at
22     Infogroup, a similar reference company that shares the
23     same founder, Vin Gupta; do you see that?
24 A.  Yes.
25 Q.  Do you consider that in any way misleading?

**99**

1  A.  Potentially. Again, in the same vein, somebody could
2      connote an existing relationship.
3  Q.  Well, I guess, anything is theoretically possible. Are
4      you aware of anybody who did find it misleading or was
5      confused?
6  A.  How would I?
7  Q.  I mean, what's misleading? I mean, here it is, this is
8      an employee of Database, Jon McCormick, and they say,
9      McCormick's promotion comes after spending the last
10     three years with AtoZ Databases, and then they go down
11     and say, McCormick spent eight years at Infogroup, a
12     similar reference company that shares the same founder,
13     Vin Gupta. I don't understand why you would even say
14     that could be misleading.
15         MR. PETERS:  Object as argumentative and
16     calling for a legal conclusion.
17 Q.  (BY MR. LAUGHLIN) What's misleading about that?
18 A.  The fact that there could be two existing companies
19     with the same founder that continues to be at the helm
20     of both the companies.
21 Q.  When did you -- could you go through Exhibits L through
22     Exhibit P and tell me when you first became aware of
23     their existence? And what I mean by that is, for
24     example, Exhibit L appears to have a date here of
25     February 20, 2014.

**100**

1  A.  Uh-huh.
2  Q.  And then there are other dates.
3  A.  Yes.
4  Q.  And if you could go through them, one by one, to,
5      again, try to speed this up and tell me when you,
6      personally, became aware of them.
7  A.  So Exhibit L, probably close to when the press release
8      was actually made.
9  Q.  Which is July 11th of 2013?
10 A.  Yeah, so around that time.
11 Q.  When you became aware of Exhibit L in July of 2013,
12     what would you have done with it?
13 A.  I did send it to counsel.
14 Q.  Let's turn to Exhibit M. Exhibit M has a release date
15     of January 7, 2013, correct?
16 A.  Yes.
17 Q.  Would you have become aware of Exhibit M on or about,
18     or shortly after, that date?
19 A.  I don't remember the specific one, yeah, but, probably.
20 Q.  And would you have also forwarded that on to counsel?
21 A.  No, I wouldn't have because I wasn't part of Infogroup
22     at the time.
23 Q.  What do you mean?
24 A.  At the time when I became aware of this, I wasn't part
25     of Infogroup.

**101**

1 Q. You were working for someone else?
2 A. Yes.
Q. Who?
4 A. A company called Reachable.
5 Q. When did you work for Reachable?
6 A. Worked through most of 2012.
7 Q. What was your position?
8 A. I was chief data officer.
9 Q. And it may be obvious, but tell me what your job duties
10 were.
11 A. My job duties was to construct a database for them.
12 Q. What kind of database?
13 A. A database of executives.
14 Q. Is Reachable an Omaha company?
15 A. No.
16 Q. Did you move?
17 A. No.
18 Q. Where is Reachable?
19 A. It was based out of Palo Alto.
20 Q. But they let you live in Omaha?
21 A. That's correct.
22 Q. And they said, we don't have a database of executives,
23 but we want you to go out and build one?
24 A. We want — yes.
Q. How did you do that?

**102**

1 A. We looked at licensing Infogroup's data.
2 Q. Isn't that what Reachable did?
3 A. Yes, we did.
4 Q. So why did they need you? They could have done that
5 themself.
6 A. That's a question for the person who hired me.
7 Q. Okay. Why did you — were you terminated, or did you
8 leave?
9 A. I left.
10 Q. Why?
11 A. Because they were running out of funding, and I had a
12 better opportunity.
13 Q. Back at Infogroup?
14 A. Yes.
15 Q. And you started Reachable in the beginning of 2012?
16 A. I was initially just a consultant for them. I didn't
17 want to join them, initially. So towards the end of, I
18 think, 2011, I consulted with them, suggested how they
19 could build the database that they were interested in
20 building, and subsequent to that, I decided to
21 officially join them.
Q. When did you cease employment with Infogroup?
23 A. April 2009, that was the last time I was there.
24 Q. And what were the circumstances surrounding your
25 separation?

**103**

1 A. Regarding my separation, the role I was being given at
2 the time I didn't much care for, and I decided that I
3 would leave the company at the time.
4 Q. What role were you given?
5 A. I was in the strategic role that I had mentioned to you
6 earlier, and I was being asked to lead up different
7 products, and the disagreement came on the position and
8 just the way I was being offered the role, and the
9 employment contract that I was being asked to sign.
10 Q. Did you go to work for somebody else in April of 2009,
11 or shortly thereafter?
12 A. No.
13 Q. Were you unemployed from April 2009 until you became a
14 consultant with Reachable?
15 A. No. I was — I had my own startup that I worked on.
16 Q. What was that?
17 A. It was an appointments — marketing-based solution for
18 appointments-based businesses.
19 Q. Was that your own LLC?
20 A. S-Corp, yeah.
21 Q. What was the name of that?
22 A. NoWaits.
23 Q. NoWaits, N-O, space, W-A-I-T-S?
24 A. One word.
25 Q. And did you do that from a little after April 2009 —

**104**

1 A. Yes.
2 Q. — until late 2011?
3 A. Yes, and that's a company that's still in existence.
4 Q. Okay. Does it have employees?
5 A. Just me and my wife.
6 Q. Are you full-time at Infogroup?
7 A. That's correct.
8 Q. How many months were you a consultant for Reachable
9 before you became a full-time employee in early 2012?
10 A. I signed up for a three-month engagement with them, and
11 that's what I completed, and after that, I decided to
12 take on a full-time role.
13 Q. From April 2009 until you started as a consultant with
14 Reachable, did you do anything else, professional-wise,
15 other than NoWaits?
16 A. Yes. I did some consulting for other companies.
17 Q. Who?
18 A. I got a contract from a company called Park.com.
19 Q. P-A-R-K?
20 A. Yes.
21 Q. Okay. Who else?
22 A. That was it.
23 Q. And what did you do?
24 A. And there was one other startup that I did some minimal
25 advisory role for.

8:14-cv-00049-JMG-SMB   Doc # 52-2   Filed: 09/07/14   Page 27 of 155 - Page ID # 487

INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.   April 16, 2014

---

**105**

1   Q.   Okay.  What did you do for Park.com?

2   A.   I compiled their database of garages in New York City.

    Q.   How did you do that?

4   A.   A number of ways.  We had people on the street, going

5        to every garage, collecting information, taking

6        photographs of the garage, and keying those in.

7   Q.   So you hired people to go around and take photographs

8        and report information, and then you entered that into

9        a database and said, here you go?

10  A.   Uh-huh, that's correct.

11  Q.   I think -- and I apologize for the digression, but that

12       was helpful.  Getting back to Exhibit M, and forgive me

13       if you may have answered this already, but this is

14       dated January 7th of 2013?

15  A.   Uh-huh.

16  Q.   Did you testify that you would have seen this shortly

17       after, but you wouldn't have been at Infogroup and,

18       therefore, wouldn't have forwarded it on to anybody?

19  A.   Yeah, I think so.  I don't remember the specific dates

20       on which I looked at this.

21  Q.   Do you recall if, and if so, when you would have

22       forwarded this on to someone else at Infogroup, or your

23       counsel?

24  A.   I don't know.

    Q.   And when, in relationship to this, would you have

**106**

1        started back up at Infogroup?  Do you remember the

2        month?

3   A.   February.

4   Q.   Do you know whether you would have made someone at

5        Infogroup aware of Exhibit M shortly after you became

6        reemployed with Infogroup in February of 2013?

7   A.   Probably not.

8   Q.   Probably not?  There would have been some time period

9        that passed?

10  A.   Not at the time when I joined.

11  Q.   Let's go to Exhibit N.  When would you have first

12       become aware of this exhibit?

13  A.   You know, I don't remember the exact date on this one.

14  Q.   Can you give me an estimate?

15  A.   No.

16  Q.   Okay.  Let's turn to Exhibit O.  Same question:  When

17       did you become first aware of Exhibit O?

18  A.   Again, I don't remember.  I don't recall.

19  Q.   Exhibit P, when did you first become aware of

20       Exhibit P?

21  A.   I don't recall a specific date.

    Q.   Or an estimate?

23  A.   I'm guessing this was sent out in January 2014, so, you

24       know, I would have come across it in January or

25       February of 2014.

---

**107**

1   Q.   And then, lastly, Exhibit Q, when would you have first

2        become aware of Exhibit Q?

3   A.   I don't recall that one either.

4   Q.   Would it have been -- well, would it have been sometime

5        shortly after you returned to Infogroup in February of

6        2013?

7   A.   Yeah, after, obviously, I returned.

8   Q.   And was this something you, yourself, found, or was it

9        something that someone else showed you?

10  A.   I don't know which ones.  A lot of times, I'll get

11       forwarded what people on my team find, so I don't know

12       if I specifically found it or if it was sent to me by

13       somebody on my team.

14  Q.   As long as we're here, let's go to Exhibit R, and can

15       you tell me any facts or circumstances surrounding

16       Exhibit R that you're aware of?  And what I'm trying to

17       get at is, obviously, we can all read the E-mails, and

18       we know what they say.

19  A.   Uh-huh, yeah.

20  Q.   What I'm trying to get at is other than what's in the

21       E-mail, do you have any information of any kind

22       surrounding the things that are discussed in Exhibit R?

23  A.   No, just the facts of the E-mail.

24  Q.   So is this something Pam Quick would have forwarded on

25       to you?

**108**

1   A.   Pam Quick would have forwarded it on to my VP of sales,

2        who sent it to me.

3   Q.   And would you have received it around March of 2013?

4   A.   I would have thought so, yes.

5   Q.   And would you have forwarded that on to your counsel on

6        or about that time as well?

7   A.   Yes.

8   Q.   Paragraph 12 of your Affidavit.  Do you see, on

9        paragraph 12, you start off and you say:  Defendants

10       have also sent mailings to current Infogroup customers;

11       do you see that?

12  A.   Yes.

13  Q.   Are you talking about the mailings that are attached to

14       this Complaint, or are you referring to something else?

15  A.   I'm talking about the ones that have been attached.

16  Q.   And in order to speed this up, all of the rest of the

17       statements in paragraph 12, do those reference the

18       attachments to your Declaration as opposed to something

19       else?

20  A.   I think my Declaration is that mailings similar to the

21       ones attached created the impression, and as a result,

22       was starting to get the phone calls that we mentioned

23       in the exhibit.

24  Q.   Well, in that case, then, let's go over it.  The second

25       sentence of paragraph 12, it says, one of these

---

109

1   mailings. Which mailing, which one are you talking
2   about?
3   A.   With the assumption that, obviously, DB101 is doing
4   several mailings, we're seeing a few of them which are
5   in the exhibit. Those mailings, in general, are
6   causing the confusion which leads to --
7              MR. PETERS:  (Counsel indicating.)
8   Q.   (BY MR. LAUGHLIN) Your attorney has pointed you to
9   something?
10             MR. PETERS: I asked him to read the
11  entire paragraph that he's being asked about before he
12  answers the questions about it.
13             MR. LAUGHLIN:  I'm totally fine with
14  that.
15  Q.   (BY MR. LAUGHLIN) I mean, all I'm trying to get at is
16  I just want to know if there's something outside of
17  this that we're talking about, or whether it's just the
18  exhibit, so that's all I'm trying to get at.
19             Mr. Khanna, let me know when you're done.  Take
20  your time, but let me know when you're done reading.
21  A.   (Witness reviewing document.)  That's correct, yeah.
22  Q.   You've now read paragraph 12?
23  A.   Uh-huh.
24  Q.   That's a yes?
     A.   That's yes.

110

1   Q.   Okay.  So my question is:  You say one of these
2   mailings prompted a telephone call.  Now, first of all,
3   is the telephone call that you're talking about, is
4   that a telephone call referenced in one of the
5   exhibits?
6   A.   That's correct.  That is the Exhibit -- I think it's
7   Exhibit Q -- no, it's not Exhibit Q.  Let me figure out
8   which one it is.  Yeah, so the Exhibit P prompted a
9   call, I think.
10  Q.   And how do you know that Exhibit P prompted a call as
11  opposed to something else?
12             MR. PETERS:  Don't speculate.
13  A.   Yeah, no, I don't remember exactly why I know that.
14  Q.   (BY MR. LAUGHLIN) Who made the call that you're
15  referencing in paragraph 12?
16  A.   I'm not -- I don't recall.
17  Q.   To whom was the call made that you reference in
18  paragraph 12?
19  A.   I don't recall.
20  Q.   What source of information did you go to for you to be
21  able to make the statements you've made in paragraph
22  12?
23  A.   Again, specifically, I don't recall what -- I would
24  have gone to, probably, a voice mail that was forwarded
25  to me.

111

1   Q.   Would you have saved a copy of that voice mail?
2   A.   I don't recall.
3   Q.   Would you have provided a copy of that voice mail to
4   your attorney or anyone else at -- or anyone at
5   Infogroup?
6   A.   I don't recall.
7   Q.   Let's go on to paragraph 13.  The second sentence, you
8   say:  Defendants' strategy has caused many other
9   incidents of consumer confusion.
10  A.   Uh-huh.
11  Q.   And you're talking about what you're calling the
12  confusion that's referenced in paragraph 12, and then
13  you're talking about other ones in addition to that?
14  A.   Uh-huh.
15  Q.   Is that accurate?
16  A.   That's correct.
17  Q.   When you say, defendants' strategy has caused many
18  other incidents of consumer confusion, are you talking
19  about anything other than what is referenced further in
20  paragraph 13, or are there other references that you
21  are referring to?
22  A.   For the Declaration, it was specifically what I'm
23  referring to in the exhibit.
24  Q.   I want to make sure I understood what you just said.
25  You say:  Defendants' strategy has caused many other

112

1   incidents of consumer confusion --
2   A.   Uh-huh.
3   Q.   -- do you see that?
4   A.   Yes.
5   Q.   When you say "many other incidents", are you referring
6   only to the incidents that you, yourself, referenced in
7   paragraph 13, or are you referring to things in
8   addition to that?
9   A.   Well, I think my testimony is that that was the most
10  recent example of the confusion.
11  Q.   What was the most recent example?
12  A.   The above, number 12.
13  Q.   But then you say, "defendants' strategy has caused many
14  other incidents of consumer confusion".  My question,
15  very simply, is when you reference "many other
16  incidents of consumer confusion", are you referring
17  only to the specific examples that you give in
18  paragraph 13, or are there others?
19  A.   There are others that I've been made aware of over the
20  course of my tenure at Infogroup.
21  Q.   Tell me all the other incidents of consumer confusion
22  that you're referencing in paragraph 13?
23             MR. PETERS:  If you know.  Please don't
24  speculate.
25  A.   Yeah, I can't recall all the instances that somebody

8:14-cv-00049-JMG-SMB Doc # 32-1 Filed: 05/07/14 Page 29 of 155 - Page ID # 490
INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.
April 16, 2014

## 113

1  has brought to my attention where a customer has called
2  them or they figured a customer has been confused by
3  it.
4  Q. (BY MR. LAUGHLIN) Well, when you say over your tenure
5  at Infogroup, the database wasn't founded until 2010.
6  A. Well, since I came back, for the past year.
7  Q. For the past year?
8  A. Uh-huh.
9  Q. Are you able to recall any of the many other incidents
10  of consumer confusion that you're talking about in your
11  Affidavit?
12  A. Yes, off the top of my head, I can recall a voice mail
13  that was sent to me where the customer was confused.
14  Q. When was that voice mail left for you?
15  A. I don't recall.
16  Q. Did you save a copy of it?
17  A. I'm not sure.
18  Q. Who called?
19  A. I don't recall.
20  Q. They would have called you directly?
21  A. No, it would have been forwarded to me by one of the
22  salespeople who would have received it. I think I
23  received the call and/or a voice mail. I don't recall
24  which one, specifically, it was.
25  Q. Was the voice mail transcribed, or did you take any

## 114

1  notes?
2  A. Not really, not that I recall.
3  Q. What was the content of the voice mail?
4  A. The content of the — again, I'll be speculating a
5  little bit. It's been a while, and I'll not speculate,
6  I guess.
7  Q. Well, okay. Does that complete your answer to my
8  question?
9  A. Yes.
10  Q. And do I take it, then, you don't recall who the
11  customer would have been who was —
12  A. Yeah, that's correct.
13  Q. Paragraph 14, can you explain, in your own words, why
14  you think that Database's actions undermine Infogroup's
15  reputation for accuracy?
16  A. Obviously, if DB101 is construed to be affiliated with
17  Infogroup, and customers or businesses react to that,
18  assuming that there is a set affiliation between the
19  two companies, and they experience a product that
20  doesn't match what they're used to experiencing with
21  Infogroup products, it would — the Infogroup brand.
22  Q. Are you aware of that actually happening?
23  A. Not specifically.
24  Q. Let's go on to B. Can you explain, in your own words,
25  how Database, LLC's actions diminished the goodwill

