IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

Infogroup, Inc., et al.,

                    Plaintiffs,                                8:14-CV-49

vs.                                                   MEMORANDUM AND ORDER

DatabaseLLC, et al.,

                    Defendants.

       This matter is before the Court on the plaintiffs' motion for preliminary injunction (filing 12), motion to strike affirmative defenses (filing 61), and motion to dismiss counterclaims (filing 63). The Court will deny each of the plaintiffs' motions.

## I. BACKGROUND

       The plaintiffs and the defendants are all, generally speaking, in the information business: they compile databases about consumers and businesses and they sell access to that information through various Web sites. The plaintiffs are Infogroup, Inc., infoUSA, Inc., and infoUSA Marketing, Inc. (collectively, Infogroup). Filing 23 at 1. The defendants are DatabaseUSA.com and several individual employees of DatabaseUSA.com (collectively, DatabaseUSA).[1] Filing 23 at 1-2 The individual defendants are all former employees of Infogroup—most pertinently, Vinod Gupta, the founder of Infogroup, and a former officer and shareholder. Filing 23 at 2; filing 13 at 2. Gupta founded DatabaseUSA after leaving Infogroup, and there is no love lost between them.

       Infogroup has pled several claims for relief, but as relevant to the current motions, Infogroup's claims generally fall into three categories: (1) DatabaseUSA's alleged acquisition of information from Infogroup's

---

[1] To be precise, the primary defendant is "DatabaseUSA.com LLC d/b/a Database101.com, d/b/a InfoFree.com, d/b/a AtoZ Databases." Filing 23 at 1. The names used by Infogroup include infoUSA, Salesgenie.com, ReferenceUSA.com, and Credit.net. DatabaseUSA's names include Infofree.com, AtoZdatabases, DB101, Database101.com, and Creditjam.com. For present purposes, it is generally unnecessary to identify precisely which entity or Web site has done (or is accused of doing) particular acts, and for the sake of clarity, the Court will use the collective terms "Infogroup" and "DatabaseUSA" most of the time.

proprietary database, (2) alleged false advertising regarding the extent to which DatabaseUSA's information is "verified," and (3) alleged false representations suggesting to potential customers that there is a corporate relationship between DatabaseUSA's products and Infogroup.

## 1. PROPRIETARY INFORMATION

As mentioned above, the basis of Infogroup's business is its proprietary database. To check the security of its database, Infogroup inserts "seed data" into its listings, containing fictitious combinations of name, address, and telephone number. Filing 14-1 at 3. Seed data is disbursed through the database geographically, and per industry, on a monthly basis. Filing 32-2 at 19-20; filing 33-1 at 2. So, if Infogroup's seed data appears in the wild, in a competitor's list, Infogroup knows that the competitor has somehow gained access to Infogroup's information.[2] Filing 14-1 at 3. But the word "somehow" is important, because *how* the competition got information from Infogroup's database makes all the difference when it comes to establishing liability— and, as a precursor to liability, obtaining a preliminary injunction.

In June 2013, Infogroup found its November 2011 seed data in DatabaseUSA's products.[3] Filing 33-1 at 5; filing 40-1 at 2. Specifically, Infogroup found all of the expected seeds for its November 2011 data set. Filing 33-1 at 3. According to Infogroup's Vice President of Business Optimization, the presence of November 2011 seed files—but no other seed files—and the high match rate between Infogroup's data and DatabaseUSA's data suggests that DatabaseUSA acquired Infogroup's full business database at one point in time.[4] Filing 40-1 at 2-3. Infogroup sued, theorizing that the individual defendants—each of whom had left Infogroup and been hired by DatabaseUSA—had provided DatabaseUSA with misappropriated data or access to Infogroup's systems. Filing 23 at 7, 11, 13-14, 16-17.

---

[2] The use of fictitious entries is an old, well-established technique used by compilers, such as mapmakers, encyclopedists, and dictionary editors, to detect copyright infringement and plagiarism. *See* Wikipedia, *Fictitious Entry*, http://en.wikipedia.org/wiki/Fictitious_entry (last visited March 28, 2015).

[3] Infogroup obtained DatabaseUSA's data under false pretenses to make its comparison. The propriety of that act, while disputed by the parties, is not relevant at this point.

[4] The parties have devoted a great deal of evidence and argument to expert analysis disputing the extent to which samples of Infogroup's database "match" DatabaseUSA, how precise that "match" needs to be to prove anything, and how high a "match" rate would be meaningful. *E.g.,* filing 48-2 at 3-25; filing 48-3 at 2-7; filing 78 at 15-17, 40-44, 53-61. But the Court finds, from the seed files if nothing else, that Infogroup has sufficiently proven that DatabaseUSA obtained a substantial portion, if not the entirety, of Infogroup's database information at some point. *How* that happened is the more uncertain part.

But DatabaseUSA's evidence pokes some holes in that theory. The information in Infogroup's database is not wholly unavailable to the world at large—to begin with, while some data may come from private sources or Infogroup's own information-gathering, a substantial amount of the data is compiled from publicly-available sources. Filing 32-2 at 5-6; filing 33-1 at 2. And, of course, because Infogroup makes money by selling information, some data is made publicly available after it is compiled. Some of Infogroup's data is available to the public on search services such as Google, Yahoo!, Bing, and Ask.com. Filing 32-2 at 8-10. The business database is available through a reference service provided to libraries. Filing 32-2 at 10. Obviously, data sets have been sold to customers, sometimes through resellers, although Infogroup's licensed customers are prohibited by licensing agreements from providing that data to DatabaseUSA. Filing 32-2 at 10-11; filing 33-1 at 12, 18-19. And DatabaseUSA points out that third parties have been able to "scrape" database information from publicly-accessible sources and bundle it for resale. Filing 32-2 at 4. Information from at least some of Infogroup's seed files has been found in other competitors' data and on public search engines. Filing 33-1 at 9-10; filing 33-3 at 69-225.

DatabaseUSA's evidence also casts substantial doubt on whether any of the individual employee defendants could have obtained the data at issue. Three of the five individual defendants were terminated by Infogroup before the November 2011 seed data was inserted into the Infogroup database. Another was not hired by DatabaseUSA until after the June 2013 audit that discovered the seed data. And none of the former Infogroup employees (with the presumable exception of Gupta, who was out the door by 2008) had the necessary access to Infogroup's database to have perpetrated a heist.

None of that conclusively proves that the individual defendants were uninvolved—for instance, someone might have been secretly working for DatabaseUSA, exceeded his authorized access to Infogroup's database, or been working with someone else at Infogroup. But there is no evidence of any of that. Infogroup speculates that perhaps DatabaseUSA bought the information from someone else who "scraped" it. Filing 39 at 4. But in the end, it suffices to say this: it is certain that information from Infogroup's proprietary database ended up in DatabaseUSA's hands, and it is wholly uncertain how that happened.[5]

---

[5] Infogroup's complaint alleges not only acquisition of its proprietary database, but also its own customer list, and the software for its proprietary user interfaces. Filing 23 at 16-17. It appears that only the database is at issue right now—there is nothing in the record about the user interfaces, and Infogroup's brief in support of motion for preliminary injunction describes "Infogroup Trade Secrets," for purposes of this motion, as "[t]he information compilations that make up Infogroup's consumer and business databases." Filing 13 at 4.

### 2. "VERIFIED" LISTINGS AND FALSE ADVERTISING

Infogroup claims that DatabaseUSA is falsely representing its database entries as "verified" when they are not. Filing 23 at 9-11, 32-33. This claim, factually, is mostly derived from the presence of Infogroup's seed files in DatabaseUSA's database. DatabaseUSA promotes its database as "Triple-Verified." Filing 14-2 at 36. When Infogroup marks a listing in its database as "verified," that apparently means an Infogroup employee has confirmed that the information is accurate and current. Filing 14-1 at 2. It is far less apparent what a "verified" record means to DatabaseUSA. *E.g.*, filing 48-1 at 2; filing 51 at 8. But there is evidence that DatabaseUSA promotes its "verification process" as involving "original sources," telephone verification, and Internet research. Filing 82-1 at 8; Ex. A.

DatabaseUSA displayed some of Infogroup's seed files as "verified" records, stating that "Verified Records have been through our verification process that includes phone verification, search engine research and business website review." Filing 14-2 at 23. Infogroup's argument is simple: how could DatabaseUSA have "verified" a fictitious entry? Filing 13 at 9. And Infogroup points to other inaccuracies in supposedly-"verified" entries in DatabaseUSA's data. Filing 82-3. But DatabaseUSA points out that even Infogroup's seed files contain some real information. For instance, one of the seed files at issue is a fictional business, but the address is a real place, and the telephone number is a working number belonging to an Infogroup employee. Filing 31 at 19. So, there is still some information that could be "verified" by certain methods. DatabaseUSA also points to similar inaccuracies among Infogroup's "verified" listings, filing 86-3, and argues that even "verified" listings will sometimes be incorrect because information changes and not every listing can be verified every day. Filing 85 at 12-13. And DatabaseUSA presented evidence of the process that it uses, internally, to verify the accuracy of its listings. Filing 33-2 at 2-3; filing 48-1 at 1-2.

### 3. FALSE REPRESENTATIONS ABOUT RELATIONSHIP BETWEEN COMPANIES

Infogroup claims that DatabaseUSA is making misleading statements, in press releases and advertisements, that falsely imply an ongoing relationship between Gupta and Infogroup, or DatabaseUSA and Infogroup. Infogroup has presented evidence of these instances:

- A press release about a managerial promotion at AtoZdatabases said that the promoted employee had "spent eight years at InfoGroup, a similar reference company that shares the same Founder, Vin Gupta." Filing 14-2 at 25.