## 115

1  Infogroup has established with its customers?
2  A. And if you read that paragraph, it threatens to. I'm
3  not saying that it has; it potentially will.
4  Q. Okay. And do I understand that — did you just say,
5  when you wrote paragraph 14, you weren't intending to
6  imply that, in fact, Database's actions has actually
7  undermined Infogroup's reputation for accuracy, or has
8  diminished the goodwill of Infogroup, or has caused
9  Infogroup to lose customers and business revenue;
10  you're just saying that there's a threat that it could?
11  A. I'm just saying I'm not aware of anything, but it has
12  the threat that it will, and probably has.
13  Q. As you sit here today, are you aware of any way that
14  Infogroup has been actually damaged due to any conduct
15  of any Database, LLC, person?
16  A. I don't have specifics.
17  Q. Your last sentence: If defendants are allowed to
18  continue such conduct, Infogroup's entire business
19  model would be irreparably harmed; do you see that?
20  A. Yes.
21  Q. What's the basis for that conclusion?
22  A. The basis is if somebody is assuming that Database101
23  products are the same as Infogroup products, it will
24  irreparably harm our goodwill.
25  Q. But, again, you're not aware of any person who actually

## 116

1  did assume that Database, LLC's products were the same
2  as InfoGroup's; would that be accurate?
3  A. Well, the exhibits show that one person was.
4  Q. Other than the exhibits?
5  A. Not specifically.
6  Q. I'm going down, now, to paragraph 15. What
7  involvement, if any, did you have in the 2011 lawsuit
8  filed by Infogroup against Database?
9  A. I didn't have any involvement.
10  Q. When was the first time that you saw Exhibit S?
11  A. I don't remember the specific dates.
12  Q. Well, if you signed this Declaration on February 21st
13  of 2014, how long before you first signed this would
14  you have reviewed a copy of the Settlement and Mutual
15  Release Agreement between Infogroup and Database?
16  A. I don't remember the specific dates.
17  Q. Well, do you remember, generally, was it a week before
18  you signed, three months before you signed?
19  A. No, I don't.
20  Q. Can you give me an estimate?
21  A. No, I can't. I mean, I've known about the settlement
22  ever since I joined. I don't know when, specifically,
23  I would have seen the exhibit.
24  Q. And other than your attorney, have you spoken to anyone
25  at Infogroup about the Infogroup/Database settlement

### 117

1    agreement and what it means or, for that matter,
2    anything relating to the settlement agreement?
3  A.  Not specifically.
4          MR. LAUGHLIN:  Off the record.
5          (A break was taken.)
6        (Exhibit No. 2 marked for identification.)
7  Q.  (BY MR. LAUGHLIN)  Mr. Khanna, we are back on the
8    record.  With respect to your Declaration, we talked
9    about some of the press releases and Exhibits L through
10    Q or R, I believe.  Did you, or anyone from Infogroup,
11    to your knowledge, ever contact anybody at Database and
12    say, you know, hey, these are out here, we object, we
13    want you to change, or anything like that, prior to
14    when suit was filed?
15  A.  I did not, and I don't know if anyone else at the
16    company did.
17  Q.  Handing you what the court reporter has marked as
18    Exhibit 2, have you seen this before?
19  A.  Not this particular one.
20  Q.  Have you seen things like Exhibit 2 before?
21  A.  That's a pretty broad question.  I've seen a Power
22    Point printed out.
23  Q.  Sure.
24  A.  I haven't seen this particular slide.
25  Q.  Sure, and I'll represent to you that we found this on

### 118

1    the Internet and printed this out.
2  A.  Okay.
3  Q.  Let me, if I could, can I ask you to turn — and I'm
4    going to go through this as quickly as we can.  About
5    four pages in, there's a page, Who uses Infogroup data?
6  A.  Uh-huh.
7  Q.  And my question for you is:  Is it true that from 2011,
8    until today, are all of the companies listed on this
9    page — were they companies that used Infogroup data?
10  A.  I can't attest to the specificity of that.  I don't
11    know how many of these companies are continuing to use,
12    if they are still individual companies.
13  Q.  Are any of these companies in your — in the Small and
14    Medium Business?
15  A.  These are mostly large companies.
16  Q.  So you're not — so as you sit here today, you're not
17    able to verify, one way or the other, whether —
18  A.  All of them have our data or not?
19  Q.  Do you have any reason to believe that any of these
20    would not have been companies that, over the last
21    couple of years, have used Infogroup data?
22  A.  I don't have any reason to believe otherwise.
23  Q.  Can you turn to the next page, and it says, Infogroup
24    Data Assets, The Numbers; do you see that?
25  A.  Yes.

### 119

1  Q.  And based on your knowledge of Infogroup, are you able
2    to confirm, within the last couple of years, whether
3    the numbers on this page are accurate or close to
4    accurate?
5  A.  I can't attest to the fact whether they are or they're
6    not.  I don't know.
7  Q.  I mean, for example, it says, U.S. business assets, and
8    there's 27 million records.  Does that sound about
9    right to you?
10  A.  I don't know.  It depends on a number of things.
11  Q.  Verified business file, 14.5 million records, does that
12    sound approximately accurate as the number of verified
13    business records in the Infogroup business file?
14  A.  I don't know.  I don't know the intent of the deck.
15  Q.  The intent of the —
16  A.  Deck, who it's for, what they're trying to connote
17    here.
18  Q.  Well, I understand, but, I mean, either there's
19    27 million records, or there's 24 million records, or
20    there's 10 million records.  I'm just trying to ask —
21  A.  And all of those could be true, depending on what you
22    consider a record, is my point.
23          MR. PETERS:  I'm going to object to the
24    line of questioning.  It's outside of the Declaration
25    and the purpose of today's deposition.

### 120

1  Q.  (BY MR. LAUGHLIN)  Okay.  Bottom line, you don't really
2    know, one way or the other, whether the numbers on this
3    page, Infogroup Data Assets, would be accurate; would
4    that be fair?
5  A.  Yeah.
6  Q.  Can you turn to about four or five pages, Compilation?
7  A.  Uh-huh.
8          MR. PETERS:  Counsel, are you able to
9    provide information about where this was located?
10          MR. LAUGHLIN:  Well, let's go off the
11    record.
12        (An off-the-record discussion was held.)
13  Q.  (BY MR. LAUGHLIN)  Let's go back on the record.
14         Are you at the Compilation —
15  A.  Yes — which slide?  You want slide 10?
16  Q.  Yes.  Well, let's go back to Page 9, Compilation
17    Sources, and we talked a little bit about compilation
18    earlier on.
19  A.  Uh-huh.
20  Q.  And I think I asked you some questions about the
21    sources of data.
22  A.  Uh-huh.
23  Q.  But I don't know if I asked you any questions about
24    your understanding as to the process of how Infogroup
25    compiles its business and consumer database.  Can you

121

| 1 | | describe for me, as particularly as you can, the |
|---|---|---|
| 2 | | process that Infogroup uses to compile its business and |
| 3 | | consumer database? |
| 4 | A. | You know, that's not an expertise of mine. Somebody |
| 5 | | else, you know, better equipped with that information |
| 6 | | can better testify than I can. |
| 7 | Q. | Fair enough. Are you able, on Page 9, to confirm |
| 8 | | whether these sources listed are, in fact, the sources |
| 9 | | of data for Infogroup's databases or not? |
| 10 | A. | I can't speculate. |
| 11 | Q. | Go to Page 10. |
| 12 | | MR. PETERS: May I interrupt for a |
| 13 | | second? |
| 14 | | MR. LAUGHLIN: Sure. |
| 15 | | MR. PETERS: Can we go off the record |
| 16 | | for just a second? |
| 17 | | MR. LAUGHLIN: Sure. |
| 18 | | MR. PETERS: I need to consult with |
| 19 | | Mr. Khanna. |
| 20 | | MR. LAUGHLIN: Sure. |
| 21 | | (An off-the-record discussion was held.) |
| 22 | Q. | (BY MR. LAUGHLIN) Mr. Khanna, I think we were on |
| 23 | | Page 10 of Exhibit 2, correct? |
| 24 | A. | Yes. |
| 25 | Q. | And I think the question -- so we're back here on |

122

| 1 | | compilation, and with respect to the information |
|---|---|---|
| 2 | | contained in Page 10 of Exhibit 2, is that generally |
| 3 | | accurate, according to what you know, everything you |
| 4 | | know about Infogroup, currently? |
| 5 | A. | Kind of reiterating, for the record, I can't confirm |
| 6 | | the validity of this presentation that I'm looking at |
| 7 | | and/or the source of it, whether it is Infogroup or |
| 8 | | not. So having cleared that, I can't confirm the whole |
| 9 | | page. I mean, there's too many facts on that that I |
| 10 | | just don't know. |
| 11 | Q. | Are there any facts on Page 10 that you would, based on |
| 12 | | everything you know about Infogroup, that you'd say, |
| 13 | | no, no, no, that's off, that's wrong, or anything of |
| 14 | | that nature? |
| 15 | A. | Again, these are facts that somebody in the |
| 16 | | organization might be better able to attest to than I |
| 17 | | can, of the specific facts, and I just don't know. |
| 18 | Q. | Okay. Page 12 -- |
| 19 | A. | Yes. |
| 20 | Q. | -- talking about aggregate sources on compilation, |
| 21 | | correct? |
| | A. | Page -- sorry? |
| 23 | Q. | 12. |
| 24 | A. | 12? |
| 25 | Q. | Are you there? |

123

| 1 | A. | Yes. |
|---|---|---|
| 2 | Q. | And it talks about aggregate sources of compilation, |
| 3 | | over 250 sources. Are the five that are listed there, |
| 4 | | are you able to confirm that those are five specific |
| 5 | | sources where Infogroup does obtain records to compile? |
| 6 | A. | I can't. |
| 7 | Q. | Are you able to confirm any of them? |
| 8 | A. | Yes. |
| 9 | Q. | Which ones? |
| 10 | A. | Secretary of State, utility providers, those are it. |
| 11 | Q. | 15, is there a point of interest group at Infogroup? |
| 12 | A. | I'm not sure. |
| 13 | | MR. PETERS: Mark, before we go further |
| 14 | | on this, let me just put some of my previous concerns |
| 15 | | on the record, since there's no record of it. |
| 16 | | MR. LAUGHLIN: Sure. |
| 17 | | MR. PETERS: We've been given a document |
| 18 | | marked as Exhibit 2, and the document, on its face, |
| 19 | | purports to be an Infogroup document, or a document |
| 20 | | about Infogroup, and we've not had the opportunity to |
| 21 | | review the document and to check and confirm its |
| 22 | | authenticity and validity as an Infogroup document. |
| 23 | | I'm just going to state an objection to the extent |
| 24 | | that questioning is attempting to get Mr. Khanna to |
| 25 | | agree to this document as statements by Infogroup. |

124

| 1 | | MR. LAUGHLIN: Are you done? |
|---|---|---|
| 2 | | MR. PETERS: I'm finished, yes. Thank |
| 3 | | you. |
| 4 | Q. | (BY MR. LAUGHLIN) Page 18, and this talks about |
| 5 | | telephone verification that you've testified to. |
| 6 | A. | Uh-huh. |
| 7 | Q. | Based on all the information you have about Infogroup, |
| 8 | | are you able to confirm the accuracy of the information |
| 9 | | listed on Page 18 of Exhibit 2? |
| 10 | A. | Again, the specifics, I'm not. I can't confirm those |
| 11 | | specifics. |
| 12 | Q. | Is there anything that you can confirm on Page 18? |
| 13 | A. | That we offer analytic services to our customers. |
| 14 | Q. | Okay. Does that complete your answer? |
| 15 | A. | Telephone lead generation and customer outreach, I'm |
| 16 | | not sure what that means, but something similar we |
| 17 | | offer for our customers. |
| 18 | Q. | Let me turn to Page 25. |
| 19 | A. | Page 25? |
| 20 | Q. | Yes. |
| 21 | A. | Okay. |
| 22 | Q. | And, again, based on everything -- and that's talking |
| 23 | | about how data changes in the last three months, |
| 24 | | correct? |
| 25 | A. | That's what the slide says, yes. |

8:14-cv-00049-JMG-SMB   Doc #132-2   Filed: 06/07/16   Page 32 of 155 - Page ID # 5021

INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.                          UNITED STATES OF AMERICA   April 16, 2014

---

**125**

1    Q.   And would you agree that, as a general matter, that

2       businesses come and go in the thousands every month, as

3       is reflected in this chart?

4    A.   I can't confirm the specifics of the chart, but, yes,

5       businesses come and go by the thousands every month.

6    Q.   And, in fact, it says, brand-new businesses in the last

7       three months in the U.S., 625,000, and, again, I'm not

8       holding you to this exact number, but would it square

9       with your understanding and knowledge of Infogroup, and

10      databases, that there's, approximately, 200,000 new

11      businesses every month?

12    A.   You know what, I can't confirm that.  The number

13      doesn't seem right.

14    Q.   You talked earlier in your testimony about the names

15      that were taken out of your, you know, verified or

16      active database, and you've got deleted businesses.

17      Does that also square with your recollection that

18      there's, approximately, 100,000 deleted businesses

19      every month?  Does that square with your understanding?

20    A.   I don't know the specifics of how many businesses are

21      deleted.

22    Q.   Is part of the challenge for Infogroup, in order to

23      keep an accurate database, is to keep on top of the

24      substantial changes that comes in terms of businesses

       that are ending, businesses that are starting, correct?

**126**

1    A.   Fair enough.

2    Q.   Businesses that change phone numbers, businesses that

3       move, businesses that hire and have a different number

4       of employees, true?

5    A.   That's correct.

6    Q.   Can you go to Page 38?  Do you see that's titled,

7       Ultimate New Business File; do you see that?

8    A.   Yes.

9    Q.   Does Infogroup have kind of an ultimate new business

10      file, or something like that?  Do you know what they're

11      talking about?

12    A.   We have a new business file, I don't know about an

13      ultimate new business file.

14    Q.   And when did that — that new business file, when did

15      that come into existence?

16    A.   We started to market the new business file probably 10,

17      15 years ago.

18    Q.   Are you able to confirm the accuracy of the

19      information — does the information — strike that.

20      Does the information on Page 38 of Exhibit 2 appear

21      accurate to you, based on your knowledge of Infogroup

       and how it works?

23    A.   I can't confirm that.

24    Q.   Can you confirm any of it?

25    A.   Utility connections, some of our new business file

**127**

1       comes from utility connections.  We have monthly,

2       weekly, daily updates.  We have company name, contact

3       name, address, phone, SIC code, employee size.  I'm not

4       sure about E-mail addresses for some of the periodic

5       feeds, whether we have that on the daily feed or not.

6    Q.   Does that complete your answer?

7    A.   Uh-huh.

8    Q.   Please turn to Page 45.  Actually, turn to Page 39, if

9       you would.  Do you see, Prospect File?

10    A.   Yes.

11    Q.   It says, Infogroup's pre-verified prospect business

12      database contains 6 million records; do you see that?

13    A.   Yes.

14    Q.   Are you aware whether Infogroup has a pre-verified

15      prospect business database?

16    A.   We do.

17    Q.   And, approximately, 6 million records in size, does

18      that square with your understanding?

19    A.   I'm not sure of the number.

20    Q.   Does Infogroup sell pre-verified businesses, business

21      names, addresses, et cetera, to anyone?

22    A.   We make that available if the customer so chooses.

23    Q.   But if I call up and say, okay, I want all the doctors

24      in Atlanta, am I going to get just the verified list,

25      or am I going to get the pre-verified list?

**128**

1    A.   It depends on who you call, and it depends on how that

2       person interprets your need and what's going to work

3       best for you.

4    Q.   In your Affidavit — in your Declaration, paragraph

5       two, you say, Infogroup has — currently maintains

6       demographic marketing and other information on,

7       approximately, 17 million U.S. businesses, correct?

8    A.   That's correct.

9    Q.   Does that include or exclude the 6 million,

10      approximately, pre-verified prospect business database

11      businesses?

12         MR. PETERS:  Objection, not —

13      misstating testimony.  I don't think the witness

14      adopted the number of 6 million.

15         Let me continue.  Again, that assumes that this is

16      a valid document; we don't know that.  I'll restate my

17      objection to it on that basis and, also, on the basis

18      that this goes far beyond the Declaration and the

19      purpose of today's deposition.

20         MR. LAUGHLIN:  To which I would only

21      state, for the record, that the verification and

22      related activities are expressly in Mr. Khanna's

23      Declaration.

24    Q.   (BY MR. LAUGHLIN)  But go ahead and answer my question,

25      if you can.