- 4 -

- A press release about a private equity investment in infofree.com said that it "was founded by and is under the leadership of industry pioneer Vin Gupta, proprietor of companies such as infoUSA and Salesgenie. He brings nearly 40 years of experience in building databases, creating sales leads, and helping salespeople and small businesses to his new company." Filing 14-2 at 27.

- A press release touting customer savings at infofree.com included a quotation from Gupta, "who also founded InfoUSA, infogroup, and Sales Genie." Filing 14-2 at 30.

- A promotional article published on infofree.com described it as having been "started by the founder and former head of InfoGroup, Vin Gupta." Filing 14-2 at 33.

- An advertising letter to a "loyal customer" from DatabaseUSA included a picture of Gupta at the bottom, and a facsimile of his signature; the picture was captioned, "Vin Gupta, Founder & Chairman (also Founder of infoUSA)." Filing 14-2 at 36.

- DatabaseUSA uses Google AdWords, or similar products with other search engines, to place DatabaseUSA advertisements in proximity to search results when a consumer searches for Infogroup marks. Filing 82-1 at 25-26; filing 82-2 at 5, 7.

- A letter sent to Gupta by President Bill Clinton is posted on infofree.com. The letter, sent to Gupta in 1998, was addressed to Gupta as the "Chairman and Chief Executive Officer" of infoUSA. Filing 82-1 at 5, 33-34.

- DatabaseUSA advertising describes DatabaseUSA as "Serving the Database Industry Since 1972" or "Creators of the Finest Databases Since 1972." Filing 82-1 at 28-29, Ex. A; filing 82-2 at 9. As Infogroup points out, it was Infogroup that was founded in 1972; DatabaseUSA was founded in 2009. Filing 82-1 at 16.

Infogroup also complains about excerpts of a "60 Minutes" segment that are played in a video on infofree.com, and referenced in DatabaseUSA advertising. The story, originally aired in August 2003, was meant to alert viewers to the amount of personal information that was being sold to data

companies. Filing 82-2 at 15-21. Gupta, then the CEO of infoUSA, was interviewed for the story, and the portions of the video played by DatabaseUSA include Gupta describing the detailed data that infoUSA had compiled about businesses and consumers. Filing 82-2 at 16-18.

The video was recorded at infoUSA while Gupta was in charge there, but the clips played by DatabaseUSA do not identify the company. Filing 82-1, Ex. A, Ex. E. DatabaseUSA contends that it has permission from Infogroup to use those clips, pursuant to a prior agreement. Filing 14-2 at 42. But DatabaseUSA's advertising also makes repeated claims to the effect that its databases are "so good, they were featured on '60 Minutes.'"[6] Filing 82-1 at 20, 22, Ex. A, Ex. E; filing 82-2 at 9.

Infogroup contends that references by DatabaseUSA to Infogroup have led to confusion among consumers about the association among the various business entities. Infogroup cites these instances:

- The "loyal customer" advertising letter described above, sent to an Infogroup customer, caused the recipient to contact Infogroup asking if Infogroup and DatabaseUSA were the same company. Filing 14-1 at 8; Hr'g Ex. 2.

- In September 2012, two consumers called Infogroup asking about an advertising special that was being offered by infofree.com. Filing 14-1 at 8-9.

- A customer question posted at infofree.com's customer support portal asked, "You are not part of Sales Genie are you?" An agent replied, "Yes, that is correct. Vin Gupta was the founder of InfoUSA (Sales Genie), but sold it and is not the CEO of infofree.com which is a separate company." Filing 14-2 at 38.

- A customer of Infogroup sent an email to an Infogroup account executive asking for a copy of a particular invoice, but when the account executive replied that no such invoice existed, the customer replied, "You are info free correct?" Filing 14-2 at 40.

---

[6] Infogroup also points to these claims, and DatabaseUSA's advertising dating itself to 1972, as instances of false advertising. *E.g.* filing 81 at 15. But, as described below, Infogroup has not asked the Court to enjoin such conduct except to the extent that it might suggest an ongoing relationship between DatabaseUSA and Infogroup. *See* filing 81 at 24. So, the Court only considers this evidence in that context.

- In a telephone call from a consumer to Infogroup, the consumer said that he had been told (by whom is unclear) that "the Database USA company was the one that has been around forever." Filing 82-1, Ex. C.

- A customer had been exchanging emails with a DatabaseUSA sales manager for several months regarding a purchase. When an email wasn't replied to for a couple of days, the customer emailed an Infogroup employee he had apparently also been in contact with to ask about it, implying that he believed the two worked for the same company.[7] Hr'g Ex. 3.

- An email exchange between Gupta and Infogroup's CEO referenced a recorded call to Infogroup from a customer who apparently used both businesses, and an email from an Infogroup customer about a DatabaseUSA promotional email that he was repeatedly receiving. Hr'g Ex. 5, 6, 7. But the voice recording is not in the record (or if it is, it is not identified as such), and it is not clear from the email exchange what either customer was confused about, or why.[8]

## II. DISCUSSION

As noted above, Infogroup's audit detected its seed files in DatabaseUSA's database in June 2013. But Infogroup waited several months to file suit. *See* filing 1. Infogroup explains that at the time, Infogroup and Gupta were codefendants in litigation arising from events that occurred while Gupta was associated with Infogroup. Filing 40-2 at 1. Infogroup, needing Gupta's participation and cooperation with that litigation, waited until it was resolved to file suit against him. Filing 40-2 at 2; filing 78 at 45-49. But as soon as that litigation concluded, Infogroup determined to settle all family

---

[7] It may be worth noting that the DatabaseUSA sales manager promptly replied to the second email and explained that the two worked at separate companies. Hr'g Ex. 3 at 1.

[8] Infogroup also accused a DatabaseUSA representative of calling an Infogroup customer and claiming to represent Infogroup. Filing 81 at 10-11; filing 82-1, Ex. K. Infogroup claims that this conduct violated the Lanham Act, the Nebraska Deceptive Trade Practices Act, and the Nebraska Consumer Protection Act, and was common-law tortious interference with a business expectancy. Filing 81 at 16-20. But that was based solely on what the customer reported to an Infogroup account representative. DatabaseUSA has provided a detailed account history from the DatabaseUSA employee whose conduct is at issue, along with documentation and recordings that, it suffices to say, cast substantial doubt on the customer's story. Filing 86-1. The Court does not find Infogroup's evidence on this point to be credible, and will not discuss it further.

business: it initiated the present case and moved for a preliminary injunction. *See* filing 12. Limited discovery, an evidentiary hearing, and extensive briefing have been had on that motion.[9] DatabaseUSA also raised several affirmative defenses and alleged several counterclaims in its answer to Infogroup's operative complaint. *See* filing 60. Infogroup, in turn, moved to strike DatabaseUSA's affirmative defenses and dismiss some of its counterclaims. Filing 61; filing 63.

So, there are three pending motions that require disposition: a motion for preliminary injunction (filing 12), a motion to strike (filing 61), and a motion to dismiss (filing 63). The Court will address each in turn.

### 1. MOTION FOR PRELIMINARY INJUNCTION

At the time of the hearing on Infogroup's motion for preliminary injunction, Infogroup had narrowed its request for injunctive relief to the following proposed terms:

1.  Absent Infogroup's written permission, DatabaseUSA should be enjoined and restrained from "[a]cquiring data directly from Infogroup, or from sources that expressly purport to offer Infogroup data compilations in their published descriptions."

2.  DatabaseUSA should be enjoined and restrained from making false or deceptive statements of fact regarding the extent to which it has verified the accuracy of each of its business listings.

3.  DatabaseUSA should be enjoined and restrained from "[r]eferencing or using any of Infogroup's registered or unregistered trademarks . . . except in in statements of fact, or statements conspicuously labeled as statements of opinion, which statements shall include clear disclaimers stating that Infogroup is the registered owner" of the mark and has no association with DatabaseUSA.

---

[9] Evidence was adduced at the hearing that was received subject to several objections, most pertinently hearsay, relevance, foundation, and proper notice. Filing 78 at 21-23, 26-31, 34, 67. To make sure the record is clear: the Court will, for purposes of these motions, overrule those objections. The Court finds, based on its disposition of these motions and DatabaseUSA's opportunity to meet the evidence at the hearing and in subsequent filings, that DatabaseUSA was not prejudiced by any belated disclosure. And the Court finds that DatabaseUSA's other objections go to the weight, not the admissibility, of the evidence.

4.     DatabaseUSA should be enjoined from publishing any marketing materials "claiming or suggesting the existence of any past or present association" with Infogroup or "to the effect that Gupta founded InfoUSA, or any Infogroup company."

*See* filing 81 at 24. As a way of combing through the often-interwoven tangle of factual allegations and legal theories presented by the parties, the Court has focused on the proposed injunction: only those facts or claims relevant to the terms of the proposed injunction need be considered.

When deciding whether to issue a preliminary injunction, the Court weighs the four *Dataphase* factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013); (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). A preliminary injunction is an extraordinary remedy, and the movant bears the burden of establishing its propriety. *Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *see also H&R Block Tax Servs. LLC v. Acevedo-Lopez*, 742 F.3d 1074, 1077 (8th Cir. 2014).