---

**129**

1   A.   I'm not sure whether the 17 million includes the
2        verified and pre-verified.
3   Q.   Turn to Page 45, if you would.  Do you see, How
4        Infogroup Compares?
5   A.   I see that slide.
6   Q.   And it talks about a 2009 competitive analysis was done
7        comparing Infogroup's business data to that of its
8        closest competitors; do you see that?
9   A.   Yes, I see that.
10  Q.   Are you, generally, aware of that competitive analysis?
11  A.   I'm not sure whether -- I wasn't there at the company
12       in 2009.  Like I mentioned earlier, I quit in April.  I
13       know there's a competitive analysis that we use; I
14       don't know when we did that.
15  Q.   Okay.  And the study that you're aware of, does, for
16       example, a company name accuracy of 96.8 percent, does
17       that square with your understanding of what the
18       comparative analysis revealed, that you're aware of?
19  A.   I can't recall, off the top of my head, the specifics
20       of the accuracy of it.
21  Q.   Is there any information contained on Page 45 that you
22       are able to verify as in the general range of what you
23       believe to be the case for the accuracy of the
24       Infogroup data?
25            MR. PETERS:  Objection, calls for

---

**130**

1        speculation, "general range".
2   A.   I don't want to speculate.
3            (Exhibit No. 3 marked for identification.)
4   Q.   (BY MR. LAUGHLIN)  Handing you what the court reporter
5        has marked as Exhibit 3, have you seen a copy of
6        Exhibit 3 before?
7   A.   Not specifically.
8   Q.   Have you seen any literature or advertising from
9        Infogroup about its verified and non-verified
10       businesses?
11  A.   Yes, I have.
12  Q.   Given that, are you able to verify, for example, that
13       in Infogroup's business database, that there's,
14       approximately, 14.5 million verified businesses?
15  A.   Again, I can't attest to the specific numbers.  We have
16       a very competent compilation team that I'm sure could
17       give you all the relevant numbers you want.
18  Q.   Is the information accurate, based on when it has
19       non-verified overview, and it talks about pre-verified
20       records, partial records, unverified records, and
21       suspect records; are you familiar with those categories
22       of records at Infogroup?
23  A.   Vaguely.
24  Q.   And do the definitions given square with your
25       understanding, the definitions given in Exhibit 3?

---

**131**

1   A.   Not all of them.  I don't know the details of the
2        definitions of pre-verified, partial records.  I mean,
3        just by the literal definition, I can understand what
4        it's trying to connote or say, but I won't speculate on
5        it.
6   Q.   It says, there are 7 million non-verified records on
7        the Infogroup business database.  Are you able to
8        comment on the general accuracy of that number?
9   A.   I don't know the specific number.
10            (Exhibit No. 4 marked for identification.)
11  Q.   (BY MR. LAUGHLIN)  I'm handing you what the court
12       reporter has marked as Exhibit 4.
13            MR. PETERS:  I'll make an objection to
14       Exhibits 3 and 4 for the same reasons that I stated
15       objections to Exhibit 2.
16  Q.   (BY MR. LAUGHLIN)  4 purports to be a press release
17       from Infogroup.  Have you seen this before?
18  A.   Yes, I have.
19  Q.   So you can verify that this is a press release put out
20       by Infogroup?
21  A.   Let me read it just to make sure.  Yes, I'm familiar
22       with this press release.
23            MR. PETERS:  I withdraw my objection as
24       to Exhibit 4 then.
25  Q.   (BY MR. LAUGHLIN)  Is there any information -- now that

---

**132**

1        you've had a chance now to review Exhibit 4, is there
2        any information -- strike that.  Is the information
3        contained in Exhibit 4 accurate, to the best of your
4        knowledge?
5   A.   I can't verify that.
6   Q.   It says, in the third paragraph, towards the bottom, it
7        says:  The business database contains over 30 million
8        business records; do you see that?
9   A.   The third paragraph?  Okay, yeah, the business contains
10       over 30 million business records, yes.
11  Q.   Are you able to either verify or dispute the accuracy
12       of that statement?
13  A.   No.
14            (Exhibit No. 5 marked for identification.)
15  Q.   (BY MR. LAUGHLIN)  Handing you what the court reporter
16       has marked as Exhibit 5, I will represent to you that
17       this is a screen shot of an infoUSA web site as of
18       yesterday, April 15, 2014.  I guess I need to ask the
19       question, I assume you've seen this and can validate
20       that this is, in fact, on the Infogroup web site?
21  A.   You know, this specific page, it looks like an
22       infoUSA.com page, let me attest to that.
23  Q.   Fair enough.  And on phone verification, at the bottom
24       right, they say:  Our process is like no other in the
25       industry.  We make more than 40 million calls each year

---

**133**

1   to verify the business information; do you see that?
2   A.   Yes, I do.
   Q.   And are you able to verify the accuracy of that
4   statement?
5   A.   I can't.
6   Q.   Research team:  500 full-time researchers at our
7   132,000-square-foot database and technology center are
8   dedicated to building, verifying, and updating our
9   data; do you see that?
10   A.   Yes, I do.
11   Q.   Are you able to verify the accuracy of that statement?
12   A.   I can't.
13         (Exhibit No. 6 marked for identification.)
14   Q.   (BY MR. LAUGHLIN)  Handing you what the court reporter
15   has marked as Exhibit 6, is that a true and accurate
16   copy of a ReferenceUSA web page?
17   A.   I can't validate that.  It's off of the
18   Omahalibrary.org site.
19   Q.   That is hooked up to ReferenceUSA.com, correct?
20   A.   The Omaha Library does have access to ReferenceUSA, but
21   the page that you have provided, the URL of that is the
22   Omahalibrary.org.
23   Q.   Okay.  Do you see, in the second paragraph, it says:
24   Each record is examined by hand for quality and
25   completeness by one of more than 700 database

**134**

1   specialists; do you see that?
2   A.   I do.
3   Q.   Can you confirm the accuracy of that statement?
4   A.   I can't confirm the source of the page, forget the
5   accuracy of the content.
6   Q.   Well, I'm not asking the source of the page, I'm asking
7   the accuracy of the content.
8   A.   I can't.
9   Q.   It says, continuing:  Our business and residential
10   databases are continuously updated from more than 5,000
11   public sources; do you see that?
12   A.   Yes.
13   Q.   Can you confirm the accuracy of that statement?
14   A.   I can't.
15   Q.   I think, we place 26 million phone calls a year to
16   verify, we've already established you are not able to
17   verify that, correct?
18   A.   The specific number, I'm not able to.
19         (Exhibit No. 7 marked for identification.)
20   Q.   (BY MR. LAUGHLIN)  Handing you what the court reporter
21   has marked as Exhibit 7, is that a true and accurate
22   copy of a ReferenceUSA web site, currently?
23   A.   Again, this has the URL of Omahalibrary.org, so I can't
24   confirm that this page --
25   Q.   I mean, are you generally familiar with Infogroup web

**135**

1   sites, ReferenceUSA web sites?
2   A.   Yeah.
3   Q.   Okay.  When is the last time you were on any of them?
4   A.   Which one?
5   Q.   Either.
6   A.   Yesterday.
7   Q.   Which one were you on?
8   A.   Specifically, yesterday, I would have been on --
9   yesterday was Tuesday, I would have been on
10   infoUSA.com.
11   Q.   And have you been on the ReferenceUSA web site in the
12   last month?
13   A.   Yeah.
14   Q.   And are you able to confirm -- forget about that it
15   came through the Omaha Library.  Are you able to
16   confirm the fact that this is accurate?
17   A.   Each of these sites has over, probably, a few hundred
18   pages.  You're asking me to confirm, of all the sites,
19   we have one specific page.  It's like me taking a page
20   out of a law book and asking you to confirm you read
21   it.
22   Q.   I understand.  On Exhibit 7, if you go down to the --
23   about halfway down, it says:  All
24   Infogroup/ReferenceUSA information is compiled from
25   public sources; do you see that?

**136**

1   A.   Sorry, where do you see that?
2   Q.   Right here (indicating).
3   A.   Okay, the first sentence?
4   Q.   Yes, I'm sorry, yes.  Do you see where it says:  All
5   Infogroup/ReferenceUSA information is compiled from
6   public sources?
7   A.   Uh-huh, I see that.
8   Q.   Is that an accurate statement?
9   A.   I'm not sure.
10         (Exhibit No. 8 marked for identification.)
11   Q.   (BY MR. LAUGHLIN)  I'm handing you what the court
12   reporter has marked as Exhibit 8, and I'm not going to
13   beat a dead horse, Mr. Khanna, but are you able to
14   identify or recall whether this is a page from a
15   ReferenceUSA web site or not?
16   A.   I can't because, specifically -- let me also clarify.
17   Q.   Sure.
18   A.   Every library gets an ops for different modules.  Now,
19   this page could look different for every library.
20         (Exhibit No. 9 marked for identification.)
21         MR. LAUGHLIN:  Doug, I'll give you a
22   copy later.
23         MR. PETERS:  Okay.
24         MR. LAUGHLIN:  I've got one, I just
25   can't find it right now.

8:14-cv-00049-JMG-SMB   Doc # 372   Filed: 05/07/14   Page 35 of 155 - Page ID # 505

INFOGROUP, INC., et al. vs. DATABASEUSA.COM, LLC, et al.                    May 16, 2014

**137**

1    MR. PETERS:  That's fine.

2   Q.   (BY MR. LAUGHLIN)  Handing you what the court reporter

3        has marked as Exhibit 9, can I assume, to quicken this

4        up, that you're not able to identify this as a page off

5        the ReferenceUSA web site either?

6   A.   I can't confirm that, yes.

7   Q.   And it looks like — do you see a record type, and

8        verified businesses is checked; do you see that?

9   A.   Yes, I do.

10  Q.   Do you see the record count on the right is a

11       16 million figure?

12  A.   Yes.

13  Q.   Do I assume, from your prior testimony, you would not

14       be able to verify the general accuracy of that number

15       of verified records as well; is that true?

16  A.   That's correct.

17  Q.   Are you able to verify that that is one of the selects

18       in ReferenceUSA?

19  A.   Verified businesses, yes, I am able to.

20  Q.   And are you also able to do selects in ReferenceUSA by

21       geography, business type —

22  A.   That's correct.

23  Q.   — financial data and other special selects?

24       Everything on the left side of the page are selects; is

25       that true?

**138**

1   A.   That's correct, on ReferenceUSA, the criteria select is

2        on the left side.

3                 MR. LAUGHLIN:  One moment.

4             (An off—the—record discussion was held.)

5                 MR. LAUGHLIN:  That's all the questions

6        I have for this portion.

7                 MR. PETERS:  Okay.  Can we go off the

8        record for a moment?

9                 MR. LAUGHLIN:  Absolutely.

10            (An off—the—record discussion was held.)

11             (VIN GUPTA AND FRED VAKILI ARE

12           NO LONGER PRESENT IN THE DEPOSITION.)

13                   CROSS—EXAMINATION

14  BY MR. PETERS:

15  Q.   Let's go back on the record.

16            MR. KHANNA:  I just have a couple of follow—up

17       questions to things you talked about with Mr. Laughlin.

18       Was it your intention, in putting together your

19       Declaration, to provide an exhaustive and full list of

20       every conceivable instance of consumer confusion or

21       misleading statements?

22  A.   No, it wasn't.

23  Q.   Do you believe it's possible to be aware of specific

24       instances without recalling the details of those

25       specific instances?

**139**

1   A.   Absolutely.  I mean, I come across instances

2        periodically and, in general, know what's happening,

3        but to recall the specifics of any particular thing is

4        kind of hard months later.

5   Q.   Mr. Laughlin asked you to go through several of the

6        exhibits to your Declaration and tell him whether you

7        believed those exhibits contained any false or

8        misleading material; do you recall that?

9   A.   Yes, I do.

10  Q.   I'd like you to look at one exhibit in particular,

11       Exhibit M, as in "Mary".

12  A.   Okay.

13  Q.   And take your time, read it closely, and let me know

14       when you've finished.

15  A.   (Witness reviewing Exhibit M.)  Okay.

16  Q.   After re—reading that closely, is there anything in

17       Exhibit M, InfoFree.com press release, that you believe

18       is misleading as to the existence of an ongoing

19       affiliation between Infogroup and Database?

20  A.   Yes.  I guess, the statement on — the first statement

21       of paragraph three, InfoFree was founded by and is

22       under the leadership of industry pioneer, Vin Gupta,

23       proprietor of companies such as infoUSA and SalesGenie.

24  Q.   What's misleading about that sentence?

25  A.   It kind of connotes that he's still proprietor of

**140**

1        infoUSA and SalesGenie.

2   Q.   How do you define "proprietor"?

3   A.   Somebody who owns the business.

4                 MR. PETERS:  That's all I have.

5                 MR. LAUGHLIN:  Nothing further.

6            (Deposition adjourned at 4:05 p.m.)

141

C E R T I F I C A T E

STATE OF NEBRASKA        )
                         ) ss.
COUNTY OF DOUGLAS        )

3
4      I, TAMMY J. HETHERINGTON, a General Notary Public
5  in and for the State of Nebraska, do hereby certify that
6  AMIT KHANNA was by me duly sworn to testify to the truth, the
7  whole truth, and nothing but the truth; and that the
8  deposition as above set forth was reduced to writing by
9  Tammy J. Hetherington;
10     That the within and foregoing deposition was reported by
11  Tammy J. Hetherington at the time and place herein specified
12  and in accordance with the within stipulations;
13     That I am not counsel, attorney or relative of any of
14  the parties or otherwise interested in the event of this
15  suit.
16     IN TESTIMONY WHEREOF, I have placed my hand and Notarial
17  Seal this 23rd day of April, 2014.
18
19     _____
          General Notary Public
20
21
22
23
24

142

1          IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF NEBRASKA
3  Infogroup, INC., infoUSA, Inc.,   )Case No. 8:14CV49
   and InfoUSA Marketing, Inc.,       )
4  Delaware corporations,             )
                                      )
5       Plaintiffs,                   )
                                      )COST CERTIFICATE
6   vs.                               )
                                      )
7  DATABASEUSA.COM LLC d/b/a          )
   Database101.com, d/b/a infoFree.com,)
8  and d/b/a AtoZ Databases, a Nevada )
   limited liability company, VINOD   )
9  GUPTA, BLAKE VAN GILDER, JASON     )
   DAILEY, MARK PULJAN, JON McCORMICK,)
10  and JOHN DOES 1-20,                )
                                      )
11       Defendants.                  )
12
13        CERTIFICATE OF DEPOSITION OF AMIT KHANNA
14                    Taken in behalf of
                        the defendants.
15
   The Original Deposition is
16  in the possession of:
17  Mr. Mark C. Laughlin
    Attorney at Law
18  500 Energy Plaza
    409 South 17th Street
19  Omaha, Nebraska  68102-2663
20
    Costs:
25
       _____
22     Tammy J. Hetherington
       Notary Public
23
       Date:  4/23/14
24





## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

INFOGROUP, INC., infoUSA, Inc., and
infoUSA Marketing, Inc., Delaware
corporations,

        Plaintiffs,

    v.

DATABASELLC d/b/a Database101.com,
d/b/a InfoFree.com, and d/b/a AtoZ Databases,
a Nevada limited-liability company,
VINOD GUPTA, BLAKE VAN GILDER,
JASON DAILEY, MARK PULJAN,
JON McCORMICK, and JOHN DOES 1-20,

        Defendants.

**Case No.: 8:14-cv-49**

### DECLARATION OF AMIT KHANNA IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Amit Khanna, declare as follows:

1.     I am the President of Small and Medium Business at Infogroup, Inc. ("Infogroup") and have held this position since February of 2013. By virtue of my position and experience, I am familiar with Infogroup's business, policies, and practices, and I have personal knowledge of, or have confirmed through my review of business records kept in the ordinary course of business, and through discussions with appropriate personnel, the facts stated in this Declaration.

2.     Infogroup was established in 1972 and currently maintains demographic, marketing and other related information on approximately 210 million consumers, 17 million U.S. businesses, and 12 million executives.

3.     Infogroup collects data directly from a multitude of original public and proprietary sources, including demographic and marketing information on consumers and businesses

("Data"). Infogroup then uses proprietary analytical systems and tools to accurately and comprehensively categorize millions of consumers and businesses into compilations of Data, namely, its consumer and business databases ("Databases"). When information has been verified by an Infogroup employee as being accurate and current, that information will be designated as verified in Infogroup's Data listings provided to customers. In order to deliver Infogroup's valuable Data to its customers, and thereby to better serve its customers, Infogroup has developed and maintained the following websites and products, among others: "InfoUSA.com", "Salesgenie.com", "ReferenceUSA.com", and "Credit.net".

4.     Infogroup has spent decades and considerable time and money to (a) collect, archive, update, and verify the Data in its Databases; and (b) cultivate its reputation, goodwill, and relationships with its customers. In fact, Infogroup employs more than 400 individuals just to collect, archive, update, and verify the Data in its Databases. Due to its efforts, Infogroup has obtained a reputation for accuracy and quality in the data and marketing solutions industry.

5.     Infogroup maintains its Data on a protected computer system, which it uses to produce and provide mailing lists and other information to customers in interstate commerce across the United States, and to United States Government agencies themselves. The information contained in Infogroup's consumer and business databases ("Databases") is confidential, proprietary to Infogroup, and password protected. The Data has independent economic value from not being known to others, specifically Infogroup's competitors. As such, only a limited number of individuals within Infogroup are provided access to the Data. In addition, Customers who purchase data from Infogroup agree not to sell or disseminate the Data.