As will be explained below in more detail with respect to Infogroup's separate claims, the Court finds that the *Dataphase* factors weigh against a preliminary injunction in this case. In particular, the Court is not persuaded that Infogroup has shown a likelihood of success on the merits sufficient to warrant an injunction. And the Court bases that conclusion, in part, on Infogroup's failure to show how it has been injured by DatabaseUSA's allegedly-wrongful conduct—which means, in turn, that Infogroup's showing of irreparable harm—or, indeed, any harm—is also deficient.

### (a) Proprietary Information

Infogroup's claim regarding its database rests, for purposes of the present motion, on the Nebraska Trade Secrets Act, Neb. Rev. Stat. §§ 87-501 *et seq. See,* filing 13 at 12-17; filing 81 at 21.[10] It is important to note, from

---

[10] That is to say that, while Infogroup has alleged other claims for relief based on these facts in its operative complaint (like, for instance, the Computer Fraud and Abuse Act), Infogroup's briefing in support of preliminary injunctive relief raises only the Trade Secrets Act as a claim on which Infogroup argues it has proven a likelihood of success on the merits. The Court's analysis is, as to each of Infogroup's specific requests for injunctive relief, limited to the theories of recovery Infogroup has specifically raised in support of its motion for a preliminary injunction.

- 9 -

the outset, that Infogroup does not propose that DatabaseUSA be required to scrub its existing database of any data that may have originated with Infogroup. *See* filing 78 at 11-12. Rather, Infogroup proposes an injunction that would, as described at the evidentiary hearing,

> say don't obtain our data going forward and to the degree that they're doing something called webscraping which involves basically programming a computer -- it's basically a computer program that accesses various Internet websites and extracts data and then they put it in their database and they do whatever it is they do with it, to the degree that those websites state that those -- that information was powered by or provided by Infogroup, just don't use it.

Filing 78 at 12.

But that poses a problem for the Court, because it is questionable whether the activity Infogroup wants enjoined is actually proscribed by the Trade Secrets Act. To prevail under the Trade Secrets Act, Infogroup would need to prove, among other things, the existence of a trade secret and DatabaseUSA's misappropriation of it. *See*, Neb. Rev. Stat. §§ 87-502 to 504; *Richdale Development Co. v. McNeil Co., Inc.*, 508 N.W.2d 853, 859 (Neb. 1993). And Infogroup's argument is strained on both points.

To begin with, under Nebraska law, a "trade secret" is defined as information that:

(a) Derives independent economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Neb. Rev. Stat. § 87-502(4). That definition is narrow; it means that "if an alleged trade secret is *ascertainable at all* by any means that are not 'improper,' the would-be secret is peremptorily excluded from coverage under the [Act]." *First Express Servs. Grp., Inc. v. Easter*, 840 N.W.2d 465, 474 (Neb. 2013) (emphasis in original) (citations and quotations omitted).

So, for instance, in *Easter*, the Nebraska Supreme Court concluded that the Trade Secrets Act did not protect the customer list of a company that sold crop insurance, which included "customers' names and their 2009 information: what crops the farmers had, what counties the crops were

located in, what insurance plan the farmers bought, what percentage of coverage each farmer had, and what commission [the insurer] had earned." *Id.* at 469. The court explained that "simple Internet searches could identify which farmers farmed what land and could provide contact information for those farmers." *Id.* at 475. And the other

> information on the list essentially reflected the farmers' previous insurance coverage on their crops. It is undisputed that the individual farmers had all of that information and that [the defendant] could have obtained the information from them through a simple telephone call. Also, once a customer changed agencies, all of the customer's prior insurance information became available from the insurance carrier's Web site. Though the exact information required to transfer a customer is a bit unclear, the record shows that, at most, all that is required is the customer's name, address, type of crops, and signature, all of which are ascertainable by proper means.

*Id.* So, because the information on the customer list was ascertainable through proper means, the court concluded as a matter of law that it was not a trade secret. *Id.* at 476. Similar reasoning applies here.

Nor is Infogroup likely to be able to prove that purchasing or using lists that were obtained by "webscraping" is "misappropriation" under the Trade Secrets Act. "Misappropriation" is defined as:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret;

(ii) At the time of the disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

(A) Derived from or through a person who had utilized improper means to acquire it;

- 11 -

(B)   Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(C)   Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii)   Before a material change of his or her position, knew or had reason to know that the information was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

Neb. Rev. Stat. § 87-502(2). "Improper means," in turn, are "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[.]" Neb. Rev. Stat. § 87-502(1).

Clearly, if DatabaseUSA obtained direct possession of Infogroup's database—by, for instance, working with an Infogroup employee or accessing Infogroup's system without permission, or obtaining data from someone it knew had—that would be "misappropriation" under the Trade Secrets Act. And if Infogroup's internal database contained information that was not publicly available, or perhaps was the product of Infogroup's time and effort in developing information, then the database might be a "trade secret" under Nebraska law. *Cf. Easter*, 840 N.W.2d at 475. But there is no evidence proving such corporate espionage here. As a result, Infogroup has made little showing of its likelihood to succeed on the merits of its Trade Secrets Act claim. A party seeking injunctive relief need not necessarily show a greater than 50 percent likelihood that it will prevail on the merits. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 731 (8th Cir. 2008). But there must be some showing, and here there is not: to the extent that Infogroup's motion is focused on "webscraping," such conduct is not unlawful under Nebraska law.

And to the extent that Infogroup's motion is more broadly directed—that is, at "acquiring data directly from Infogroup" or from someone who had—then there has been no showing of irreparable harm. To show a threat of irreparable harm, the movant must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief. *Roudachevski*, 648 F.3d at 706. Stated differently, the harm "must be actual and not theoretical." *Brady v. Nat'l Football League*, 640 F.3d 785, 794 (8th Cir. 2011). And here, the evidence does not prove that DatabaseUSA has violated the Trade Secrets Act by hacking or copying

- 12 -

Infogroup's database in the past, much less that it intends to do so in the future. It is clear that the parties neither like nor trust one another, and that Infogroup, in particular, suspects Gupta and DatabaseUSA of all sorts of malfeasance. But for a preliminary injunction, the Court must have evidence that the complained-of misconduct is likely to occur—that is, the movant must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Infogroup has not demonstrated such a likelihood here.

In deciding whether to grant a preliminary injunction, likelihood of success on the merits is the most significant factor. *Laclede Gas Co. v. St. Charles Cnty.*, 713 F.3d 413, 419-20 (8th Cir. 2013). The absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied. *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013). And, of course, a preliminary injunction cannot issue without a showing of irreparable harm. *Dataphase*, 640 F.2d at 114 n.9. Both of those factors are missing from Infogroup's Trade Secrets Act claim. And the other *Dataphase* factors do not help Infogroup. The Court does not find the public interest to be significantly implicated by this dispute. Nor does the balance of harms tip either way, given both the lack of evidence showing an impending harm, and the ineffectual nature of Infogroup's proposed injunction. In sum, the Court finds no basis to issue a preliminary injunction based on Infogroup's trade secrets claim.

(b) "Verified" Listings and False Advertising

Infogroup claims that DatabaseUSA's promotion of listings as "verified" is false advertising actionable under the Lanham Act, 15 U.S.C. § 1051 *et seq.*[11] Filing 13 at 17-23; filing 81 at 13-16. Under the Lanham Act, a

---

[11] In a supplemental memorandum, Infogroup also invoked the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301 *et seq.*, and the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601 *et seq.* Filing 81 at 17-19. The Court does not discuss them separately, because for purposes of the present motion, they are essentially coextensive with Infogroup's Lanham Act claims, and are disposed of by the same reasoning. *See*, Neb. Rev. Stat. § 87-302; *Prime Home Care, LLC v. Pathways to Compassion, LLC*, 809 N.W.2d 751, 764 (Neb. 2012); *Stenberg v. Consumer's Choice Foods, Inc.*, 755 N.W.2d 583, 591-92 (Neb. 2008). In particular, because the Trade Practices Act provides injunctive relief for "[a] person likely to be damaged," *see* § 87-303(a), it provides relief from future damage, not past damage—and as will be explained in the context of the Lanham Act, Infogroup has not proven that such damage is likely. And the Consumer Protection Act has another requirement Infogroup does not meet—its ambit is limited to unfair or deceptive acts or practices that affect the public interest. *See*, *Eicher v. Mid Am. Fin. Inv. Corp.*, 748 N.W.2d 1, 12 (Neb. 2008); *Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 36 (Neb. 2004). Specifically, the conduct at issue must affect numerous citizens of Nebraska.

defendant may be liable if it, "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities[.]" 15 U.S.C. § 1125(a)(1)(B). To establish a Lanham Act false advertising claim, a plaintiff must prove (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products. *Buetow v. A.L.S. Enters.*, 650 F.3d 1178, 1182 (8th Cir. 2011); *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998).

The false statement necessary to establish such a violation usually falls into one of two categories: a commercial claim that is literally false as a factual matter; or a claim that may be literally true or ambiguous but which implicitly conveys a false impression, is misleading in context, or is likely to deceive consumers. *Id.* If a plaintiff proves that a challenged claim is literally false, the court may presume that consumers were misled and grant an irreparably-injured competitor injunctive relief without requiring consumer surveys or other evidence of the ad's impact on the buying public. *Buetow*, 650 F.3d at 1183; *see Clorox Co.*, 140 F.3d at 1180. But even then, the plaintiff must show that it will suffer irreparable harm absent the injunction. *Buetow*, 650 F.3d 1183.[12] And even when a court finds that a defendant's ads are literally false, the plaintiff, to succeed on a claim of false advertising, must still establish that the defendant's deception is material—that is, likely to influence the purchasing decision. *Johnson & Johnson Vision Care, Inc. v. 1-800-Contacts, Inc.*, 299 F.3d 1242, 1250-51 (11th Cir. 2002); *see, Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003); *Cashmere & Camel Hair*

---

*See, Eicher*, 748 N.W.2d at 12; *Arthur*, 676 N.W.2d at 37-38. Infogroup has not made that showing at this point, and does not even advance the point. *See* filing 81 at 19.