6.     The secrecy of Infogroup's Data is necessary to prevent loss of revenue, loss of customers, and damage to Infogroup's goodwill and reputation.  As such, Infogroup takes steps

to protect its Data from unauthorized access both by maintaining electronic security of its computer system and by requiring all Infogroup employees with access to the Data and equipment containing the Data to sign nondisclosure agreements limiting the scope of their authority to use the Data. For instance, the nondisclosure agreements (a) provide that Infogroup employees may only use the Data on Infogroup protected computers; (b) provide that Infogroup employees may only use the Data in furtherance of Infogroup's internal business purposes; (c) conclusively establish Infogroup's ownership of all right, title, and interest in and to the Data; (d) expressly prohibit the misappropriation or unauthorized disclosure of the Data; and (e) require Infogroup employees to return all Data in their possession upon termination of the employment relationship. In addition, to protect its Databases and to monitor potential unauthorized access to the Databases by competitors, Infogroup occasionally inserts so-called "seed data" files into its Databases. Each such seed data file typically consists of fictitious name, address, and phone-number combinations. If seed data listings appear in lists sold or offered for sale by a competitor, it is considered proof that the competitor has gained unauthorized access to Infogroup's Databases.

7.     Infogroup is the owner of numerous federally registered service marks, including, without limitation, the following:

    a.     **INFOUSA** (Reg. No. 2,147,134), for "[b]usiness and consumer information services, namely, preparing and compiling informational lists and directories relating to businesses and consumers throughout the United States for others", which was first used in commerce in June of 1996 and was registered by the U.S. Patent and Trademark Office ("USPTO") on March 31, 1998. A true and correct copy of the INFOUSA mark's Certificate of Registration obtained from the USPTO's Trademark

3

Status & Document Retrieval website (http://www.tsdr.uspto.gov) ("TSDR") is attached hereto as Exhibit "A".

b.   **REFERENCEUSA** (Reg. No. 2,507,419), for "[p]roviding business and consumer information in the nature of research, business profile, geographic and identification information, via a global computer network", first in commerce by Infogroup in June of 1998, and registered by the USPTO on November 13, 2001. A true and correct copy of the REFERENCEUSA mark's Certificate of Registration obtained from TSDR is attached hereto as Exhibit "B".

c.   **SALES GENIE** (Reg. No. 3,176,697), for "[p]roviding business information in the field of company profiles, business credit reports, company and contact names, telephone numbers, and addresses via a global computer network.", first used in commerce by Infogroup on February 2, 2001, and registered by the USPTO on November 28, 2006. A true and correct copy of the SALES GENIE mark's Certificate of Registration obtained from TSDR is attached hereto as Exhibit "C".

d.   **SALESGENIE.COM** (Reg. No. 3,388,763), for "[p]roviding business information in the field of company profiles, business credit reports, company and contact names, telephone numbers, and addresses via a global computer network.", first used in commerce by Infogroup in June of 2004, and registered by the USPTO on February 26, 2008. A true and correct copy of the SALESGENIE.COM mark's Certificate of Registration obtained from TSDR is attached hereto as Exhibit "D".

e.   **SALESGENIE** (Reg. No. 3,588,558), for "[p]roviding business information in the field of company profiles, business credit reports, company and contact names, telephone numbers, and addresses via a global computer network.", first used in

4

commerce by Infogroup on November 2, 2008, and registered by the USPTO on March 10, 2009. A true and correct copy of the SALESGENIE mark's Certificate of Registration obtained from TSDR is attached hereto as Exhibit "E".

f.      **CREDIT.NET** (Reg. No. 3,589,725), for "[p]roviding an online computer database in the field of business information", first used in commerce by Infogroup in July of 2004, and registered by the USPTO on March 17, 2009. A true and correct copy of the CREDIT.NET mark's Certificate of Registration obtained from TSDR is attached hereto as Exhibit "F".

g.      **INFOUSA.COM** (Reg. No. 3,616,006), for "[p]rinting services in the area of direct mail", first used in commerce by Infogroup in January of 2001, and registered by the USPTO on May 5, 2009. A true and correct copy of the INFOUSA.COM mark's Certificate of Registration obtained from TSDR is attached hereto as Exhibit "G".

h.      **INFOUSA.COM** (Reg. No. 3,626,873), for "[b]usiness and consumer information services, namely, preparing and compiling informational lists and directories relating to businesses, consumer research and market research services throughout the world for other; direct marketing services, namely, business leads for others, telemarketing, and computerized database management services in the field of marketing", first used in commerce by Infogroup in January of 2001, and registered by the USPTO on May 26, 2009. A true and correct copy of the INFOUSA.COM mark's Certificate of Registration obtained from TSDR is attached hereto as Exhibit "H".

i.     **INFOGROUP** (Reg. No. 3,940,152), for "[e]lectronic transmission of data and electronic mail services featuring the transmission of information regarding marketing demographics and mailing lists; providing access to databases featuring information in the field of mail order customers; providing multiple-user access to a global computer network featuring databases in the field of mail order customers; electronic transmission of mail featuring electronic publications of others; electronic transmission of computer controlled data; transmission and distribution of data via a global computer network or the internet", first used in commerce by Infogroup in December of 2008, and registered by the USPTO on April 5, 2011. A true and correct copy of the INFOGROUP mark's Certificate of Registration obtained from TSDR is attached hereto as Exhibit "I".

j.     **INFOGROUP** (Reg. No. 3,940,152), for "[b]usiness marketing consulting services; business marketing services; direct marketing advertising for others; market research services; providing an online electronic database in the field of customer and prospective customer information...; data and information processing services...; providing a computer database, interactive computer database and online computer database in the fields of marketing demographics and mailing lists; management of customer and marketing information and data of others...", first used in commerce by Infogroup in December of 2008, and registered by the USPTO on May 10, 2011. A true and correct copy of the INFOGROUP mark's Certificate of Registration obtained from TSDR is attached hereto as Exhibit "J".

8.     Infogroup and Defendant DatabaseLLC d/b/a Database101.com, d/b/a InfoFree.com, and d/b/a AtoZ Databases ("DB101") are direct competitors.  DB101 owns and operates: (a)

"Infofree.com", a website that provides unlimited sales leads and mailing lists, the same types of services and products provided by Infogroup's InfoUSA.com and Salesgenie.com; "DatabaseUSA.com", which, like Infogroup's InfoUSA.com, provides consumers with mailing lists, database marketing, direct mailing and email marketing services; (c) "AtoZDatabases.com", which, like Infogroup's ReferenceUSA.com, (i) provides consumers with information on businesses and households throughout the United States; and (ii) is marketed through libraries and public institutions; and (d) "Creditjam.com", which purports to provide the same types of services provided by Infogroup's Credit.net.

9.    During a recent, routine Data audit, Infogroup discovered that its seed data had been incorporated into DB101's databases.  This Data audit revealed that more than one of DB101's services, including those published to subscribers through Infofree.com and AtoZdatabases.com, had incorporated numerous listings of those seed files used by Infogroup in November of 2011. This seed data was contained in large Databases of actual Data, which had been carefully developed, quality checked, and maintained by Infogroup. The presence of the seed data in DB101's databases indicates that DB101 also had incorporated Infogroup's actual Database listings. A true and correct copy of a screen capture of an Infogroup seed data listing taken from AtoZdatabases.com ("Screen Capture") is attached hereto as Exhibit "K".

10.   Defendant DB101 claims that it uses a verification process similar to Infogroup's on its data compilations, and designates individual records as "verified." Defendants' marketing materials state that the "verified" designation means that a human operator has personally checked the data to verify that it is current and accurate.  However, as demonstrated by the Screen Capture, Defendant DB101 has often attached the "verified" designation to DB101 records that could not have been verified – the fictitious seed data listings that Infogroup had

7

inserted in its databases to detect unauthorized access and use. Notably, as further demonstrated by the Screen Capture, the seed files placed in Infogroup's Databases are labeled as "verified."

11. Defendants have frequently has made references to Infogroup and used Infogroup service marks in its marketing and promotional materials to suggest a present or ongoing relationship between DB101 (and in particular, Defendant Vinod Gupta) and Infogroup's products and services. For example, on July 11, 2013, in a press release announcing Defendant Jon McCormick's promotion within the company, Defendants referred to Infogroup as "a similar reference company that shares the same Founder, Vin Gupta." A true and correct copy of a screen capture of such press release is attached hereto as Exhibit "L". In addition, Defendants' marketing materials frequently describe Defendant Vinod Gupta as the "founder" and "proprietor" of "infogroup", "InfoUSA", and "Sales Genie". True and correct copies of screen captures of such marketing materials are attached hereto as Exhibits "M", "N", and "O".

12. Defendants have also sent mailings to current Infogroup customers that appear to have been written to create the impression of an association between DB101 and Infogroup. One of these mailings prompted a telephone call from a longtime Infogroup customer to his Infogroup account representative in which the customer expressed confusion over the mailing and asked whether DB101 and Infogroup were one and the same. The mailing was signed by Defendant Vinod Gupta, and included, under Gupta's signature, the words "also founder of InfoUSA." A true and correct copy of this mailing is attached hereto as Exhibit "P".

13. The above-mentioned incident is just the most recent example of consumer confusion cause by Defendants' strategy of associating DB101 with Infogroup. Defendants' strategy has caused many other incidents of consumer confusion. In September of 2012, two consumers mistakenly called Infogroup inquiring about an advertising special being offered by

InfoFree.com. On January 17, 2013, a consumer posted an inquiry on InfoFree.com's Support Center, which stated "[y]ou are not part of Sales Genie are you?" A true and correct copy of a screen capture of said consumer's Support Center post is attached hereto as Exhibit "Q". On March 21, 2013, a consumer mistakenly sent an email to Pam Quick of Infogroup, requesting a copy of a March 3, 2013 invoice in the amount of $299.50, and when Ms. Quick responded that she did not have an invoice for that amount, the consumer replied, "[y]ou are info free correct?" A true and correct copy of email conversation between Ms. Quick and said consumer is attached hereto as Exhibit "R".

14.     Defendants' unauthorized use of Infogroup's Data (as evidenced by DB101's incorporation in its databases of Infogroup's seed data files), and their false and misleading statements associating DB101 with Infogroup, threatens to (a) undermine Infogroup's reputation for accuracy; (b) diminish the good will Infogroup has established with its customers; and (c) cause Infogroup to lose customers and business revenue. If Defendants are allowed to continue such conduct, Infogroup's entire business model would be irreparably harmed.

15.     It is unlikely that Defendants will discontinue their unauthorized use of Infogroup's Data and cease making their false and misleading comments unless enjoined, as Infogroup previously filed a lawsuit against DB101 based on inequitable conduct of like nature. In 2011, Infogroup filed suit against DB101 in the District Court of Douglas County, Nebraska, alleging violations of the Nebraska Trade Secret Act, deceptive trade practices and unjust enrichment, among other claims. The state-court litigation ended with a March 2012 settlement agreement ("Agreement") among the parties under which DB101 agreed, among other things, to refrain from referring to any Infogroup product, including, but not limited to, InfoUSA and ReferenceUSA, in its advertising or marketing communications, to refrain from disparaging

9

Infogroup products, and to refrain from soliciting testimonials purporting to compare Infogroup products with DB101 products, for a period of four years from the effective date of the Agreement. In the Agreement, DB101 also agreed to refrain from making any claim that suggests the existence of any present relationship or association between DB101 and Infogroup, its subsidiaries or their products and services.   A true and correct copy of the Agreement is attached hereto as Exhibit "S".


I declare under penalty of perjury that the foregoing is true and correct.

Executed on February **21**, 2014, in Omaha, Nebraska.

Amit Khanna

10

# EXHIBIT A

Int. Cls.: 9 and 35

Prior U.S. Cls.: 21, 23, 26, 36, 38, 100, 101 and 102

## United States Patent and Trademark Office

Reg. No. 2,147,134

Registered Mar. 31, 1998

### TRADEMARK
### SERVICE MARK
### PRINCIPAL REGISTER

# *info*USA

AMERICAN BUSINESS INFORMATION, INC. (DELAWARE CORPORATION)
5711 SOUTH 86TH CIRCLE, P.O. BOX 27347
OMAHA, NE 68127

FOR: PRE-RECORDED CD ROMS CONTAINING INFORMATION ABOUT AMERICAN AND CANADIAN BUSINESSES AND CONSUMERS , IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).
FIRST USE 6-0-1996; IN COMMERCE 6-0-1996.

FOR: BUSINESS AND CONSUMER INFORMATION SERVICES, NAMELY, PREPARING AND COMPILING INFORMATIONAL LISTS AND DIRECTORIES RELATING TO BUSINESSES AND CONSUMERS THROUGHOUT THE UNITED STATES FOR OTHERS, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).
FIRST USE 6-0-1996; IN COMMERCE 6-0-1996.

SER. NO. 75-153,561, FILED 8-21-1996.

ANDREW A. ROPPEL, EXAMINING ATTORNEY

# EXHIBIT B

Int. Cl.: 35

Prior U.S. Cls.: 100, 101, and 102

**United States Patent and Trademark Office**

Reg. No. 2,507,419
Registered Nov. 13, 2001

## SERVICE MARK
### PRINCIPAL REGISTER

## REFERENCEUSA

INFOUSA INC. (DELAWARE CORPORATION)
5711 SOUTH 86TH CIRCLE
OMAHA, NE 68127 BY CHANGE OF NAME AMER-
ICAN BUSINESS INFORMATION, INC. (DELA-
WARE CORPORATION) OMAHA, NE 68127

FOR: PROVIDING BUSINESS AND CONSUMER
INFORMATION IN THE NATURE OF RESEARCH,
BUSINESS PROFILE, GEOGRAPHIC AND IDENTI-

FICATION INFORMATION, VIA A GLOBAL COM-
PUTER NETWORK, IN CLASS 35 (U.S. CLS. 100, 101
AND 102).

FIRST USE 6-0-1998; IN COMMERCE 6-0-1998.

SN 75-504,964, FILED 6-18-1998.

RONALD AIKENS, EXAMINING ATTORNEY

# EXHIBIT C

Int. Cl.: 35

Prior U.S. Cls.: 100, 101 and 102

## United States Patent and Trademark Office

Reg. No. 3,176,697
Registered Nov. 28, 2006

### SERVICE MARK
### PRINCIPAL REGISTER

# SALES GENIE

INFOUSA, INC. (DELAWARE CORPORATION)
5711 SOUTH 86TH CIRCLE
OMAHA, NE 68127-0347

FOR: PROVIDING BUSINESS INFORMATION IN THE FIELD OF COMPANY PROFILES, BUSINESS CREDIT REPORTS, COMPANY AND CONTACT NAMES, TELEPHONE NUMBERS, AND ADDRESSES VIA A GLOBAL COMPUTER NETWORK, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 2-2-2001; IN COMMERCE 2-2-2001.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NO. 2,791,921.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SALES", APART FROM THE MARK AS SHOWN.

SER. NO. 78-767,335, FILED 12-6-2005.

LINDA M. KING, EXAMINING ATTORNEY

# EXHIBIT D

Int. Cl.: 35

Prior U.S. Cls.: 100, 101 and 102

**United States Patent and Trademark Office**

Reg. No. 3,388,763
Registered Feb. 26, 2008

**SERVICE MARK
PRINCIPAL REGISTER**

# SALESGENIE.COM

INFOUSA INC. (DELAWARE CORPORATION)
5711 S 86TH CIRCLE
OMAHA, NE 68127

FOR: PROVIDING BUSINESS INFORMATION IN THE FIELD OF COMPANY PROFILES, BUSINESS CREDIT REPORTS, COMPANY AND CONTACT NAMES, TELEPHONE NUMBERS, AND ADDRESSES VIA A GLOBAL COMPUTER NETWORK , IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 6-0-2004; IN COMMERCE 6-0-2004.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 2,591,921 AND 3,176,695.

SER. NO. 77-252,326, FILED 8-10-2007.

JENNIFER MARTIN, EXAMINING ATTORNEY

# EXHIBIT E

Int. Cl.: 35

Prior U.S. Cls.: 100, 101, and 102

## United States Patent and Trademark Office

Reg. No. 3,588,558
Registered Mar. 10, 2009

### SERVICE MARK
### PRINCIPAL REGISTER

# SALESGENIE

INFOUSA INC. (DELAWARE CORPORATION)
5711 S 86TH CIRCLE
OMAHA, NE 68127

FOR: PROVIDING BUSINESS INFORMATION IN THE FIELD OF COMPANY PROFILES, BUSINESS CREDIT REPORTS, COMPANY AND CONTACT NAMES, TELEPHONE NUMBERS, AND ADDRESSES VIA A GLOBAL COMPUTER NETWORK , IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 11-2-2008; IN COMMERCE 11-2-2008.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 2,791,921 AND 3,176,607.

SN 77-361,708, FILED 12-31-2007.

SEAN CROWLEY, EXAMINING ATTORNEY

# EXHIBIT F

Int. Cl.: 35

Prior U.S. Cls.: 100, 101 and 102

Reg. No. 3,589,725

## United States Patent and Trademark Office

Registered Mar. 17, 2009

### SERVICE MARK
### PRINCIPAL REGISTER



INFOUSA INC. (DELAWARE CORPORATION)
5711 S 86TH CIRCLE
OMAHA, NE 68127

FOR: PROVIDING AN ONLINE COMPUTER DATABASE IN THE FIELD OF BUSINESS INFORMATION, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 7-0-2004; IN COMMERCE 7-0-2004.