[12] Infogroup cites *Clorox Co.* for the proposition that irreparable harm may be presumed when an advertisement is deceptive. Filing 13 at 33; filing 81 at 21-22. That proposition is difficult to square with *Buetow*, which clearly holds that a plaintiff must prove irreparable harm absent an injunction, even if the advertisement is literally false. 650 F.3d at 1183; *see Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 994-1000 (9th Cir. 2011) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) and *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)); *see, e.g., Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 215-17 (3d Cir. 2014); *Salinger v. Colting*, 607 F.3d 68, 76-80 (2d Cir. 2010); *see also Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894-95 (8th Cir. 2013).

*Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 311-12 (1st Cir. 2002); *Hewlett-Packard Co. v. NU-Kote Int'l, Inc.*, 155 F.3d 571 (Fed. Cir. 1998) (unpublished table decision); *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997); *cf. Buetow*, 650 F.3d at 1182; *but cf. Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000).[13]

The Court finds, first, that DatabaseUSA's description of its listings as "verified" has not been shown literally false.[14] DatabaseUSA presented evidence of the process it uses to verify listings, and that evidence is substantially uncontested. Infogroup's theory, instead, seems to be that DatabaseUSA's verification process isn't effective enough to warrant use of the word "verified," or that DatabaseUSA describes records as "verified" that haven't been through its verification process.[15] But in assessing whether an advertisement is literally false, the Court must analyze the message conveyed within its full context. *Buetow*, 650 F.3d at 1185. The context here is inconsistent with any implication that every listing—even "verified" listings—are guaranteed to be completely accurate. For instance, one of Infogroup's exhibits is a DatabaseUSA advertisement that describes its "95% Accurate, Triple-Verified Database. . . ." Filing 82-1 at 22; *see also* filing 82-2 at 9-10. There is not, so far as the Court can see, any attempt to guarantee every line item as accurate. So, Infogroup's instances of inaccurate data—and it doesn't present very many—do little to prove that DatabaseUSA's data is not generally "verified," or that any particular "verified" listing hasn't been

---

[13] The Eighth Circuit has not clearly weighed in on this point, so to the extent that *Pizza Hut* can be read to support a circuit split, the Court will say this: the majority rule, represented by the 11th Circuit's decision in *1-800-Contacts*, is far more persuasive. There is a difference between whether a consumer is likely to be deceived by a falsehood, and whether that deception makes a difference to the consumer. The Fifth Circuit may have elided the distinction (albeit in dicta, given that the advertising slogan at issue in that case was not literally false). *Pizza Hut*, 227 F.3d at 497. But there is good reason to presume that a literally false statement has a tendency to deceive. *See Saks Fifth Ave.*, 284 F.3d at 314. That does not mean the deception made a difference, so there is no basis to also relieve the plaintiff of the materiality element of its prima facie case. *See Corizon, Inc. v. Wexford Health Sources, Inc.*, No. 4:10-cv-2430, 2013 WL 3821268, at *9 (E.D. Mo. July 23, 2013).

[14] Or variations on the term, such as "triple-verified."

[15] It is not entirely clear to the Court whether Infogroup is only complaining about specific instances in which an inaccurate listing is nonetheless described as "verified," or is generally objecting to DatabaseUSA's promotion of its verification *process*. But Infogroup's argument suggests the latter, broader argument. Infogroup argues that DatabaseUSA "engages in an overall practice of labeling business listings as 'verified' when in fact they are not" and seeks to enjoin DatabaseUSA from making "false or deceptive statements of fact regarding the extent to which" it "has verified the accuracy of each of its business listings." Filing 13 at 9; filing 81 at 24.

verified to some degree. Infogroup's argument asks the Court to make a very hasty generalization.

To the extent that DatabaseUSA's representations might be misleading in context, the Court finds that they are, at worst, puffery. Although the Eighth Circuit has generally categorized false advertising as either literally false, or literally true or ambiguous but misleading in context, the Court of Appeals has observed that many claims will actually fall into a third category, generally known as "puffery" or "puffing." *Clorox Co.*, 140 F.3d at 1180. Puffery is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely and is not actionable under the Lanham Act. *Id.* Nonactionable puffery includes representations of product superiority that are vague or highly subjective. *Id.* However, false descriptions of specific or absolute characteristics of a product and specific, measurable claims of product superiority based on product testing are not puffery and are actionable. *Id.* Whether a database entry is "verified" is not (as the parties' disagreements here demonstrate) a specific, measurable attribute. And it should also be noted that both Infogroup and DatabaseUSA are primarily in the business of providing information about consumers and businesses to people who want to market their own goods and services—in other words, to people who are themselves sales professionals. Such an audience is unlikely to be confused by such advertising techniques. *Cf.*, *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 766 (8th Cir. 2010); *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1330 (8th Cir. 1984). No reasonable buyer of such services would expect verification to be foolproof.

And, even if DatabaseUSA's claim of "verified" listings *was* misleading in context, there is nothing to show that anyone was misled. Where a commercial claim is not literally false but is misleading in context, proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical. *Clorox Co.*, 140 F.3d at 1182. If a plaintiff does not prove the claim to be literally false, he must prove that it is deceptive or misleading, which depends on the message that is conveyed to consumers. *Id.* at 1182-83. Unless a commercial claim is literally false, or a competitor acted willfully with intent to deceive or in bad faith, a party seeking relief under this section of the Lanham Act bears the ultimate burden of proving actual deception by using reliable consumer or market research. *Id.* at 1183.

There is no evidence in the record of any customer of DatabaseUSA who claims to have been deceived or misled by the claim that a DatabaseUSA listing was "verified." Nor does the Court find bad faith or an intent to deceive, given the evidence of the efforts DatabaseUSA makes to verify its data. The Court recognizes that at the preliminary injunction stage, full-

blown consumer surveys or market research are not an absolute prerequisite. *Id.* But Infogroup has far less than that.

Because the Court finds that DatabaseUSA's use of the word "verified" is neither literally false, nor misleading in context, and that no tendency to deceive or actual deception has been shown, the Court finds that Infogroup has not shown a likelihood of succeeding on its claim. But Infogroup's claim has another problem: Infogroup has not shown that it has been injured or is likely to be injured by DatabaseUSA's actions. This has a number of implications. It means that another element of Infogroup's false advertising claim is missing, further diminishing its likelihood of success on the merits. It may even mean that Infogroup lacks standing to prosecute the claim. And, of course, absent evidence of an injury, much less an irreparable one, Infogroup cannot obtain an injunction.

As noted above, a false advertising claim under the Lanham Act requires that the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products. *Buetow*, 650 F.3d at 1182; *Clorox Co.*, 140 F.3d at 1180. The Court finds no evidence to suggest that this is the case. And failure to show such injury may be a more fundamental defect in Infogroup's case: in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, the Supreme Court explained that a plaintiff's right to sue under a particular statute depends on whether the plaintiff comes within the "zone of interests" protected by the law involved, and that the statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute. 134 S. Ct. 1377, 1387-88 (2014). Specifically, to come within the zone of interests for false advertising under the Lanham Act, the plaintiff must allege an injury to a commercial interest in reputation or sales. *Id.* at 1390. And to satisfy the proximate cause requirement, the plaintiff must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising, "and that that occurs *when deception of consumers causes them to withhold trade from the plaintiff*." *Id.* at 1391 (emphasis supplied).

There is nothing here that persuades the Court that Infogroup has been, or is likely to be, injured by DatabaseUSA's description of its occasionally-inaccurate data as "verified." Without that showing, the Court can find neither a likelihood of success on the merits of this claim, nor the irreparable harm that is a necessary prerequisite to a preliminary injunction. The Court may not issue a preliminary injunction based only on a possibility of irreparable harm. *Winter*, 555 U.S. at 22.

So, the Court finds neither a likelihood of success on the merits nor a likelihood of irreparable harm and, as above, that much would be dispositive.

*See*, *Barrett*, 705 F.3d at 320; *Dataphase*, 640 F.2d at 114 n.9. But for the sake of completeness, the Court also finds that the public interest is not implicated by this claim, and that the balance of harms tips significantly in DatabaseUSA's favor: Infogroup has not shown a likelihood of harm, but Infogroup's proposed injunction would undoubtedly be disruptive to DatabaseUSA's business. Infogroup has not established the propriety of a preliminary injunction on this claim.

(c) False Representations about Relationship Between Companies

There are two specific provisions of the Lanham Act at issue here.[16] First, a defendant may be liable for using a mark in commerce, in connection with goods or services, in a way that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]" 15 U.S.C. § 1125(a)(1)(A). And second, as discussed in detail above, a defendant may also be liable if it, "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities[.]" 15 U.S.C. § 1125(a)(1)(B). Infogroup relies upon both provisions, almost interchangeably at times, with respect to DatabaseUSA's alleged attempts to confuse potential customers about the affiliation between DatabaseUSA and Infogroup entities.