THE MARK CONSISTS OF A CHECK MARK ABOVE THE LETTER "I" IN THE WORD "CREDIT".

SER. NO. 77-266,249, FILED 8-28-2007.

LINDA ORNDORFF, EXAMINING ATTORNEY

# EXHIBIT G

Int. Cl.: 40

Prior U.S. Cls.: 100, 103 and 106

## United States Patent and Trademark Office

Reg. No. 3,616,006
Registered May 5, 2009

### SERVICE MARK
### PRINCIPAL REGISTER

# INFOUSA.COM

INFOGROUP, INC. (DELAWARE CORPORA-
TION)
5711 SOUTH 86TH CIRCLE
OMAHA, NE 68127

FOR: PRINTING SERVICES IN THE AREA OF
DIRECT MAIL, IN CLASS 40 (U.S. CLS. 100, 103 AND
106).

FIRST USE 1-0-2001; IN COMMERCE 1-0-2001.

THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 2,147,134 AND
2,267,512.

SER. NO. 77-599,697, FILED 10-24-2008.

BRIAN CALLAGHAN, EXAMINING ATTORNEY

# EXHIBIT H

Int. Cl.: 35

Prior U.S. Cls.: 100, 101 and 102

**United States Patent and Trademark Office**

Reg. No. 3,626,873
Registered May 26, 2009

## SERVICE MARK
### PRINCIPAL REGISTER

# INFOUSA.COM

INFOGROUP, INC. (DELAWARE CORPORA-
TION)
5711 SOUTH 86TH CIRCLE
OMAHA, NE 68127

FOR: BUSINESS AND CONSUMER INFORMA-
TION SERVICES, NAMELY, PREPARING AND
COMPILING INFORMATIONAL LISTS, AND DI-
RECTORIES RELATING TO BUSINESSES, CONSU-
MER RESEARCH AND MARKET RESEARCH
SERVICES THROUGHOUT THE WORLD FOR OTH-
ERS; DIRECT MARKETING SERVICES, NAMELY,
DIRECT MAIL MARKETING TO GENERATE NEW
BUSINESS LEADS FOR OTHERS, TELEMARKET-
ING, AND COMPUTERIZED DATA BASE MAN-
AGEMENT SERVICES IN THE FIELD OF
MARKETING, IN CLASS 35 (U.S. CLS. 100, 101
AND 102).

FIRST USE 1-0-2001; IN COMMERCE 1-0-2001.

THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 2,147,134 AND
2,267,512.

SEC. 2(F).

SER. NO. 77-599,182, FILED 10-23-2008.

BRIAN CALLAGHAN, EXAMINING ATTORNEY

# EXHIBIT I

# United States of America

### United States Patent and Trademark Office

# INFOGROUP

**Reg. No. 3,940,152**
**Registered Apr. 5, 2011**

**Int. Cl.: 38**

**SERVICE MARK**

**PRINCIPAL REGISTER**

INFOGROUP INC. (DELAWARE CORPORATION)
5711 SOUTH 86TH CIRCLE
OMAHA, NE 68127

FOR: ELECTRONIC TRANSMISSION OF DATA AND ELECTRONIC MAIL SERVICES FEATURING THE TRANSMISSION OF INFORMATION REGARDING MARKETING DEMOGRAPHICS AND MAILING LISTS; PROVIDING ACCESS TO DATABASES FEATURING INFORMATION IN THE FIELD OF MAIL ORDER CUSTOMERS; PROVIDING MULTIPLE-USER ACCESS TO A GLOBAL COMPUTER NETWORK FEATURING DATABASES IN THE FIELD OF MAIL ORDER CUSTOMERS; ELECTRONIC TRANSMISSION OF MAIL FEATURING ELECTRONIC PUBLICATIONS OF OTHERS; ELECTRONIC TRANSMISSION OF COMPUTER CONTROLLED DATA; TRANSMISSION AND DISTRIBUTION OF DATA VIA A GLOBAL COMPUTER NETWORK OR THE INTERNET, IN CLASS 38 (U.S. CLS. 100, 101 AND 104).

FIRST USE 12-0-2008; IN COMMERCE 12-0-2008.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 85-033,140, FILED 5-7-2010.

JAMES A. RAUEN, EXAMINING ATTORNEY



*David J. Kappos*

Director of the United States Patent and Trademark Office

# EXHIBIT J

# United States of America

### United States Patent and Trademark Office

# INFOGROUP

**Reg. No. 3,956,974**
**Registered May 10, 2011**

**Int. Cl.: 35**

**SERVICE MARK**

**PRINCIPAL REGISTER**

INFOGROUP INC. (DELAWARE CORPORATION)
5711 SOUTH 86TH CIRCLE
OMAHA, NE 68127

FOR: BUSINESS MARKETING CONSULTING SERVICES; BUSINESS MARKETING SER-
VICES; DIRECT MARKETING ADVERTISING FOR OTHERS; MARKET RESEARCH SER-
VICES; PROVIDING AN ONLINE ELECTRONIC DATABASE IN THE FIELD OF CUSTOMER
AND PROSPECTIVE CUSTOMER INFORMATION, NAMELY, MARKETING INFORMATION,
MARKETING DEMOGRAPHICS AND MAILING LISTS; INFORMATION SERVICES IN THE
FIELD OF MANAGEMENT OF CUSTOMER AND MARKETING INFORMATION AND DATA
OF OTHERS, MARKETING DEMOGRAPHICS AND MAILING LISTS; DATA AND INFORM-
ATION PROCESSING SERVICES, NAMELY, DATA SELECTION, DATA ARRANGEMENT,
DATA PROCESSING, DATA CLEANING TO REMOVE ERRONEOUS OR UNWANTED IN-
FORMATION, DATA MERGING, DATA MODELING, DATA SCORING AND DATA
PRESENTATION; DATA PROCESSING SERVICES FOR OTHERS RELATED TO POSTAL
PROCESSING, NAMELY, ZIP CODE SORTING, MAINTENANCE OF MAIL FILES; MAIL
PROCESSING FOR OTHERS, NAMELY, ADDRESSING, INSERTING, TABBING, FOLDING,
LASER IMAGING, METERING AND STAMPING; ORDER FULFILLMENT SERVICES,
NAMELY, MAINTAINING AN INVENTORY OF INFORMATIVE LITERATURE OF OTHERS
AND MAILING OF SAID LITERATURE TO THOSE REQUESTING IT; PROVIDING A
COMPUTER DATABASE, INTERACTIVE COMPUTER DATABASE AND ONLINE COM-
PUTER DATABASE IN THE FIELDS OF MARKETING DEMOGRAPHICS AND MAILING
LISTS; MANAGEMENT OF CUSTOMER AND MARKETING INFORMATION AND DATA
OF OTHERS; DATA PROCESSING SERVICES, NAMELY, ONLINE MANAGEMENT AND
PROCESSING OF DATA AND INFORMATION; MAILING LIST PREPARATION, NAMELY,
ONLINE SELECTION AND PROCESSING OF MAILING LISTS, ASSOCIATED INFORMATION
AND REPORTS; ANALYSIS AND EVALUATION OF MARKETING DATA; PROVIDING
ONLINE REPORTS AND INFORMATION IN THE FIELD OF MARKETING DEMOGRAPHICS
AND MAILING LISTS; MARKETING SERVICES, NAMELY, PREPARING ADVERTISEMENTS
FOR THE PRODUCTS AND SERVICES OF OTHERS; DIRECT MAIL CONSULTING SER-
VICES. MARKETING RESEARCH SERVICES, NAMELY, MARKETING RESEARCH IN THE
FIELDS OF CUSTOMER LOYALTY SERVICES, CUSTOMER TARGETING SERVICES AND
CUSTOMER PROFILING SERVICES; LEAD GENERATION SERVICES; DISSEMINATION
OF BUSINESS MARKETING INFORMATION FOR OTHERS VIA A GLOBAL COMPUTER
NETWORK; DATA MANAGEMENT SERVICES, NAMELY, INTEGRATION, CONSOLIDA-
TION, ORGANIZATION AND CLEANSING OF MULTIPLE DATABASES; COMPUTERIZED
DATABASE MANAGEMENT; PROVIDING AN INTERACTIVE COMPUTER DATABASE
IN THE FIELD OF MARKETING DEMOGRAPHICS AND MAILING LISTS; CONSUMER
RESEARCH; PREPARATION OF MAILING LISTS; CREATING OF MARKETING TOOLS
FOR OTHERS THAT ARE DESIGNED TO INCREASE KNOWLEDGE OF CUSTOMERS
NEEDS; ADVERTISING, PROMOTION AND MARKETING SERVICES IN THE NATURE OF
EMAIL BLAST CAMPAIGNS, CAMPAIGNS CONDUCTED THROUGH SOCIAL NETWORK-
ING SITES, MOBILE APPLICATIONS AND WEBSITES; PROMOTING THE GOODS AND



*David J. Kappos*

Director of the United States Patent and Trademark Office

Reg. No. 3,956,974   SERVICES OF OTHERS THROUGH SEARCH ENGINE REFERRAL TRAFFIC ANALYSIS AND REPORTING, SOCIAL MEDIA STRATEGY AND MARKETING CONSULTANCY SERVICES, RESEARCH SERVICES, NAMELY, PROVIDING BUSINESS AND MARKET RESEARCH AND MARKET ANALYSIS SERVICES, COMMERCIAL INFORMATION AGENCY SERVICES; DIRECT MARKETING SERVICES FEATURING A DATABASE OF CONSUMER NAMES, ADDRESSES AND MARKETING INFORMATION; PROVIDING DATABASES FEATURING INFORMATION REGARDING MAIL ORDER CUSTOMERS AND CONSULTATION IN CONNECTION THEREWITH; CONDUCTING ON-LINE SURVEYS TO COMPILE DATA ABOUT BUSINESSES AND CONSUMERS, AND PREPARING AND PROVIDING RELATED REPORTS; COMPILATION AND SYSTEMIZATION OF INFORMATION INTO COMPUTER DATABASES; BUSINESS CREDIT INFORMATION SERVICES; PROVISION OF BUSINESS INFORMATION SUCH AS ADDRESS, PHONE, CONTACT, AND OTHER BUSINESS INFORMATION VIA IN-CAR, ONLINE AND MOBILE NAVIGATION SYSTEMS; AND EMPLOYEE SATISFACTION RESEARCH SERVICES, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 12-0-2008; IN COMMERCE 12-0-2008.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 85-053,359, FILED 5-7-2010.

JAMES A. RAUEN, EXAMINING ATTORNEY

# EXHIBIT K



# EXHIBIT L

2/20/2014                     Jon McCormick Appointed General Manager of AtoZdatabases

 **PRWeb**
Online Visibility from Vocus

United States   Login

Create Free Account >

HOME    NEWS CENTER    BLOG

Front Page | Arts | Business | Education | Environment | Government | Industry | Lifestyle | Sports | Tech | Other

Thursday, February 20, 2014                                              R   E-mail Newsletters | Put PRWeb on your site

# Jon McCormick Appointed General Manager of AtoZdatabases

The industry veteran has been promoted from VP of Product and Technology to General Manager.

**Contact**

**Christine Smally**
Zdatabases
877-428-0101
Email

San Mateo, CA (PRWEB) July 11, 2013

 Tweet   Like   +1   Share   EMAIL

AtoZdatabases, the leading provider of eference & marketing databases and job searches for libraries, is proud to announce that it has promoted McCormick to General Manager of its Library Division.

McCormick's promotion comes after spending the last three years with AtoZdatabases, first as Product Manager, and most recently as Vice President of Product Development. In this short time span, he has helped the company grow from a start up to a top player in the reference database industry that is now available in over 1,000 libraries nationwide. Before AtoZdatabases, McCormick spent eight years at InfoGroup, a similar reference company that shares the same Founder, Vin Gupta.

As General Manager of AtoZdatabases, McCormick will be responsible for overseeing both the AtoZ application, as well as the sales efforts directed toward public libraries and institutions across the country. His goal is to continue to provide an industry-revolutionary product with unique features that helps to improve the patrons' and reference librarians' experience.

"Jon has done a tremendous job of building a great product and technology infrastructure that has made this division successful. He is a natural leader and team builder. His promotion could not be more well deserved," says Rakesh Gupta, President of AtoZdatabases.

For a FREE 30-Day trial of AtoZdatabases, please call toll-f   7-428-0101 or email Sales(at)AtoZdatabases(dot)com.

A
   tabases, powered by DatabaseUSA.com, is a leading provider of job searches, reference, and marketing databases for public libraries, academic institutions, and government agencies across the United States.



AtoZdatabases provides a comprehensive look at over 30 million businesses and 220 million residents.

 Jon is a natural leader and team builder. His promotion could not be more well deserved. "

 Tweet   Like   +1  Share  EMAIL

PDF  Print

Please visit our website

---

> **News Center**

## We're here to help.
## Call 1-866-640-6397

Twitter    LinkedIn
Facebook   Google

**Why PRWeb**        **About Vocus**
**How It Works**     **Contact Us**
**Who Uses It**      **Partners**
**Pricing**          **Subscribe to News**
**Learning**         **Terms of Service**
**Blog**             **Privacy Policy**
                **Copyright**
                **Site Map**

BEST IN BIZ
Inc 50
2009 SBA
//CODIE//
FINALIST

VOCUS   ©Copyright 1997-2014 Vocus PRW Holdings, LLC. Vocus, PRWeb, and Publicity Wire are trademarks or registered trademarks of Vocus, Inc. or Vocus PRW Holdings, LLC.

Create Free Account >

# EXHIBIT M

2/20/2014                    infofree.com Raises $10 Million in Series B Funding from Everest Group, LLC | Infofree





# infofree.com Raises $10 Million in Series B Funding from Everest Group, LLC

San Mateo, CA (PRWEB) January 07, 2013

infofree.com, the leading provider of unlimited sales leads and mailing lists for the incredible price of only $49.95 per month, is excited to announce that it has just received $10 million in Series B funding from Everest Group LLC.

Everest Group is an international private equity firm whose philosophy centers on leveraging its team's experience to build leading service companies. It is actively seeking new acquisitions and investment opportunities with companies that deal in business services, database, email, and SaaS-based technologies.

infofree.com was founded by and is under the leadership of industry pioneer Vin Gupta, proprietor of companies such as infoUSA and Salesgenie. He brings nearly 40 years of experience in building databases, creating sales leads, and helping salespeople and small businesses to his new company.

"This Series B funding will allo                    logy and branding so that we can continue to enhance our product for our subscribers," says Gupta.

To try infofree, visit http://www.infofree.com or call 877-448-0101 for more information.

About Us: infofree.com™ is revolutionizing the sales lead and mailing list industry by providing unlimited search, view, and download of over 12 million business records, 200 million consumers, and hundreds of other specialty databases for the lo    , flat price of only $49.95 per month. Reach new homeowners, new movers, newlyweds, new businesses, and more!

The infofree.com content is compatible with the follo        latforms: Oracle CRM, Salesforce CRM, Microsoft CRM, Nutshell CRM, Goldmine CRM, Sage ACT! CRM, Highrise CRM, Zoho CRM, NetSuite CRM, SAP CRM, Constant Contact, RightNow Technologies, Responsys, Vertical Response, and Dun & Bradstreet.

## Add a Comment

Your email address will not be published. Required fields are marked *

Name *

Email *

Website

Comment

Post Comment

4 5 7 2 5

### Categories

Infofree SMB Blog
Press Releases
Sales Tips Center
  Database Marketing
  Email Marketing
  Find New Customers
  Mailing Lists
  Sales Productivity
  Sales Leads
Success Stories
Tech Blog

### Recent Posts

Finding a new sales lead is great, but keeping a current customer can be cheaper.

infofree.com™ Launches Nationwide TV Ad Campaign.

Unlimited Background Search Now Available At infofree.com For No Extra Charge.

Vin Gupta's infoFree.com Reinvents CRM and Lead Gen Tools For Small Business

Unlimited Business Credit Reports by infofree.com Saves Business Owners Thousands

### Archives

January 2014 (4)
December 2013 (2)
May 2013 (4)
April 2013 (21)
March 2013 (38)
February 2013 (23)
January 2013 (27)
December 2012 (63)
November 2012 (40)
October 2012 (62)
September 2012 (101)
August 2012 (40)
July 2012 (3)
April 2012 (1)
March 2012 (9)
February 2012 (12)
January 2012 (5)
December 2011 (20)
November 2011 (17)

**Search**

Search for:

[                    ]

Search

Due to the high turnover in email addresses, we estimate the accuracy of our email database at approximately 50%. By using email addresses from infofree.com you are agreeing to comply with all CAN-SPAM regulations. FEEDLINK#LC1MO7151

About Us                 Testimonials              Explore               Press Releases          Contact Us
Our Founder              Success Stories           Pricing               Blog                    Jobs
                                                   FAQs
                                                   Databases

# EXHIBIT N

2/20/2014                    $50 Million Saved Thanks to infofree.com Unlimited Sales Leads | Infofree





# $50 Million Saved Thanks to infofree.com Unlimited Sales Leads

infofree.com, a leading provider of unlimited sales leads, mailing lists, and business credit profiles for only $49.95 per month, has announced that its subscribers have saved over $50 million and downloaded more than 500 million sales leads since its launch 13 months ago.