*(i) False Association Claim*

Mark infringement requires proof that the plaintiff has ownership or rights in the mark and that the defendant has used the mark in commerce, in connection with goods or services, in a manner likely to cause consumer confusion as to the source or sponsorship of the goods or services. *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1009 (8th Cir. 2011). In evaluating a likelihood of confusion between a mark and an allegedly-infringing mark, courts generally consider such factors as the strength of the owner's mark, the similarity between the marks, the degree to which the allegedly-infringing service competes with the mark-owner's service, the alleged infringer's intent to confuse the public, and evidence of actual confusion. *See Devon Park*, 634 F.3d at 1009. No one factor controls, and because the inquiry is inherently

---

[16] Infogroup also invoked the Trade Practices Act and the Consumer Protection Act in support of this claim in its supplemental memorandum. The Court does not discuss these statutes separately, for the same reasons explained above. *See supra*, n.11.

- 18 -

case-specific, different factors may be entitled to more weight in different cases. *Id.*

Of course, at this point, the degree of similarity is not a relevant criterion, because only Infogroup's marks are at issue—Infogroup's theory is that DatabaseUSA is using Infogroup's marks in a manner that could confuse the public.[17] *See Masters*, 631 F.3d at 473. So, this case does not fit neatly into the rubric set forth above. Courts considering similar facts have, instead, considered whether the allegedly-infringing use comports with the nominative fair use doctrine, which is implicated when the defendant uses the plaintiff's mark to describe the *plaintiff's* product. *See, Playboy Enters. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2002); *Commerce Bankcorp, LLC v. Hill*, Civil No. 08-5628, 2010 WL 2545166 (D.N.J. June 18, 2010); *Maurag, Inc. v. Bertuglia*, 494 F. Supp. 2d 395, 398 (E.D. Va. 2007); *cf. Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 611-12 (6th Cir. 2009).

The Ninth Circuit has said that whether a defendant is entitled to nominative fair use depends on whether the product or service is readily identifiable without use of the mark, whether only so much of the mark is used as is reasonably necessary to identify the product, and whether the user has done anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder. *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992). In other words, the defendant's conduct or language must reflect the true and accurate relationship between plaintiff and defendant's products or services. *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 222 (3d Cir. 2005). The Eighth Circuit has not discussed the doctrine, and the Ninth Circuit's approach has not been universally adopted, but the broad parameters of the doctrine are consistent. *See Dwyer Instruments, Inc. v. Sensocon, Inc.*, 873 F. Supp. 2d 1015, 1030 (N.D. Ind. 2012); *see also Bd. of Supervisors v. Smack Apparel Co.*, 550 F.3d 465, 489 (5th Cir. 2008); *cf. Swarovski Aktiengesellschaft v. Building No. 19, Inc.*, 704 F.3d 44, 49-53 (1st Cir. 2013); *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 154 (4th Cir. 2012); *Tiffany (NJ) v. eBay, Inc.*, 600 F.3d 93, 102 (2d Cir. 2010).

---

[17] Infogroup also presented evidence of DatabaseUSA's use of "-genie" as a suffix for various services, apparently in an attempt to play off Infogroup's "Salesgenie" mark. Hr'g Ex. 4. But Infogroup's complaint does not allege a claim for relief based on mark infringement of that nature. *See* filing 23. In other words, the claim presented in the pleadings is that DatabaseUSA is using Infogroup's marks in a way that falsely suggests an affiliation—not that DatabaseUSA is using its own, but confusingly similar, marks. Absent such a claim, the Court does not view the use of "-genie" as particularly relevant, although the Court will admit the evidence for what weight it has.

And in this case, Gupta's identification of himself as the founder of Infogroup and its associated entities is accurate—and Gupta is entitled to accurately describe his experience in the industry when marketing his company's products and services.[18] For instance, in *Bertuglia*, the court dismissed a trademark claim that was based on a defendant restauranteur's description of himself as the "former owner" of a popular restaurant in advertising for his new restaurants. 494 F. Supp. 2d at 398. The court found that the defendant "did not use the accused phrases for the purpose of luring customers into his restaurants under false pretenses. Rather, [he] intended to convey that if a customer liked [his old restaurant] in the past, that customer may also like his new restaurants." *Id.*; *cf. Hensley*, 579 F.3d at 612. Similarly, in *Welles*, the Ninth Circuit found that a former "Playmate of the Year" was entitled to describe herself as such on her personal Web site (although some of her uses of the plaintiff's mark were excessive). 279 F.3d at 802-04. The Court of Appeals reasoned that the marks were clearly used to describe the title she had been awarded by the plaintiff, "a title that helps describe who she is." *Id.* at 803. And in *Hill*, the court found that a defendant was entitled to make use of his former employer's marks in autobiographical material that was part of a presentation the defendant made for his new consulting business (although the Court denied the defendant summary judgment because he might have used the marks too many times). 2010 WL 2545166, at *15.

Granted, some of Gupta's descriptions come very close to the line.[19] But on balance, the Court finds that Gupta's descriptions of his experience are sufficiently accurate to avoid preliminary injunctive relief—particularly the sweeping injunction sought by Infogroup against any marketing materials "to the effect that Gupta founded InfoUSA, or any Infogroup company."[20] Filing

---

[18] The letter from President Clinton to Gupta is factually a bit distinct, but the conclusion is the same: Infogroup does not dispute that the letter is genuine, and it is clearly dated 1998. The obvious purpose of publicizing it is to suggest that Gupta is an important person, not that he is still associated with Infogroup. It happened, and Gupta is entitled to say so.

[19] He should, for instance, strongly consider avoiding the word "proprietor," as opposed to "founder," and may want to think about confining himself to relatively unambiguous phrases such as "founder and former CEO." The fact that Infogroup's motion for preliminary injunction is denied does not mean this case is over.

[20] To the extent that the other terms of proposed injunction are less sweeping, such as enjoining marketing materials "claiming or suggesting the existence of any past or present association with Infogroup," they are troublingly vague. An injunction must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). It is questionable whether some terms of Infogroup's proposed instruction are consistent with those standards.

- 20 -

81 at 24. Whether considered under the nominative fair use doctrine or the ordinary (if somewhat ill-fitting) rubric set forth in *Devon Park*, 634 F.3d at 1009, and other cases, the Court's conclusion is the same: DatabaseUSA's use of Infogroup's marks has not been shown, at this point, to create a sufficient likelihood of confusion to establish Infogroup's likelihood of succeeding on the merits of its mark infringement claim.[21]

Nor, the Court finds, has Infogroup sufficiently demonstrated actual confusion on the part of consumers. Infogroup's evidence of confused consumers is, again, anecdotal at best. The only instance of confusion that was clearly tied to any of Gupta's representations was the letter sent to a "loyal customer" which led the customer to call Infogroup and ask about the mailing. Filing 14-1 at 8-9. But the precise nature of the customer's inquiry is not reflected in the record. *See* filing 14-1 at 8-9; Hr'g Ex. 2; *see also Duluth News-Tribune, Inc. v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996) ("vague evidence of misdirected phone calls and mail" was "hearsay of a particularly unreliable nature given the lack of an opportunity for cross-examination of the caller or sender regarding the reason for the 'confusion'"). And even then, the fact that the customer called to ask "indicates a distinction in the mind of the questioner, rather than confusion." *Id.*

The evidence does not directly connect the other instances of purported confusion proffered by Infogroup to any conduct by Gupta or DatabaseUSA. The Court finds that evidence "to be de minimis and to show inattentiveness on the part of the caller or sender rather than actual confusion." *Id.* The various Infogroup and DatabaseUSA entities do similar business, and the prefixes "info-" and "data-" have similar connotations and can only be conjoined in so many ways. To be candid, it would be surprising if someone *hadn't* confused them at some point, particularly when at least some customers apparently use both businesses. Ask enough people and you could probably find someone who thought infofree.com and Infowars.com were somehow associated.[22]

The Court does not find the evidence offered by Infogroup to be persuasive evidence of actual confusion, much less confusion attributable to DatabaseUSA's use of Infogroup's marks. The Eighth Circuit has said, for purposes of summary judgment, that "even several isolated incidents of actual confusion" may be "insufficient to establish a genuine issue of material

---

[21] Some possibility of consumer confusion is consistent with a fair use defense. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121-22 (2004). But the Court finds no significant possibility to have been proven in this case at this point.

[22] To be clear, they aren't. It is unlikely that Gupta and Alex Jones would have much in common.

fact as to the likelihood of confusion." *Id.* Evidence that could not prevent summary judgment is surely insufficient to warrant a preliminary injunction.

Unrelated to Gupta's résumé, Infogroup argues that DatabaseUSA's use of search engine ad placement services, triggered by Infogroup's marks, is somehow infringing. Filing 81 at 6-7. The Court is unpersuaded. Although the use of such targeted advertising can be misused, it is generally understood that such tactics can be deployed consistently with the Lanham Act. *See*, *CollegeSource, Inc. v. AcademyOne, Inc.*, ___ F. App'x ___, 2015 WL 469041, at *11 (3d Cir. Feb. 5, 2015); *1-800-Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242-45 (10th Cir. 2013); *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1148-54 (9th Cir. 2011); *compare N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1222-23 (11th Cir. 2008) (advertisers created likelihood of confusion by using competitors Web address and trademarks in their own advertisements). The advertisements at issue here, as displayed by Infogroup's exhibits, do not use Infogroup's marks in the advertisement itself, and each is either separated from the search results or plainly labeled as a sponsored advertisement. *See*, filing 82-1 at 25; filing 82-2 at 5, 7. As the Tenth Circuit explained:

> Perhaps in the abstract, one who searches for a particular business with a strong mark and sees an entry on the results page will naturally infer that the entry is for that business. But that inference is an unnatural one when the entry is clearly labeled as an advertisement and clearly identifies the source, which has a name quite different from the business being searched for.