T          t of a sales lead in the industry is upwards of 10-20 cents per lead. infofree.com is revolutionizing the mailing list industry by providing unlimited search and download of sales leads from dozens of databases with over 14 million businesses and 225 million consumers. Users have the ability to narrow their list of prospects by hundreds of selects, and can even access weekly "hot" databases like new businesses, new homeowners, and newlyweds, all for one flat price.

"infofree is quickly becoming the finest sales tool in the business. For one flat price, get all the sales leads you need, no annual contract, a money back guarantee, and many new features in the works," says founder Vin Gupta, who also founded InfoUSA, infogroup, and Sales Genie.

infofree.com will be available for iPhone, iPad, and other mobile devices coming soon.

Special Offer
Only $42.95 per month for unlimited sales leads, mailing lists, and business credit profiles. Visit infofree.com and use promo code PR41.

About infofree.com
For $49.95 per month, the service provides unlimited search and download of sales leads and mailing lists, as well as the unlimited view and print of business credit profiles and email lists of 12 million businesses, 200 million consumers and homeowners, and hundreds of other unique databases. Reach new homeowners, new movers, newlyweds, recently divorced consumers, and new businesses with real time downloading and unlimited search.

T          .com content is compatible with the follo    latforms: Oracle CRM, Salesforce CRM, Microsoft CRM, Nutshell CRM, Goldmine CRM, Sage ACT! CRM, Highrise CRM, Zoho CRM, NetSuite CRM, SAP CRM, Constant Contact, RightNow Technologies, Responsys, Vertical Response, and Dun & Bradstreet.

## Add a Comment

Your email address will not be published. Required fields are marked *

Name *

Email *

Website

Comment

Post Comment

### Categories

Infofree SMB Blog
Press Releases
Sales Tips Center
   Database Marketing
   Email Marketing
   Find New Customers
   Mailing Lists
   Sales Productivity
   Sales Leads
Success Stories
Tech Blog

### Recent Posts

Finding a new sales lead is great, but keeping a current customer can be cheaper.

Infofree.com™ Launches Nationwide TV Ad Campaign.

Unlimited Background Search Now Available At Infofree.com For No Extra Charge

Vin Gupta's Infofree.com Reinvents CRM and Lead Gen Tools For Small Business

Unlimited Business Credit Reports by Infofree.com Saves Business Owners Thousands

### Archives

January 2014 (4)
December 2013 (2)
May 2013 (4)
April 2013 (21)
March 2013 (36)
February 2013 (23)
January 2013 (27)
December 2012 (53)
November 2012 (40)
October 2012 (62)
September 2012 (101)
August 2012 (40)
July 2012 (3)
April 2012 (1)
March 2012 (9)
February 2012 (12)
January 2012 (5)
December 2011 (20)
November 2011 (17)

2/20/2014                    $50 Million Saved Thanks to infofree.com Unlimited Sales Leads | Infofree

**Search**

Search for:

[ Search ]

Due to the high turnover in email addresses, we estimate the accuracy of our email database at approximately 50%. By using email addresses from infofree.com, you are agreeing to comply with all CAN-SPAM regulations. FEDLINK # LC14Q7154

About Us                Testimonials          Explore           Press Releases        Contact Us
Our Founder             Success Stories       Pricing           Blog                  Jobs
                                              FAQs
                                              Databases

# EXHIBIT O

2/20/2014                                    Selling Power Article | Infofree

 

1.877.448.0101   Email   Chat

home   explore   list accuracy   faq   sales tips   pricing   Sign in

# Selling Power Endorses infofree.com
## A New Lead Deal

T          lead company on the Web offers affordable and accessible leads to salespeople in a wide variety of markets. Infofree.com, started by the founder and former head of InfoGroup, Vin Gupta, now offers plentiful leads for every business — small, medium, large, and supersize.

With 50 databases to choose from covering 15 million business sales leads, managers can find the leads that start every sale. T          lude small businesses with fewer than 100 employees, larger businesses, new businesses, minority-o          turers, accountants, la          tors, contractors, wholesalers and distributors, retailers, and nonprofits. Consumer databases have 200 million leads, including millionaires, people turning 65, gamblers, investors, golfers, runners and joggers, frequent cruise travelers, boat o          tsmen, gardeners, pet owners, camera buffs, and recreation vehicle drivers. Don't see what you want here? There are plenty more at Infofree.com.

Infofree.com costs only $49.95 per month, with no long-term commitment required and no installed software. You just upload your profile of your best leads and download your prospects. You even get a free contact manager and alerts for existing customers and new prospects!

Sort and search your contacts, edit search fields, and choose your own dashboard settings. View prospects and customers on a map. For additional charges, have your current customers analyzed to find new prospects, do email and postcard marketing campaigns, and have your customer data professionally cleansed.

Customers are already lining up. Farmers Insurance Group district manager Scott Richmann finds that, in a slo          lling to listen to money-saving offers from different insurance providers. But competition has gotten tougher, and he must find these potential customers fast and affordably.

Richmann used Salesgenie to uncover leads but found the price too high. But he still needed a lead database, especially for all the new agents he was training for Farmers.

"I reviewed Infofree.com, and it looked like a good alternative," says Richmann's training coordinator Melissa Bauer. "When we pulled some lists for cold calls, we actually found them to be good. People were answering the phone. We didn't get a lot of disconnected numbers. We definitely got good feedback from our agents."

Bauer likes using Infofree.com because it offers flexibility and search options: "I can download an entire list right a          leads at a time."

Richmann is happy that Infofree. com's ever-expanding products, such as renter leads, are cost-effective tools that allo          ts to "initiate conversations with people about insurance." He says these leads drive new business.

Reginald Hawkins started Red Tie Insurance Services in Ingle          . Sales experience taught him the importance of having good leads: "You never want to ignore the cold call. It's proven." He says Infofree.com does the same thing other such solutions do, only better, with new features and at more affordable rates.

**Export your Sales Leads into any CRM**
Export your sales leads into any CRM, including ZOHO CRM™, Sage ACT!®, SugarCRM™, Microsoft Dynamics®, Maximizer®, Salesforce.com®, and all others.

**Multiseat Pricing**
If you have more than five salespeople, you can get multiseat pricing and save up to 60% on monthly charges.

*Only $49.95 per month*

**CLICK HERE FOR A No-Risk Subscription!**

**See Our Founder on 60 Minutes**

Learn more about Vin, including pictures of him at the White House and Camp David. Click here

**Testimonials**
"Low cost lead source. Try it out."
Continue reading →
— Greg Bibos
View More

**Success Stories**
Crime, Justice & America
"I filter it by bondsmen down to the county level and by credit rating and business size. By using those filtering features, we can make it better for us, for the vendor, for the customer, and it creates repeat business." Continue reading →
View More

**Sales Tips Center**
Finding a new sales lead is great, but keeping a current customer can be cheaper.

2/20/2014                          Selling Power Article | Infofree

Now infofree.com is Red Tie's sole cold-call provider. Hawkins explains, "It's serving its purpose of allo
ll of Los Angeles County, at affordable rates."

Hawkins likes the homeowner leads primarily, but to sell life insurance, he also uses lists of people turning 55:
"Infofree. com has produced some leads that have turned into clients for us. They've already saved us money and
made us money, so we're very satisfied."

– HENRY CANADAY







# EXHIBIT P

 **DatabaseUSA**
Top Quality Databases Since 1972



Los Angeles Office
2813 May Avenue            tj.hyman@databaseUSA.com
Redondo Beach, CA 90278    Phone: 323.306.6596

January 2014

Jay Huling
Manager
Jay Huling Copywriter
PO Box 14171
Jacksonville, FL 32238-1171

## Over 15 Million Executive Emails
### + 22 Million Business Executives with Titles
*TRY 5,000 Names FREE*!*

Dear Jay,

I want to Thank You for being our loyal customer. To show our appreciation, we are offering 5,000 Names FREE! Yes -- **5,000 Names FREE – No Strings Attached!**

Remember, our database is Triple-Verified and over 95% Accurate and includes:

- 16 Million Businesses
- 15 Million Emails of Business Executives
- 22 Million Business Executives with Titles
- 225 Million Consumers / 100 Million Homeowners
- *Plus* – New Businesses, New Homeowners, New Movers, New Parents, Newlyweds and Much More!

To get your **5,000 FREE Names**, please call T.J. Hyman today at **(323) 306-6596** or email him at **tj.hyman@databaseUSA.com** today! *No Subscription - No Contracts – No Hassles.* Call Today!

Again, Thank You for your continued Customer Loyalty.

Sincerely,



*T.J. Hyman*
T.J. Hyman
VP Enterprise Sales - Western Region
323.306.6596
tj.hyman@databaseUSA.com

*Vin Gupta*
Vin Gupta
Founder & Chairman
(also Founder of InfoUSA)
vin.gupta@databaseUSA.com

* Offer good one per new customer.
Offer # ENT-EM

Offices in: Omaha • Washington, DC • Los Angeles • San Mateo • Boston • New Rochelle • Portland • Miami • Las Vegas • Noida, India

# EXHIBIT Q



# Support Center

Home › Our Database › Curious



### Curious

**YOLANDA**  **JAN 17, 2013 12:43PM CST**

You are not part of Sales Genie are you?

 1 

**April Perry**
**JAN 17, 2013 01:09PM CST**
**INFOFREE Agent**

Yes, that is correct. Vin Gupta was the founder of InfoUSA (Sales Genie), but sold it and is now the CEO of infofree.com which is a separate company.

http://support.infofree.com/customer/portal/questions/750859-curious

# EXHIBIT R

**From:** Uccjansen [mailto:uccjansen@aol.com]
**Sent:** Wednesday, March 20, 2013 2:43 PM
**To:** Quick, Pam
**Subject:** Re: DirectBuy

You are info free correct?

——Original Message——
From: Quick, Pam <Pam.Quick@infogroup.com>
To: Uccjansen <uccjansen@aol.com>
Sent: Wed, Mar 20, 2013 3:28 pm
Subject: RE: DirectBuy

I do not have an invoice for that amount.

**From:** Uccjansen [mailto:uccjansen@aol.com]
**Sent:** Wednesday, March 20, 2013 2:26 PM
**To:** Quick, Pam
**Subject:** Re: DirectBuy

I am not sure I just need the one that is for 299.50 and it was charged to my account on 3/7. Thanks

——Original Message——
From: Quick, Pam <Pam.Quick@infogroup.com>
To: Uccjansen <uccjansen@aol.com>
Sent: Wed, Mar 20, 2013 2:45 pm
Subject: RE: DirectBuy
Hi Genta,

Are you looking for the one from 3/13 or 2/07?

Thanks,

Pam


**Pam Quick**
Senior Account Executive

**Infogroup**
office: 800.323.0261
cell: 402.660.0342
fax: 402.836.1409

**From:** Uccjansen [mailto:uccjansen@aol.com]
**Sent:** Wednesday, March 20, 2013 12:56 PM
**To:** Quick, Pam
**Subject:** DirectBuy

pam,
Could you please send me a copy of the invoice from 299.50 on 3/7. Thanks genta

# EXHIBIT S

## SETTLEMENT AND FULL MUTUAL RELEASE AGREEMENT

This agreement executed this _____ day of _March_, 2012, by and between Infogroup, Inc. (collectively with its subsidiaries, "Infogroup") and Databaselle (hereinafter "Database").

### WITNESSETH:

WHEREAS, Infogroup and Database are competitors in business because both are, among other things, in the business of selling marketing and customer data; and

WHEREAS, certain members of Database's executive management were formerly members of Infogroup's executive management; and

WHEREAS, a dispute has arisen between Infogroup and Database regarding the parties' methods and means of competition;

WHEREAS, as a result of this dispute, Infogroup filed a complaint against Databaselle in the District Court of Douglas County, Nebraska, Case No. CI 11 5969, and Databselle filed a counterclaim against Infogroup in the same proceeding ("the Litigation"); and

WHEREAS, the parties have reached an agreement to compromise and resolve all issues and claims among them and to settle, release, and compromise any and all claims which they have, or claim to have, on account of, arising out of, related to, or as a consequence of the Litigation.

NOW, THEREFORE, in consideration of the above premises and mutual promises contained in the following, the parties agree as follows:

1. Use of _60 Minutes_ Video. Database, including its subsidiaries and affiliates, agree that they shall use video footage of Vinod Gupta appearing on the CBS program "_60 Minutes_" only by using portions thereof that do not include direct references by name to Infogroup, its predecessors, subsidiaries and/or affiliates, and does not display their logos. The parties acknowledge that this video is in the public domain like the version on display on the Databaselle website as of this date.

2. Cease and Desist. The parties jointly agree they will remove marketing material and discontinue the use of marketing material, including, but not limited to, press releases, containing references to the other party or the other party's goods or services. Database specifically agrees not to reference Infogroup, InfoUSA, Salesgenie, Reference USA or any other trade names currently or formerly in use by Infogroup, nor will Database make any claim that suggests the existence of any present relationship or association between Databaselle (including its subsidiaries, affiliates, employees, owners, founders, or agents) and Infogroup, its subsidiaries or their products and services. Infogroup specifically agrees not to reference Databaselle, Vinod Gupta, database101.com, infofree.com, and/or AtoZdatabases in its marketing materials. As used herein, "marketing material" shall include press releases, websites, direct mail, oral or written advertisements through any

Page 1 of 4

medium, and direct solicitations of clients whether in person, in writing, or over the telephone. This paragraph shall not restrict either party from providing requesting customers with honest non-speculative comparisons and contrasts when such a customer has made a request for a comparison or contrast. This paragraph shall also not restrict party from using honest, non-speculative testimonials given by customers in which customers compare and contrast the parties' products or services with those of any competitor, including the other party, provided that these testimonials may not be solicited by the party using them.

3.     <u>Non-solicitation</u>. Infogroup and Database agree that neither shall attempt to hire the other's employees while those individuals are still employed by the other. Notwithstanding the foregoing, neither Infogroup or Database+ is restricted from hiring a former employee of the other, nor will this agreement preclude either party from hiring an employee of the other who responds to a general solicitation not specifically targeted at employees of the other or who approaches the other seeking employment on his/her own initiative.

4.     <u>Admonition</u>. Each party agrees that its respective Chief Executive Officer will provide the following company-wide admonition:

> All employees, agents, or other individuals acting on behalf of [Infogroup/Databaselle] are expressly prohibited from using, in any manner, any confidential, proprietary or trade secret information obtained from [Databaselle/Infogroup] for any purpose, specifically including for the purpose of soliciting business. Failure to adhere to this restriction will expose the company and the individual using the information to liability for unfair competition.

5.     <u>Non-Disparagement</u>. It is understood and agreed that Infogroup and Database shall not malign, defame, blame or otherwise disparage the other, either publicly or privately, regarding, arising from or related to the companies' respective business, the Litigation, the filing of the complaint or counterclaim in the litigation, their settlement negotiations, and/or this Agreement.

6.     <u>Press Release</u>. The parties agree to respond to any media inquiries regarding the Litigation or this Agreement with the following statement:

> Infogroup and Databaselle have resolved their disputes and have mutually agreed to dismiss their claims. Neither party admits doing anything improper. Other than this response to any media inquiries, the parties agree to keep the terms and conditions of this Agreement and the settlement confidential.

7.     <u>No Admission</u>. The parties understand and agree that, except for the promises and obligations herein, this Agreement does not constitute an admission of liability, or against interest, whatsoever by either party.

8.   <u>No Reliance.</u>   Except as otherwise provided herein, each party represents and acknowledges that in executing this agreement, neither has relied upon any representations or statements made by another party, another released party, or any of the agents or attorneys of a released party with respect to the subject matter, basis or effect of this Agreement.

9.   <u>Attorney Review.</u>   Each party represents that they have had the advice and counsel of their own attorney, who has negotiated this Agreement on their respective behalf.  Each party has carefully read and fully understands all the provisions of this Agreement and each party is voluntarily entering into this Agreement.  The terms of this Agreement shall be construed as if no party hereto is the drafter of this Agreement or any portion thereof.

10.   <u>Dismissal of Litigation.</u>  Following the full execution of this Agreement, each party shall cause its attorneys to stipulate to a Motion to Dismiss requesting that the Court in the Litigation dismiss the Litigation, with prejudice, each party to pay their own costs and attorney's fees.

11.   <u>Counterparts.</u>  This Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, and all such counterparts shall constitute one agreement.  Whether in counterparts or otherwise, this Agreement shall not be binding on, and shall not be effective against, any party who has signed it unless and until all parties have signed it.

12.   <u>Authority.</u>  Each signatory hereto represents and warrants that it has the full right, power, authority, and capacity to enter into this Settlement Agreement on behalf of the entity for which he or she has signed the Agreement.

13.   <u>Term.</u>  The parties shall govern their behavior under the terms of this agreement for a period of four (4) years, unless they agree, sooner, to terminate this agreement. Any earlier termination must be in a written instrument signed by both parties.

In witness whereof, the parties intended to be legally bound hereby have executed this Settlement and Full Mutual Release Agreement on the ____ day of _____, 2012.