*Lens.com*, 722 F.3d at 1245. And that could explain why Infogroup has presented no evidence to suggest that anyone has actually been confused by the advertisements, or is likely to be. Having considered "(1) the strength of the mark; (2) the evidence of actual confusion; (3) the type of goods and degree of care likely to be exercised by the purchaser; and (4) the labeling and appearance of the advertisements and the surrounding context on the screen displaying the results page," the Court finds that Infogroup has not shown a likelihood of success under the Lanham Act based on DatabaseUSA's search engine advertisements. *See Network Automation*, 638 F.3d at 1154.

One final note: Infogroup also contends that the "60 Minutes" references, and description of DatabaseUSA as having been creating databases "since 1972," somehow support its false association claim. Filing 81 at 16-17. But neither the "60 Minutes" excerpts, nor the slogan, make any direct reference to Infogroup. Because Database's conduct in this regard does

not actually make use of Infogroup's marks, it does not support a claim under § 1125(a)(1)(A). Perhaps they could be false advertisements—but, as noted above, Infogroup has not asked the Court to enjoin them as such, so that issue is not presented by the motion before the Court.[23]

### (ii) False Advertising Claim

Infogroup also contends that by implying a connection between DatabaseUSA and Infogroup, DatabaseUSA is falsely advertising its services. As discussed above, a false advertising claim requires proof of a false statement of fact in a commercial advertisement that had a tendency to deceive, was material to the purchasing decision, and injured the plaintiff. *See*, *Buetow, 650 F.3d at 1182*; *Clorox Co., 140 F.3d at 1180*.

But, although the factors are phrased differently, the Court's reasoning with respect to Infogroup's false association theory is equally dispositive of its false advertising theory. The challenged statements were not literally false, and were (at most) misleading in isolated instances. Saying that the challenged advertising was not likely to confuse consumers is effectively the same as saying that it had no tendency to deceive them. Absent persuasive evidence of actual confusion, there is also no persuasive evidence of injury to Infogroup. And as explained above, without evidence of actual or imminent injury, Infogroup can demonstrate neither a likelihood of prevailing on the merits nor the irreparable injury necessary for a preliminary injunction.

### (iii) Remaining Dataphase Factors

For the reasons explained above, the Court finds that Infogroup has shown neither a likelihood of success on the merits, nor a likelihood of irreparable injury, for its claims based on allegedly-false representations about the association between Infogroup and DatabaseUSA. That is enough to deny Infogroup's motion for preliminary injunction. *See*, *Barrett, 705 F.3d at 320*; *Dataphase, 640 F.2d at 114 n.9*. But for the sake of completeness, the remaining *Dataphase* factors do not help Infogroup. The public interest is again not implicated, except to the extent that it might favor permitting Gupta to make truthful statements about his experience in the field, so that consumers can make fully-informed choices. The balance of harms does not swing as far in DatabaseUSA's favor on these claims, because unlike with the "verified" data, it would not be as disruptive to DatabaseUSA's business operations (as opposed to its marketing) to preclude its use of Infogroup's

---

[23] That said, there's an argument to be made that they're misleading, so DatabaseUSA would be well advised to knock it off.

marks. But because Infogroup has not shown how it would be injured, the balance of harms still favors DatabaseUSA.

In sum, the Court finds when the *Dataphase* factors are applied to each of Infogroup's claims, Infogroup has not met its burden of establishing the propriety of preliminary injunctive relief. Infogroup's motion for preliminary injunction (filing 12) will be denied.

## 2. MOTION TO STRIKE

Infogroup moves the Court to strike DatabaseUSA's affirmative defenses pursuant to Fed. R. Civ. P. 12(f). Filing 61. Infogroup complains that DatabaseUSA has failed to allege facts supporting its affirmative defenses, and that some fail as a matter of law. Filing 61.

But as a preliminary matter, the Court must address the appropriate standard for such a motion. Specifically, the question is whether the elevated pleading requirements of Fed. R. Civ. P. 8(a), as explicated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), also apply to affirmative defenses stated pursuant to Rule 8(c)(1). Neither the Supreme Court nor any circuit court has considered the question, and district courts are sharply divided.[24] This Court, however, is persuaded that *Iqbal* and *Twombly* should not be applied in this context.

To begin with, the Eighth Circuit's law is clear regarding motions to strike affirmative defenses: while the Court enjoys "liberal discretion" to strike pleadings under Fed. R. Civ. P. 12(f), it is "an extreme and disfavored measure." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007); *Stanbury Law Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir. 2000). A motion to strike a defense will be denied if the defense is sufficient as a matter of law or if it fairly presents a question of law or fact which the Court ought to hear. *Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir. 1977). And while defenses must be asserted in a responsive pleading, they need not be articulated with any rigorous degree of specificity, and may be sufficiently raised for purposes of Rule 8 by their bare assertion. *See Zotos v. Lindbergh Sch. Dist.*, 121 F.3d 356, 361 (8th Cir. 1997).

---

[24] There is, in fact, not even a consensus on the majority rule. Compare *Alston v. Equifax Info. Servs., LLC*, No. 13-934, 2014 WL 580148, at *2 (D. Md. Feb. 11, 2014) (majority view applies *Iqbal/Twombly* to affirmative defenses), and *Lakeside Roofing Co. v. Nixon*, No. 4:10-cv-1761, 2011 WL 2600421, at *1 n.3 (E.D. Mo. June 29, 2011) (same), with *U.S. Commodity Trading Comm'n v. U.S. Bank, N.A.*, No. 13-cv-2041, 2014 WL 294219, at *10 (N.D. Iowa Jan. 27, 2014) (at first majority of courts applied *Iqbal/Twombly*, but that is now minority position), and *Powers v. Fifth Third Mortg. Co.*, No. 1:09-cv-2059, 2011 WL 3418290, at *3 n.2 (N.D. Ohio Jul. 18, 2011) (majority of courts have rejected application of *Iqbal/Twombly*). But this Court need not resort to nose-counting to decide a question of law.

Of course, *Zotos* precedes the Supreme Court's decisions in *Iqbal* and *Twombly*. The Eighth Circuit, if presented with the question, might well conclude that *Zotos* has been abrogated by *Iqbal* and *Twombly* (although it is unlikely to do so, for the reasons explained below). But *Zotos* is squarely on point, and *Iqbal* and *Twombly* are not, which means *Zotos* remains the law of this Circuit. *Strauss v. Centennial Precious Metals, Inc.*, 291 F.R.D. 338, 342-43 (D. Neb. 2013); *Bank of Beaver City v. Sw. Feeders, L.L.C.*, No. 4:10-CV-2309, 2011 WL 4632887, at *5-8 (D. Neb. Oct. 4, 2011). As far as this Court is concerned, it is the Eighth Circuit's prerogative to overrule its own decisions. *See*, *Rodriguez de Quijas v. Shearson/Am. Express*, 490 U.S. 477, 484 (1989); *Hood v. United States*, 342 F.3d 861, 864 (8th Cir. 2003); *Okruhlik v. Univ. of Ark.*, 255 F.3d 615, 622 (8th Cir. 2001).

But even if faced with an open question, the Court would hold that the *Iqbal*/*Twombly* standard does not apply. To plead a claim for relief, Rule 8(a)(2) requires, as relevant, a "short and plain statement of the claim showing that the pleader is entitled to relief." This, the Supreme Court explained in *Twombly*, "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." 550 U.S. at 555 n.3. The Supreme Court's holding in *Twombly*, and its iteration of that standard in *Iqbal*, were expressly grounded on Rule 8(a)(2)'s language requiring a "showing" of the pleader's entitlement to relief. *See*, *e.g.*, *Iqbal*, 556 U.S. at 679; *Twombly*, 550 U.S. at 556-56. But the terms of Rule 8(c)(1) require no such "showing": rather, a party is only required to "affirmatively state any avoidance or affirmative relief." Several district courts have relied on that distinction in concluding that the reasoning of *Iqbal* and *Twombly* does not apply with equal force to Rule 8(c). *See*, *Phelps v. City of Parma, Idaho*, No. 14-cv-85, 2015 WL 893112, at *2 n.2 (D. Idaho Mar. 2, 2015); *Sibley v. Choice Hotels Int'l, Inc.*, 304 F.R.D. 125, 132 (E.D.N.Y. 2015); *Fed. Trade Comm'n v. AMG Servs., Inc.*, No. 2:12-CV-536, 2014 WL 5454170, at *5-6 (D. Nev. Oct. 27, 2014); *Hansen v. R.I.'s Only 24 Hour Truck & Auto Plaza, Inc.*, 287 F.R.D. 119, 122 (D. Mass. 2012); *Kohler v. Staples the Office Superstore, LLC*, 291 F.R.D. 464, 468-69 (S.D. Cal. 2013); *Bank of Beaver City*, 2011 WL 4632887, at *6-7; *Falley v. Friends Univ.*, 787 F. Supp. 2d 1255, 1258 (D. Kan. 2011); *Lane v. Page*, 272 F.R.D. 581, 591-94 (D.N.M. 2011); *but see*, *e.g.*, *Dodson v. Strategic Rests. Acquisition Co. II, LLC*, 289 F.R.D. 595, 600 (E.D. Cal. 2013).[25]