DATED: _____          **Infogroup, Inc.**


By: _____
Its: _____

DATED: *March 16, 2012*              **Databaselle**


By: _____
Its: _____

In witness whereof, the parties intended to be legally bound hereby have executed this Settlement and Full Mutual Release Agreement on the _____ day of _____, 2012.

DATED: _March 19, 2012_

**Infogroup, Inc.**

By: _____
Its: _____

DATED: _March 16, 2012_

**Databaselle**

By: _____
Its: _____



# Infogroup's Superior Data
## U.S. Business & Consumer Databases

Infogroup owns and manages its data assets under one roof

Database Marketing IS our business. Our data assets are created for marketing and business research purposes. They are not a subset of another business venture

As an original compiler of both consumer and business data, and with that experience come significant advantages:

- Specific knowledge of raw sources
- Control over all aspects of the compilation process
- Understanding of the optimal approach to data integration
- Consistency in development of modeled attributes
- Ability to integrate new and innovative data sources

*The Result for Infogroup Customers:*          *Higher Quality Data & Superior Coverage*

2

# How Does Infogroup Touch Your Life?



- Direct Marketing & Sales Leads
- Search Engines/Local Search
- GIS, Mapping & Navigation
- Directory Assistance (411)
- Research & Analytics
- Real-Estate & Site Selection
- Government & Security
- Background Checks & Credit Agencies
- Fraud Prevention

3

# Infogroup's Superior Data
## Who we serve

- Infogroup's proprietary compilation and verification processes position us as the elite data provider in the industry

    – We service 85% of Fortune 100 Companies

    – Our data powers the top 5 internet search engines.

    – Our points of interest are used on 90% of in-car navigation systems in North America

4



# Infogroup Data Assets
## The Numbers

**U.S. Business Assets:** 27 million records

**New Business (12-mo) File:** 2.5 million records

**Prospect (pre-verified) File:** 6 million records

**Verified Business File:** 14.5 million records

**Suspect File:** 500 thousand records

**Nixie (out-of-business) File:** 3.5 million records

**Canadian Business Database:** 1.5 million records

6



Infogroup Data Assets

U.S Database Assets

Legend:
- Ultimate New
- Prospect
- Verified
- Suspect
- Nixie

In Millions: 0, 5, 10, 15, 20, 25, 30

7



# Infogroup Data Assets
## U.S. & Canadian Business Databases

- Over 500 in-house production associates

- Compiling Business Data since 1972

- A combination of public sourcing and strategic partnerships

    – Yellow Pages
    – Data Aggregation
    – Corporate Linkage
    – Points of Interest
    – Web-Mining
    – User-Generated Feedback

- Infogroup is the only company to phone verify its business databases – placing 25 million calls annually – and we've been doing it since 1989.

8





# Compilation
## Yellow Pages

- Information is compiled from approximately 4,400 U.S. and Canadian Directories

- Over 800,000 pages are scanned each year – over 19 million listings to be compiled, verified or edited

- Data within scanned pages is parsed by OCR (Optical Character Recognition)

  - Approximately 90% of these records match to the database

  - Remaining records are manually edited, increasing accuracy to over 99.5% from the source

16

# Business Firmographics



- **Data Elements Collected Through Yellow Pages**
  - Business Name
  - Mailing & Physical Addresses
  - Phone Number
  - Fax Number
  - Line of Business
  - Franchise Affiliation / Brands Sold / Specialties
  - Website
  - Professional Contacts & Titles
  - Year Established
  - Size of Ad
  - Credit Cards Accepted
  - Hours of Operation

11

# Compilation
## Aggregate Sources

- 2.5 Million New Businesses added annually
  - *10,000 Added Daily / 50,000 Weekly / 200,000 Monthly*

- Over 250 Sources
  - Secretaries of State
  - County Courthouse Records
  - Utility Providers
  - Departments of Revenue
  - Legal Journals and other sources

12



# Compilation
## Corporate Linkage

- Create reporting relationships and maintain corporate linkage on all public companies, private parent companies and the Fortune 1000

- Update, verify and maintain over 1.9 million U.S. and Canadian linked companies

- Conduct telephone verification, perform web research, and review news publications and annual reports

- Manage the daily news feeds for executive changes, mergers/acquisitions, IPOs and openings/closings

13

# Corporate Linkage



**Three-level hierarchy**

- Headquarters (39,000)
- Subsidiaries (39,000)
- Divisions and branches (1.9 Million)

14.



# Compilation

## Points of Interest

- The POI group uses web research and calling projects to obtain and verify information displayed by search engines, in-car navigation and mobile devices

- Projects involving these businesses are prioritized and driven by navigation clients. The projects generally focus on the following:

  - Improving quality and coverage
  - Identifying management offices and categorizing them correctly
  - Identifying trends within the POI categories

*Once projects are complete, the focus turns to maintenance of the category/project and proactively monitoring changes within the category/project.*

15



WEB MINING

COMPILATION

# Compilation
## Web Mining

- The web mining process allows Infogroup the opportunity to obtain additional data, improve the quality of existing data, more efficiently allocate production resources, and implement a scalable and flexible new technology.

- Surface web mining
  - Focus on enhancing current records in the database with additional data not captured through traditional compilation procedures and allows for transactions to be captured in a more timely fashion

- Deep web mining
  - Focus on websites with multiple store locations that can be pulled back in a list format with additional data attributes listed on the website.

16



# Compilation
## User Generated

- ExpressUpdateUSA makes it simple for businesses to review, verify and update information that is displayed by search engines, in-car navigation and mobile devices.

- Bulk File Upload
  - Benefit: Bulk file upload gives our partners the ability to easily transfer large amounts of business data to us for processing.

- Search, Verify, Add or Enhance Infogroup Business Records online
  - Benefit: The ability to access business records online gives our customers the ability to interact and communicate with Infogroup quickly

- Online reporting and feedback
  - Benefit: Reporting and feedback provides information on what has been completed in an easy to use format

17

# Verification

## Telephone Verification



- 75,000 - 90,000 verification calls to the U.S. & Canada per day – over 25 million calls made in 2011

- Conducts data verification, hygiene, and enhancement

- 225-seat call center – Papillion NE

- Specialized calling groups for small business, large business, new business, associated business, and special projects

- Data Axle Services
  - Analytics - Data Verification & Hygiene
  - Data Mining - Custom Data Collection & Surveys
  - Lead Generation - Telephone Lead Generation & Customer Outreach

18

# Business Firmographics



- **Data Elements Collected or Verified Through Telephone Research**
  - They <u>Are</u> In Business
  - Company Name
  - Address
  - Phone
  - Primary Decision-Maker at that Location, along with title and email address
  - Primary Line of Business
  - Number of Location Employees
  - Company Website
  - Call Status / TR Date

19



# Verification

## Production Verification

- Standardization

- Postal/Telephone validation

- Match/Merge processing

- Database quality and statistical audits

- Quality control of production processes

- Production QA checks a percentage of daily work from each compilation group

  - Bonuses based upon 99% accuracy

20

# Business Firmographics

- **Data Elements Applied Through Analytics**
  - Unique ID for Every Business (IUSA #)
  - Employee Size (if not already present)
  - Annual Estimated Sales Volume
  - Business Expense by Category
  - Business Credit Scores
  - Square Footage
  - Number of PCs
  - Mail Confidence Score



21

# Business Firmographics



- **Enhanced Content Thru Proprietary Applications and Research**
  - NAICS
  - Industry Specific Coding (#Beds, #Rooms, Enrollment, Cuisines, etc)
  - Office Size (# Professionals in Same Office)
  - Business Status (HQ, Subsidiary, Branch)
  - Stock Exchange & Fortune Rank
  - Year Added to the Database
  - Transaction Date & Type
  - Work At Home
  - Multi-Tenant Address
  - Growing / Shrinking Business
  - Executive Ethnicity (Cultural Coding)
  - Bankruptcies

22



How the Data Changes

Business Database Updates

Average 150,000 new businesses added in a typical month

Average 2 Million data changes in a typical month

15% of database is touched every month

Average 100,000 businesses deleted in a typical month

Average of 2 Million telephone verification calls per month

23

# How the Data Changes

## Businesses are Constantly Opening & Closing



**Recent Store Closings Announcements:**

- Borders — 399
- GAP — 200
- Payless/Stride Rite — 475
- Talbot's — 110
- Blockbuster Video — 545

**Recent Openings:**

- Whole Foods — 700
- Subway — 2000
- Dollar General — 1200
- Coinstar — 1400
- Blockbuster Express — 1000

24

# How the Data Changes...

## In the Last 3 Months...

| Transaction Type | US | Canada | Total |
|---|---|---|---|
| Brand New Businesses | 625,101 | 32,332 | 657,433 |
| Deleted Business | 329,306 | 39,164 | 368,470 |
| Company Name Changes | 166,265 | 14,368 | 180,633 |
| Address Changes | 199,847 | 16,101 | 215,948 |
| Mailing Addresses | 52,505 | 8,384 | 60,889 |
| Phone Number Changes | 91,595 | 4,067 | 95,662 |
| Contact Name Changes | 163,190 | 25,255 | 188,445 |
| Employment Size | 107,420 | 34,633 | 142,053 |
| Primary SIC Code | 328,179 | 29,257 | 357,436 |
| Linkage Changes | 80,844 | 6,346 | 87,190 |
| **TOTAL TRANSACTIONS (last 3 mos)** | **5,302,438** | **358,619** | **5,661,057** |

25

# Key Database Selects

- SIC / NAICS

- Employee Size

- Sales Volume

- Business Spend Estimates

- Key Contacts and Executives

# Key Database Selects

## Standard Industrial Classification (SIC)

- First 4 digits assigned through OBM standard coding based upon product & services produced

- Final 2 digits assigned by Infogroup based upon YP heading, key word, other research

| | |
|---|---|
| SIC 80 | "Health Services" |
| SIC 8011 | "Offices of Doctors of Medicine" |
| SIC 801101 | "Physicians & Surgeons" |
| SIC 801132 | "Health Screening & Vaccination" |
| SIC 801103 | "Hormone Therapy" |
| Plus others | |

- Primary versus Secondary SIC assignment
  - 25% of business have more than one SIC

27

# Key Database Selects

## Standard Industrial Classification (SIC)

- Additional granularity offered through Enhanced Content
  - Franchise / Specialty / Brand Sold / Association / Chain / Type / Denomination
  - Industry Specific Coding

| | |
|---|---|
| SIC 58 | "Eating & Drinking Places" |
| SIC 5812 | "Eating Places" |
| SIC 581208 | "Restaurants" |

| | | |
|---|---|---|
| SIC 581208 – "Restaurants" | Franchise Code - N | "Arby's" |
| SIC 581208 – "Restaurants" | Franchise Code - 1 | "Boston Market" |
| SIC 581208 – "Restaurants" | Franchise Code - L | "Perkins" |

| | | |
|---|---|---|
| SIC 581208 – "Restaurants" | Industry Specific Code - d | "Polish" |
| SIC 581208 – "Restaurants" | Industry Specific Code - G | "Cajun" |
| SIC 581208 – "Restaurants" | Industry Specific Code - Z | "Seafood" |

28

# Key Database Selects

## Standard Industrial Classification (SIC)

- Major Industry Groups

| Agriculture | SIC's (01-09) |
|---|---|
| Mining | SIC's (10-14) |
| Construction | SIC's (15-17) |
| Manufacturing | SIC's (20-39) |
| Transportation | SIC's (40-49) |
| Wholesale/Distribution | SIC's (50-51) |
| Retail | SIC's (52-59) |
| Finance, Insurance, Real Estate | SIC's (60-67) |
| Services | SIC's (70-89) |
| Government | SIC's (91-97) |
| Non-Classified Establishments | SIC (99) |

29



# Businesses by Industry

- Agriculture
- Construction
- Transportation & Communication
- Wholesale
- Finance, Insurance & Real Estate
- Business & Personal Services
- Manufacturing
- Retail
- Public Administration

30

# Key Database Selects

North American Industrial Classification System (NAICS)

- Assigns 6 digit codes based on *processes* used to create the products or services
  - First 5 digits are the same for US, Canada and Mexico
  - 6th digit designates industries specific to each of the 3 countries
  - NAICS are more recent and more specific
- Infogroup enhances NAICS with 2 extra digits

| NAICS – 722213 | Snack and Nonalcoholic Beverage Bars |
|---|---|
| NAICS – 72221302 | "Bagels" |
| NAICS – 72221305 | "Coffee Shops" |
| NAICS – 72221310 | "Doughnuts" |
| NAICS – 72221319 | "Juice Bars" |

- SIC's are still the preferred choice by most of our customers.
- Currently NAICS aren't coded on each record.  A NAICS to SIC conversion system is used.

31

# Key Database Selects

## Employee Size

- **Location Employee Size**
  - Number of employees at that location
  - 98% coverage
  - 97% accurate within one range
  - Telephone verification
  - Model applied where not available
    - By business family
    - By industry
    - By professional
    - Rescored monthly
- **Corporate Employee Size**
  - Number of employees corporate-wide
  - Only present for parents and subsidiary HQs
  - Actual, not modeled or summed
  - Annual reports, newspapers, and periodicals

| Code | Description |
|------|-------------|
| A | 1 to 4 |
| B | 4 to 9 |
| C | 10 to 19 |
| D | 20 to 49 |
| E | 50 to 99 |
| F | 100 to 249 |
| G | 250 to 499 |
| H | 500 to 999 |
| I | 1,000 to 4,999 |
| J | 5,000 to 9,999 |
| K | 10,000 or more |



Businesses by Employment

■ 1 to 4    ■ 5 to 9    ■ 10 to 19    ■ 20 to 49    ■ 50 to 99    ■ 100 to 249
■ 250 to 499    ■ 500 to 999    ■ 1,000 to 4,999    ■ 5,000 to 9,999    ■ 10,000+    ■ Blank

63%
2%
2%
6%
9%
16%

33

# Key Database Selects

## Sales Volume

| Code | Description |
|------|-------------|
| A | Less than $500,000 |
| B | $500,000 to $1 million |
| C | $1 million to $2.5 million |
| D | $2.5 million to $5 million |
| E | $5 million to $10 million |
| F | $10 million to $20 million |
| G | $20 million to $50 million |
| H | $50 million to $100 million |
| I | $100 million to $500 million |
| J | $500 million to $1 billion |
| K | $1 billion + |

- **Location Sales Volume**
  – Estimate of annual sales at that location
  – 83% coverage
  – Sales per employee by industry
    - US Dept of Commerce Economic Census
- **Corporate Sales Volume**
  – Amount of sales revenue corporate-wide
  – Only present for parents and subsidiary HQs
  – Actual, not modeled or summed
  – Collected from annual reports, newspapers, and periodicals
- **Asset Size**
  – Indicated for some industries (financial)

34

# Key Database Selects
## Business Expense Models

– Estimation of annual dollars spent by operational category

– Based upon Business Expense Survey (US Census)

– Based upon size and industry

– 60 to 70% coverage

– Categories include:

- Advertising
- Insurance
- Office Equipment
- Printing
- Technology
- Telcom
- Rent & Lease
- Utilities

| Telecommunications Expense | |
|---|---|
| Range | Count |
| $1 - $1,999 | 2,056,091 |
| $2,000 - $4,999 | 1,834,131 |
| $5,000 - $19,999 | 1,845,831 |
| $20,000 - $49,000 | 417,933 |
| $50,000 - $99,999 | 131,294 |
| $100,000 - $499,999 | 86,621 |
| $500,000 | 15,335 |

35

# Key Database Selects

## Executives by Name

- 11.9 million executives & 9 million matched email addresses
- Sourced through Directory Compilation, Telephone Research, & Public Filings
- 54 Contact Titles Available

  – Owner
  – Manager
  – President
  – CEO
  – Chairman
  – Board Member
  – Partner
  – Administrator
  – General Manager

  – Functional VPs & Executives
    - Sales
    - Marketing
    - HR
    - Finance
    - IT
    - Facilities
    - Operations
    - Purchasing

36



Remember This?

Ultimate New
Prospect
Verified
Suspect
Nixie

In Millions

30
25
20
15
10
5
0

U.S Database Assets

37

# Ultimate New Business File

## Compiled Using Over 350 Hardcopy & Electronic Sources

- Utility Connections
- State, County, and City-level Filings (traditional CDC data)
  - DBAs (Fictitious Business Names, Transactional Data, Trade Names, Assumed Name)
  - Corporations (Incorporated Businesses, Limited Liability Companies, Partnership)
  - Licenses (Occupational Business Licenses, Sales Tax Permits, Vendor Licenses)
- Business Journals
- Newspapers
- 3rd Party Vendors

## Includes

- Monthly, Weekly, and Daily update feeds
- Company Name, Contact Name, Address, Phone, SIC code, Employee Size, Email Addresses
- 200,000 Monthly / 2.3 Million Annual

## Benefits

- Speed to Market – Daily and weekly feeds available
  - Utility data available after 2 weeks of discovery
  - CDC data available after 2-3 weeks of discovery
- Quality – De-duplication, standardization and existing business match available
  after additional 2-3 weeks

# Prospect File

- Infogroup's Pre-Verified Prospect Business Database contains 6 million records:

    - <u>Yet to Be Verified Records</u> – Businesses appearing within our sources which we have been unable to contact, validate, or improve sufficiently for traditional marketing use

    - <u>Partial Records</u> – Businesses which do not contain all of the needed elements to qualify as an 'verified' record. i.e. no local phone number or website only

    - <u>Unverified Addresses</u> – Includes businesses which may have moved, and the current address is in question

- Same standardization and enhancement processes as a 'verified' record.