---

[25] That conclusion is bolstered by Fed. R. Civ. P. App. of Forms, Form 30, which provides an example of an answer presenting an affirmative defense which is stated in very general terms—it is, in fact, only a sentence long. Because a pleading that complies with one of the official Forms cannot be attacked, the brevity of Form 30 suggests that *Iqbal* and *Twombly* do not apply. *Lane*, 272 F.R.D. at 594; *see Falley*, 787 F. Supp. 2d at 1258. Of course, *Iqbal* and *Twombly* were decided after Form 30 was most recently amended. *See AMG Servs.*,

And there is good reason to make such a distinction. As courts have also observed, a complaint and an answer place asymmetrical demands on the parties. The time for filing a complaint and pleading a claim for relief is generally bounded only by the statute of limitations, while a defendant asserting an affirmative defense must, absent an extension, file a responsive pleading containing all its affirmative defenses within 21 days of service. *See* Fed. R. Civ. P. 12. It would, therefore, be somewhat unreasonable to hold the defendant to the same pleading standard as the plaintiff, given the limited time that the defendant has to respond. *See,* *Phelps,* 2015 WL 983112, at *2 n.2; *Sibley,* 304 F.R.D. at 133; *Hansen,* 287 F.R.D. at 123; *Kohler,* 291 F.R.D. at 469; *Bank of Beaver City,* 2011 WL 4632887, at *6-7; *Falley,* 787 F. Supp. 2d at 1258-59; *Lane,* 272 F.R.D. at 595-96. Of course, those deadlines are not inflexible: the time to file a responsive pleading can be extended, and leave to amend a responsive pleading may be obtained even after that. *See,* *AMG Servs.,* 2014 WL 5454170, at *8; *Dodson,* 289 F.R.D. at 602. And some asymmetry is already tolerated with respect to defendants who must file counterclaims. But the Court need not exacerbate it further, particularly where the textual foundation of *Iqbal* and *Twombly* is absent.

It is, of course, not the Court's place to question whether *Iqbal* and *Twombly* are themselves sound policy, or consistent with the plain language of the Federal Rules of Civil Procedure—but the Court need not extend them further absent clear authority compelling that conclusion. Whatever its faults, the *Iqbal/Twombly* standard, when applied to claims for relief, at least helps resolve cases. Applying that standard to affirmative defenses, however, merely invites motions to strike—and while "[m]otions to dismiss help resolve cases; motions to strike, in most cases, waste everyone's time." *Lane,* 272 F.R.D. at 586. In sum, neither the language of Rule 8 nor basic principles of fairness and practicality weigh in favor of applying the *Iqbal/Twombly* standard to affirmative defenses, and the Court declines to do so.

Infogroup contends, in the alternative, that the Court should strike at least some of DatabaseUSA's affirmative defenses regardless of whether the *Iqbal/Twombly* standard is applied. Infogroup complains that some of the affirmative defenses are "bare bones" conclusions insufficient to provide notice, and that others are not actually affirmative defenses. Filing 62 at 9-11. The Court is not persuaded.

As noted above, striking an affirmative defense is "an extreme and disfavored measure." *BJC Health Sys.,* 478 F.3d at 917; *Stanbury Law Firm,*

---

2014 WL 5454170, at *8. But other forms have been amended since then, and Form 30 was left alone. Compare, Fed. R. Civ. P. App. of Forms, Forms 52 and 60. And the Court is not at liberty to ignore Fed. R. Civ. P. 84's clear admonition that "[t]he forms in the Appendix suffice under these rules. . . ."

221 F.3d at 1063. Motions to strike are often considered "time wasters," and should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy. *Lane*, 272 F.R.D. at 587 (citing 5C C. Wright and A. Miller, *Fed. Prac. & Proc. Civ.* § 1382 (3d ed. 2004); *see Lunsford*, 570 F.2d at 229. And Infogroup does not explain how it is prejudiced by the alleged defects in DatabaseUSA's pleading.[26] *See*, *Person v. Heartland Emp't Servs, LLC*, No. 1:14-cv-1297, 2014 WL 6980572, at *1 (C.D. Ill. Dec. 10, 2014); *U.S. Commodity Futures Trading Comm'n v. A.S. Templeton Grp.*, 297 F. Supp. 2d 531, 533 (E.D.N.Y. 2003); *FDIC v. Niblo*, 821 F. Supp. 441, 448-49 (N.D. Tex. 1993); *SEC v. Toomey*, 866 F. Supp. 719, 721-22 (S.D.N.Y. 1992); *FDIC v. Ashley*, 749 F. Supp. 1065, 1066 (D. Kan. 1990); *Lunsford v. United States*, 418 F. Supp. 1045, 1051-52 (D.S.D. 1976), *aff'd*, 570 F.2d 221.

Nor is the Court cited to any authority for Infogroup's repeated demands that the Court strike DatabaseUSA's affirmative defenses "with prejudice." *E.g.* filing 62 at 1. The remedy for striking defenses at this stage of the litigation is often to permit amendment later. *Falley*, 787 F. Supp. 2d at 1259. And leave to amend a pleading to add a defense is to be freely given—it should be denied "only where it will result in 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.'" *Dennis v. Dillard Dep't Stores, Inc.*, 207 F.3d 523, 525-26 (8th Cir. 2000); *see also Joseph v. Allen*, 712 F.3d 1222, 1226 n.3 (8th Cir. 2013) (amendment adding affirmative defense should be allowed with liberality, even after motion for summary judgment has been filed). The intent of Rule 12(f) is to "minimize delay, prejudice, and confusion"—not *create* it by establishing a cycle of pleading and striking and repleading. *See Falley*, 787 F. Supp. 2d at 1259 (citation and quotation omitted). The Court is not inclined, at this point in the proceedings, to accept Infogroup's apparent

---

[26] The Court particularly notes Infogroup's contention that two defenses should be stricken because they are not "affirmative defenses" but, rather, assert defects or denials of Infogroup's prima facie case. *See* filing 62 at 10-11. The deficiency of the answer, according to Infogroup, seems to be that some of the defenses listed under the heading "Affirmative Defenses" are not actually affirmative enough. The Court does not believe the distinction is worth parsing at this point. Such matters need not be pleaded, see *Masuen v. E.L. Lien & Sons, Inc.*, 714 F.2d 55, 57 (8th Cir. 1983), but they are hardly worth striking. *See*, *Joe Hand Promotions, Inc. v. Ridgway*, No. 6:14-CV-3401, 2015 WL 1321477, at *3 (W.D. Mo. Mar. 24, 2015) (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1269 (3d ed. 2014)); *Bank of Beaver City*, 2011 WL 4632887, at *9-10.

invitation to take a blue pencil to DatabaseUSA's answer, so Infogroup's motion to strike (filing 61) will be denied.

### 3. MOTION TO DISMISS

Infogroup has moved to dismiss two of DatabaseUSA's counterclaims—specifically, its tortious interference and unjust enrichment claims. *See* filing 63. Infogroup also, in its motion to dismiss, moves the Court to strike what it calls "undisclosed facts" cited in support of the counterclaims. *See* filing 63.

To survive a motion to dismiss for failure to state a claim, a pleading must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Rule 8(a)(2). This does not require detailed factual allegations, but it demands more than an unadorned accusation. *Iqbal*, 556 U.S. at 678. The pleading need not contain detailed factual allegations, but must provide more than labels and conclusions; a formulaic recitation of the elements of a cause of action will not suffice. *Twombly*, 550 U.S. at 555. For the purposes of a motion to dismiss a court must take all of the factual allegations in the pleading as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.* And the pleading must also contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 678.

#### (a) Tortious Interference

DatabaseUSA alleges that Infogroup knows that customers come to DatabaseUSA's Web sites looking for information about its products and services, and that Infogroup made false statements about DatabaseUSA's products and services for the purpose of interfering with its business expectancies. Filing 60 at 40. Infogroup asserts that this claim fails because DatabaseUSA has alleged neither that the alleged interference caused any harm, nor that it was damaged. Filing 64 at 5. DatabaseUSA, Infogroup argues, "do[es] not identify any prospective customers who reviewed any alleged false statements made by plaintiffs about any products, or that any such customers declined to purchase defendants' services because of any false statements. Nor do[es DatabaseUSA] allege any facts from which this conclusion can reasonably be inferred." Filing 64 at 5. In response, DatabaseUSA directs the Court to allegations found elsewhere in the answer, and incorporated by reference into its tortious interference counterclaim: that agents of Infogroup left false reviews on DatabaseUSA's Web sites for the purpose of harming its reputation. Filing 60 at 34; filing 72 at 3.

To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the

relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. *Steinhausen v. HomeServices of Neb., Inc.*, 857 N.W.2d 816, 831 (Neb. 2015). The interference must impact a valid business relationship or expectancy, and the relationship or expectancy interfered with must belong to the party asserting the claim. *Id.*

Although Nebraska law is not fully developed on this point, it is true that proving a business expectancy "valid" will generally require proof that there was a reasonable likelihood or probability of a business relationship. *See*, *e.g.*, *Lucas v. Monroe Cnty.*, 203 F.3d 964, 978 (6th Cir. 2000) (applying Michigan law); *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 221-22 (Minn. 2014). And this may require proof of a potential relationship with a particular party, or at least a class of parties. *See*, *Lucas*, 203 F.3d at 978; *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1191 (11th Cir. 1999) (applying Florida law); *Gieseke*, 844 N.W.2d at 222. But this case is at the pleading stage, not the proving stage. The Court finds that DatabaseUSA's pleading sufficiently alleges the existence of a group of potential customers who may have been diverted from doing business with it by a wrongful act of Infogroup. *See TYR Sport Inc. v. Warnaco Swimwear, Inc.*, 679 F. Supp. 2d 1120, 1139-40 (C.D. Cal. 2009) (citing *Cook v. Winfrey*, 141 F.3d 322, 328 (7th Cir. 1998)); *see also Am. Home Assurance Co. v. Greater Omaha Packing Co.*, No. 8:11-CV-270, 2012 WL 2061941, at *2 (D. Neb. 2012). Accordingly, the Court will not dismiss DatabaseUSA's tortious interference claim.