    - Mailscore
    - SIC
    - employee size
    - Credit score

- Ultimately, this will result in more high-quality business records in the U.S. Business Database.

39

# Suspect File



- Infogroup's Suspect Business Database contains about 500,000 records:

1. Businesses which have disappeared from sourcing & attempts to contact have been unsuccessful

2. NCOA identifies the record as a move with no forwarding address or a move to a different 3-digit zip area. Assumption is made that the phone number has possibly changed also.

3. Business has called and requested that we do not sell their record



- Available for customer hygiene applications

- Item #1 can be used to supplement marketing or reference application

40

# Nixie "out-of-business" File

- On average, every minute 4 new businesses open
- On average, every minute 4 businesses close
- 72% of the businesses in the database will experience a significant change over the course of the year
- Infogroup is able to identify out-of-business records as soon as 2 weeks after the business has closed.

The Business Nixie Database is a 36-month rolling file containing over 3.5 million records. Infogroup identifies out of business records through :

- Telephone verification
- Utility disconnects (all disconnects are phone verified)
- NCOA moves w/o forwarding address
- Business gone from source
- Supermode deletes

Infogroup offers the nixie file in both monthly and weekly deliveries.

41

# Public Record Database



Compiled from over 8,000 U.S. Federal, County and Local Courthouses

- Daily Feeds of information from select sources

Includes Business and Consumer Data

- Bankruptcies

  – Filings, Charges and Dismissals for Chapter 7, 11, 12 and 13

Selectability

- Public Record Type

- Filing Date

- Discharge or Dismissal Date/Release Date

- Plus Appended Elements from Consumer Database

  – Household Income

  – Own/Rent Indicators

  – Gender

  – Bankcard Indicator

  – Length of Residence

  – Dwelling Unit Type

42

# ExecuReach File

- Over 4.2 Million business executives
- Target prospects at work, at home or both
- Ideal for offers targeting business professionals with consumer-oriented goods and services

  – Financial Services
  – Men's & Women's Apparel
  – Upscale Gifts
  – Gourmet Foods & Wine
  – Sports & Fitness
  – Self-Improvement
  – Fundraising
  – Travel & Leisure

- Created using a merge between Infogroup's Business and Consumer Databases. The data is then passed through Geo-spatial rules and other proprietary filters.
- Updated Quarterly

43

# Occupation Database

- A collection of occupational licenses and the individuals who have earned them

- From public sources and represents a mix of business and residential addresses and as such, is maintained within its own unique database

- An individual can have more than one professional license, and can hold licenses in multiple states

- Coverage & Content
  - 16 million records (11.6 unique)
  - 23 industries / 144 occupations / 220 trades

  - Accountants
  - Contractors
  - Teachers
  - Physicians
  - Nurses

  - Insurance Agents
  - Real Estate Sales
  - Mechanics
  - Cosmetologists
  - Engineers

44

# How Infogroup Compares . . .

A 2009 competitive analysis was done comparing Infogroup's business data to that of its closest competitors . . .

| Description | Infogroup | Company A | Company B |
|---|---|---|---|
| Company Name Accuracy | 96.8% | 90.3% | 92.6% |
| Address Accuracy | 95.3% | 89.8% | 91.9% |
| Phone Number Accuracy | 90.1% | 74.6% | 66.7% |
| Fax Number Accuracy | 92.5% | 85.5% | n/a |
| Line of Business Accuracy | 85.9% | 67.6% | 67.9% |
| Employment Size Accuracy | 86.3% | 83.1% | 79.2% |
| Executive Name Accuracy | 79.3% | 74.8% | 74.2% |
| Executive Title Accuracy | 87.9% | 76.5% | 82.7% |
| Deliverability | 93.9% | 89.1% | 90.6% |
| Out of Business Rate | 4.4% | 11.6% | 14.9% |

– Infogroup is clearly the leader in identifying the most current Company Name & Phone information, improving the efficiency of marketing efforts.

– Infogroup's ability to supply a higher percentage of accurate Executive Names allows marketing calls and mail pieces to reach the appropriate individual.

– Infogroup's address accuracy will increase the ability of a marketer to locate a business.

– Infogroup's purges records faster and more accurately than the Competitor resulting in a lower "out-of-business" rate.

45



Key Differentiators

**Recency**
- Daily update Contacts and Disconnects
- RSS News Feeds
- Phone verification
- Partner Feedback

**Accuracy**
- All active business Research and telephone researched
- Addresses standardized and Scrubbed for deliverability
- Quality Scan – NCOA, SIC codes
- Phone, Name, Disconnects & Pander/Wireless SIC

**Coverage**
- Data aggregated from over 1000 sources
- Rich filtering on all sizes businesses
- Representing all U.S. businesses since 1972

**Quality**

46

# Infogroup Verified & Non-Verified Businesses
## U.S. Business Database

Infogroup's U.S. Business Database, known worldwide as *the* quality source of marketing and business intelligence, now offers an additional quality grade for customers who find value in the wider coverage offered by unverified and hard-to-market records. Additional applications could include matching/appending to customer data, trending, historical business research, alternative marketing, and customer record management.

### Verified Overview

Infogroup's Verified Business Database continues to power traditional marketing applications through strong coverage and un-matched quality:

- 14.5 million unique businesses with 11.3 million executives
- 400+ in-house production associates
- 25 million telephone verification calls annually
- 2 million data changes each month
- High fill rates on all size businesses
- Standardized, cleansed & quality-checked
- 99+% accurate at the source-level

Our data connects with millions of consumers and businesses on a daily basis, servicing 85% of Fortune 100 companies, powering the top 5 search engines, and providing points of interest data to 90% of in-vehicle navigation systems in North America.

### Non-Verified Overview

Infogroup's Non-Verified Business Database contains:

- <u>Pre-Verified Records</u> – Businesses appearing within our sources which we have been unable to contact, validate, or improve sufficiently for traditional marketing use
- <u>Partial Records</u> – Businesses which do not contain all of the needed elements to qualify as an 'verified' record. i.e. no local phone number or website only
- <u>Unverified Addresses</u> – Includes businesses which may have moved, and the current address is in question
- <u>Suspect Records</u> – Businesses which have disappeared from sourcing & attempts to contact have been unsuccessful

There are 7 million non-verified records on the Infogroup Business Database. When combined with Infogroup's New Business File of 2.4 million records and Infogroup's Nixie File of 3.5 million verified out-of-business records, our customers have access to over 27 million Infogroup records for processing and fulfillment.

While in 'non-verified' status, a record will pass through all the same standardization and enhancement processes as a 'verified' record. Each will have a mailscore, SIC, employee size, and credit score. Records which contain data elements from a particular source or a previously Infogroup active status, will retain such information as well.

Infogroup aggressively seeks new sources and anticipates more adds in 2012. Our goal is to maintain as many records as possible while investing in the continued verification of these records. **Ultimately, this will result in more high-quality business records in the U.S. Business Database.**

Please do not hesitate to contact your <u>Database Relations</u> representative should you have any questions regarding this file.



EXHIBIT
3
4-16-14  TH



# *infogroup*

# ReferenceUSA's Database Now Updated Daily

Cutting-edge update process the first of its kind for reference database

*March 19, 2014 10:07* | **Source:** Infogroup

OMAHA, Neb., March 19, 2014 (GLOBE NEWSWIRE) – ReferenceUSA, an online reference and research database from Infogroup now has the ability to update its database on a daily basis, offering a higher level of accuracy than ever before. ReferenceUSA uses the most comprehensive verification process – data is compiled from thousands of sources by a dedicated team of over 400 people, including over 250 telephone researchers, located at the Papillion, Nebraska data center.

"The fact that our data is now updated on a daily basis further exemplifies our commitment to data quality. We are the leading compiler of both business and consumer data available. That combined with our latest features to ReferenceUSA, make the product a valuable resource for public libraries, academic institutions and government agencies." -Steve Laird, President, ReferenceUSA.

Recent enhancements to ReferenceUSA include: historical business data, data visualization and a new jobs database. Historical business data in particular gives small business owners and researchers the ability to analyze industry and geography trends dating back to 2003. The business database contains over 30 million business records and the consumer database contains over 262 million records.
For more information about ReferenceUSA, call 800.808.1113.

## About Infogroup

Infogroup's 1,900 employees enable clients – from local businesses to the Fortune 100 – to increase sales and customer loyalty by leveraging our proprietary Data Axle™ of contextually relevant real-time information on more than 235 million individuals and 25 million businesses to deliver the complete spectrum of value added data and innovative targeted marketing solutions.

For more information, visit: www.infogroup.com.

Jill Buccheri
Marketing Manager
402.836.3316



## Easily Send & Share Press Releases

- Home
- Newsroom
- RSS Feeds
- Send Releases

- Regulatory Filings
- Privacy Policy

© 2014 GlobeNewswire, Inc. All Rights Reserved.

**ABOUT US**

**GlobeNewswire**, a NASDAQ OMX company, is one of the world's largest newswire distribution networks, specializing in the delivery of corporate press releases financial disclosures and multimedia content to the media, investment community, individual investors and the general public.

**CONTACT US**

**Corporate Headquarters**
5200 W. Century Blvd.
Suite 890
Los Angeles, CA 90045
**Phone:** (800) 307-6627
**Fax:** (800) 307-3567

**European Headquarters**
Nikolaj Plads 6
P.O. Box 1040
Copenhagen, Denmark
**Phone:** +45 33 77 03 77
**Fax:** +45 33 12 86 13

EXHIBIT
5
4-16-14 TH
PENGAD 800-631-6989

infoUSA

800-321-5478

# Find New Customers & Grow Your Sales
## Mailing Lists, Sales Leads, Email & Direct Mail Services

Get instant access to setting up your FREE account

**With your InfoUSA account, you can:**

- Search our extensive business and consumer database
- Build a list 24 hours a day, 7 days a week, anywhere at any time
- Preview and refine your leads, get a price quote and download your mailing lists
- Get expert advice on how to most effectively turn leads into sales

The leading provider of business and consumer data, InfoUSA delivers the high-quality mailing lists available. We can help you identify your best audience and then build a list of businesses and consumer prospects

Complete the form to set up your FREE account and get instant access today!

**Sign Up For FREE**

First Name
Last Name
Company
Phone
Email
Password

**Research Team**

**Data Sources**

**Phone Verification**

**Satisfaction Guarantee**

Questions: 800-321-5478

Home    About Us    Data Quality    Take a Tour    Customers    Contact Us    FAQs    Resource Center    Job Help    Library Locator    Historic Data Reports

## Highest quality data available anywhere...



Whether you're doing research for an upcoming interview, gathering business intelligence, writing a school paper or looking up a cousin you have lost contact with, you need the most accurate data available. That's why you need ReferenceUSA.

ReferenceUSA, an Infogroup company, provides the highest quality data in the industry. We have a 130,000-square-foot Database & Technology Center dedicated to building the world's most comprehensive and accurate databases. Each record is examined by hand for quality and completeness by one of more than 700 database specialists. Our business and residential databases are continuously updated from more than 5,000 public sources. We place more than 26 million phone calls per year to verify and collect additional information on businesses.

Our database of 14 Million U.S. Businesses is the most accurate and comprehensive in the industry. The lists include company name and phone number, complete address, key executive name, SIC Codes, employee size, sales volume, business expenditures and much more.

In addition to basic company names and addresses, we add valuable details, including: geo-codes for mapping, fax and toll-free numbers, website addresses, franchise and brand information, headline news, liens, judgments and bankruptcies, email addresses, number of computers, work-at-home businesses, and business credit rating scores.

ReferenceUSA's residential information is compiled from more than 5,200 White Page telephone directories. Each listing appears in the database exactly as it appears in the phone book. ReferenceUSA does not include unlisted phone numbers, Direct Marketing Association and Canadian Marketing Association suppression files, or state-regulated mail and telephone suppression files (U.S. data only). Information is available eight to twelve weeks after it appears in the phone book, and the file is processed through U.S. and Canadian National Change of Address records on a monthly basis. Each U.S. residential listing also contains information from the most recent U.S. census, including median household income, median home value, latitude/longitude and percentage of owner-occupied housing.

The Infogroup databases power the directory services of the top traffic-generating Internet sites including Yahoo!, InfoSpace and Microsoft. Infogroup has partnership agreements with several Internet companies including Mapquest.com, DoubleClick, Network Solutions, USWebCKS, Dell and MyWay.com. More than 4 million customers use our products and services for direct marketing, telemarketing, market research, sales lead generation, sales planning, customer analysis and credit decisions.

Home  |  About Us  |  Data Quality  |  Take a Tour  |  Customers  |  Contact Us  |  FAQs  |  Terms & Conditions  |  Admin Log On

©2014 Infogroup™, Inc. All Rights Reserved.
66.37.226.206



EXHIBIT
6
4-16-14   TH

Home   About Us   Data Quality   Take a Tour   Customers   Contact Us   FAQs   Resource Center   Job Help   Library Locator   Historic Data Reports

[Expand All]

| Why can't I log in to ReferenceUSA? |
| Why can't I print or download data? |
| Cable modem users deploying firewalls and/or Internet security software disclaimer |
| What types of authentication methods are available for access to ReferenceUSA? |
| Which Internet browser is the best to use, and what setting will I need to access ReferenceUSA? |
| Microsoft Internet Explorer Version 7.0 Browser (Cookie) Configuration Setting Modification Instructions |
| What are the minimum system requirements for accessing ReferenceUSA? |
| Remove my consumer record? |
| How do I remove my business record? |

All Infogroup/ReferenceUSA information is compiled from public sources. We will be happy to honor your request to remove your business record from our database. Please be advised that our data powers many top internet search engines which use our data for their online directories. This also includes companies which use our data for their on-board navigation systems. Your company's online presence could be diminished by suppressing your record.

To have the business record suppressed in our database, we require that you submit your request in writing on *business letterhead* and that the request be signed by the owner. This request may be mailed to:

Infogroup - Content Feedback
1020 E 1st St.
Papillion, NE 68046.

It may also be faxed to (402) 836-3993.

If you prefer to send by e-mail, the e-mail address the request is coming from must include the owner's and company name in the body of the e-mail address to serve the purpose of signature, and be sent to contentfeedback@infogroup.com.

Top of this Page

EXHIBIT
7
4·16·14  TH
PENGAD 800-631-6989

Home    About Us    Data Quality    Take a Tour    Customers    Contact Us    FAQs    Resource Center    Job Help    Library Locator    Historic Data Reports

The premier source of
# business and residential information
# for reference and research.

## Available Databases
Select A Database To Get Started.

Available Databases

**U.S. Businesses / Employers USA**
24 Million Businesses

**NEW! U.S. Jobs / Internships**
2.5 Million Job Postings

**U.S. New Businesses**
4 Million New Businesses

**U.S. Consumers / Lifestyles**
282 Million Consumers

### U.S. Businesses / Employers USA

This database of 24 million U.S. Businesses contains verified, accurate data and is updated monthly. Plus this is the only business database enhanced with more than 20 million phone calls per year.

Selection Criteria include:
Company name, Executive title, Business type, Sales volume, Employee size, Year established, And more...,

Use Quick Search to find what you need with a few clicks or use our powerful Custom Search to fine tune your search.

**Search**

Home  |  About Us  |  Data Quality  |  Take a Tour  |  Customers  |  Contact Us  |  FAQs  |  Terms & Conditions  |  Admin Log On

©2014 Infogroup℠, Inc. All Rights Reserved.

66.37.226.206



EXHIBIT

8

4-16-14   TH

Home   About Us   Data Quality   Take a Tour   Customers   Contact Us   FAQs   Resource Center   Job Help   Library Locator   Historic Data Reports

Available Databases

## U.S. Businesses Database

Quick Search          Custom Search

Expand All    Select All

Company Name

Executives

Business Type

Geography

Phone

Business Size

Ownership

Financial Data

Special Selects

### To start your search...

Click on the headings to the left to start your search. If you are
uncertain what to search for, look for Search Tips within each
section to help you along the way.

To further customize your search, select the Record Type you
would like to search below to ensure you get the records you
are looking for.

Record Type                                    Search Tips      Collapse

☑ ⓥ Verified Businesses (Phone verified and quality checked)

☐ ⓤ Include Unverified Businesses (Not yet fully verified, may not be accurate)

☐ ⓒ Include Closed / Out of Business Records (Suspected to be out of business)

VIEW RESULTS

UPDATE COUNT

**RECORD COUNT**
16,124,929
**EMAIL COUNT**
1,254,584
more info

CLEAR SEARCH

Back To Top

50 Downloads/Prints per Search

Home  |  About Us  |  Data Quality  |  Take a Tour  |  Customers  |  Contact Us  |  FAQs  |  Terms & Conditions  |  Admin Log On
©2014 Infogroup™, Inc. All Rights Reserved.
66.37.226.206



EXHIBIT
9
4-16-14  TH