### (b) Unjust Enrichment

Infogroup also moves to dismiss DatabaseUSA's unjust enrichment claim. Filing 64 at 6-7. DatabaseUSA alleges that Infogroup has received "substantial financial benefit" as a result of "tortious and improper conduct, including but not limited to unfair competition and deceptive trade practices." Filing 60 at 40. So, DatabaseUSA asserts that it would be "inequitable and unjust for Infogroup to retain the revenue[,]" which should be disgorged to DatabaseUSA. Filing 60 at 40-41. Infogroup argues that in Nebraska, unjust enrichment contemplates a quasi-contractual arrangement between the plaintiff and defendant which was not pled here. Filing 64 at 6.

To recover under a theory of unjust enrichment in Nebraska, one must allege facts that the law of restitution would recognize as unjust enrichment. *City of Scottsbluff v. Waste Connections of Nebraska*, 809 N.W.2d 725, 743 (Neb. 2011). Restitution constitutes an independent basis of liability comparable to a liability in contract or tort. *Id.* Unjust enrichment may

result, as Infogroup contends, from a transaction that the law treats as ineffective to work a conclusive alteration in ownership rights. *Id.* But there may also be cases in which the remedy for unjust enrichment gives the plaintiff something, such as the defendant's wrongful gain, that the plaintiff did not previously possess. *See* Restatement (Third) of Restitution and Unjust Enrichment § 1, cmt. a (2011). As the Restatement (Third) explains, the "inherent flexibility" of the concept of unjust enrichment means that

> almost every instance of a recognized liability in restitution might be referred to the broad rule of the present section. The same flexibility means that the concept of unjust enrichment will not, by itself, yield a reliable indication of the nature and scope of the liability imposed by this part of our legal system. It is by no means obvious, as a theoretical matter, how "unjust enrichment" should best be defined; whether it constitutes a rule of decision, a unifying theme, or something in between; or what role the principle would ideally play in our legal system.

*Id.* But the Restatement—and the Nebraska Supreme Court—reject the view that "restitution" is limited to a *remedy*. *Id.*, cmt. e(3); *see Waste Connections, 809 N.W.2d at 743*. Instead, the Restatement explains, while "a claim for restitution or 'disgorgement' of the profits of conscious wrongdoing . . . normally incorporates as its predicate the substantive elements of a cause of action for tort or other breach of duty[,]" the Restatement

> generally refers to the wrongdoer's unjust enrichment in such cases as a parallel source of liability: the defendant, in other words, is liable both on a theory of tort and (alternatively) on a theory of unjust enrichment. Some observers prefer to characterize restitution in this context as an alternative remedy (the alternative being damages) for a single underlying wrong. Nothing practical turns on this disagreement except the identification of the applicable period of limitations, and the history of the field rebuts any suggestion that there is only one way such a claim may properly be pleaded. Ordinarily, a complaint that alleges profitable wrongdoing by the defendant states a claim for restitution of unjust enrichment as well as a claim for damages in tort . . . .

*Id.* (citation omitted).

DatabaseUSA's allegations fall within the scope of unjust enrichment for which restitution may be available under the Restatement (Third): "A

person who obtains a benefit by conscious interference with a claimant's legally protected interests (or in consequence of such interference by another) is liable in restitution as necessary to prevent unjust enrichment . . . ." Restatement (Third) of Restitution and Unjust Enrichment § 44. "Conscious interference with property rights of any kind, with contractual expectations, or with other interests to which the law of torts extends a similar protection, will support the claim in restitution described in this section." *Id.*, cmt. b.

The Nebraska Supreme Court has adopted the Restatement (Third) view of unjust enrichment. *See, United Gen. Title Ins. Co. v. Malone*, 858 N.W.2d 196, 232-13 (Neb. 2015); *Waste Connections*, 809 N.W.2d at 738-48. Accordingly, the Court finds that DatabaseUSA has adequately stated a claim for unjust enrichment under Nebraska law. Infogroup's motion to dismiss will be denied.

(c) "Undisclosed Facts"

Infogroup also complains about a handful of references in the answer to "additional facts" that are confidential, and thus unpled, but which will also (according to DatabaseUSA) support some of its counterclaims. Filing 60 at 37-39; filing 64 at 1. Infogroup insists that these allegations should be stricken "with prejudice" and that DatabaseUSA should be precluded from relying on them, or, in the alternative, that the Court should order DatabaseUSA to amend its answer. Filing 64 at 1-2.

This matter is easily disposed of. The Court has already explained its view on striking "with prejudice" and will not revisit it. Nor is the complained-of language prejudicial to Infogroup: it is mere surplusage, which does not affect the issues. *Bd. of Comm'rs of Lake Cnty. v. Keene Five-Cents Sav. Bank*, 108 F. 505, 515 (8th Cir. 1901); *see Moran v. Judson*, 96 F.2d 551, 552-53 (D.C. Cir. 1938); *cf. United States v. DeRosier*, 501 F.3d 888, 897 (8th Cir. 2007). Infogroup does not contend that the relevant claims are not well stated without them. *See Bd. of Comm'rs*, 108 F. at 515. The Court *could* strike such allegations. *Cf. DeRosier*, 501 F.3d at 897. But the Court sees no need to do so.

III. CONCLUSION

For the reasons explained above, Infogroup's various motions are denied. One final matter: the Court has, in reaching its conclusions, relied upon and described some of the contents of documents that were filed as restricted-access pursuant to NEGenR 1.3(a)(1)(B)(ii) and NECivR 5.3(c) and the protective order agreed to by the parties. Filing 29. However, it has not always been clear to the Court what information in those documents was intended to be confidential.

The Court has endeavored to avoid including information in this memorandum and order that would require it to be restricted as well. The Court has done so because under the common law, judicial records and documents have been historically considered to be open to inspection by the public. *In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 573 (8th Cir. 1988); *see also Nixon v. Warner Commc'ns*, 435 U.S. 589, 597 (1978). Accordingly, there is a common-law presumption in favor of public access to judicial records.[27] *United States v. McDougal*, 103 F.3d 651, 657 (8th Cir. 1996); *see also, IDT Corp. v. eBay*, 709 F.3d 1220, 1222 (8th Cir. 2013); *Webster Groves*, 898 F.2d at 1376; *United States v. Webbe*, 791 F.2d 103, 106 (8th Cir. 1986). This right of access bolsters public confidence in the judicial system by allowing citizens to evaluate the reasonableness and fairness of judicial proceedings and keep a watchful eye on the workings of public agencies. *IDT Corp.*, 709 F.3d at 1222; *see also Nixon*, 435 U.S. at 597-98. It also provides a measure of accountability to the public at large, which pays for the courts. *IDT Corp.*, 709 F.3d at 1222; *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980).

But records or parts of records are sometimes sealed for good reasons, including the protection of state secrets, trade secrets, and informers; and to protect the privacy of children, rape victims, and other particularly vulnerable parties or witnesses. *See Doe v. Blue Cross & Blue Shield United of Wisc.*, 112 F.3d 869, 872 (7th Cir. 1997); *see also* NECivR 5.3(b). So, when determining whether access to a document should be restricted, the Court must consider the degree to which sealing a judicial record would interfere with the interests served by the common-law right of access and balance that interference against the interests served by maintaining confidentiality of the information sought to be sealed. *IDT Corp.*, 709 F.3d at 1222.

As noted, the Court is not aware of anything in this memorandum and order that implicates confidentiality to the extent necessary to overcome the strong presumption of public access to a court order. But from an excess of caution, the Court will *provisionally* restrict access to this memorandum and order to attorneys of record and court users. That restriction will be lifted on April 3, 2015, in the absence of a *persuasive* objection from a party.

---

[27] There may be a constitutional presumption as well, but neither the Supreme Court nor the Eighth Circuit have definitively spoken as to whether there is a First Amendment right of access to civil proceedings. *See Webster Groves Sch. Dist. v. Pulitzer Publ'g Co.*, 898 F.2d 1371, 1376-77 (8th Cir. 1990).

- 32 -

IT IS ORDERED:

1.      Infogroup's motion for preliminary injunction (filing 12) is
        denied.

2.      Infogroup's motion to strike (filing 61) is denied.

3.      Infogroup's motion to dismiss (filing 63) is denied.

4.      The Clerk of the Court is directed to provisionally restrict
        access to this Memorandum and Order to attorneys of
        record and court users, pursuant to NEGenR 1.3(a)(1)(B)(ii)
        and NECivR 5.3(c).

5.      The parties are directed to notify the Court on or before
        April 2, 2015, whether they have any objection to lifting the
        access restriction that has been provisionally placed on this
        memorandum and order and, if they object, to provide the
        factual basis and legal authority supporting such objection.

6.      The Clerk of the Court is directed to set a case
        management deadline of April 3, 2015, with the following
        docket text: "Check for objection to public access to
        memorandum and order."

Dated this 30th day of March, 2015.

                                BY THE COURT:


                                John M. Gerrard
                                United States District Judge